1 CIT- PCT 1

FILED
4/9/2021 3:42 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
JAVIER HERNANDEZ DEPUTY

DC-21-04504

NO. _____

| | | |
|---|---|---|
| **TITLEMAX OF TEXAS, INC.,** | § | **IN THE DISTRICT COURT** |
| **IVY FUNDING COMPANY LLC,** | § | |
| **and NCP FINANCE LIMITED** | § | |
| **PARTNERSHIP,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **DALLAS COUNTY, TEXAS** |
| **v.** | § | |
| | § | 298th |
| **CITY OF DALLAS,** | § | |
| | § | |
| **Defendant.** | § | _____ **JUDICIAL DISTRICT** |

## PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION

TitleMax of Texas, Inc. ("TitleMax"), Ivy Funding Company LLC ("Ivy"), and NCP Finance Limited Partnership ("NCP") (Ivy and NCP collectively the "Lenders"), file this Verified Original Petition for Declaratory Relief and Application for Temporary and Permanent Injunctive Relief complaining of the City of Dallas, Texas (the "City"), and plead as follows:

1. Through its facilitation of title loans and unsecured personal loans for its non-affiliated Lenders, Plaintiff TitleMax of Texas, Inc. has helped provide cash to meet financial emergencies for tens of thousands of residents of the City of Dallas. In virtually every instance, those who come to TitleMax for assistance otherwise would have no source of emergency cash or would be forced into less desirable, and in many cases financially ruinous, borrowing alternatives. However, well-meaning elected officials misunderstand—and accordingly harbor a misplaced distaste for—the short-term financial services TitleMax, its Lenders, and competitors provide for low- and moderate-income Dallas residents. Accordingly, the City recently amended an already-restrictive ordinance to impose new limitations on the short-term financial services industry, in the process severely limiting access to essential emergency credit for Dallas citizens

**EXHIBIT**

**2**

**PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**

5

protecting—but in actuality harming—the residents whom those officials were elected to serve, the City has severely limited TitleMax's and its Lenders' title-secured services and entirely eliminated its business of facilitating unsecured personal loans.  Among its deficiencies, the City's ordinance is pre-empted by the state's comprehensive legislation  governing short-term lending; it exceeds the City's powers as a home-rule city; and it deprives TitleMax, Ivy, and NCP of the due course of law guaranteed by this State's Constitution and the due process of law guaranteed by the United States Constitution.  Plaintiffs accordingly seek and are entitled to the declaratory and injunctive relief sought by this Petition.

## PARTIES

2.      Plaintiff TitleMax is a Delaware corporation headquartered in Georgia.

3.      Plaintiff Ivy is a limited liability company organized under the laws of the State of Texas.

4.      Plaintiff NCP is a limited partnership organized under the laws of the State of Ohio.

5.      Defendant City of Dallas is a municipal corporation existing under the laws of the State of Texas and having its principal office in Dallas County.  The City has adopted a home-rule charter.  The City may be served with process through its Mayor, Eric Johnson; or its Secretary, Billierae Johnson, at 1500 Marilla Street, Dallas, Texas 75201.  *See* TEX. CIV. PRAC. & REM. CODE § 17.024(b).  Citation for service is requested at this time.

6.      Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.006(b), the Attorney General of the State of Texas will be served with a copy of this lawsuit.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all the parties.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 2

6

8.      Venue is proper because the City has its principal office in Dallas County, Texas, and the events giving rise to the controversy took place in Dallas County.  TEX. CIV. PRAC. & REM. CODE §§ 15.002(a)(1) & (3); *id.* § 65.023(a).

## RULE 47 STATEMENT

9.      Pursuant to Texas Rule of Civil Procedure 47, Plaintiff states that it seeks only declaratory and injunctive relief under Chapters 37 and 65 of the Texas Civil Practice and Remedies Code.

## DISCOVERY

10.     Plaintiff intends for the parties to conduct discovery under a Level 2 discovery control plan.  *See* TEX. R. CIV. P. 190.3.

## BACKGROUND FACTS

### A.      Texas Finance Code Chapter 393

11.     Short-term lending in Texas is subject to, and regulated under the authority of, Chapter 393 of the Texas Finance Code ("Chapter 393").

12.     TitleMax operates as a "credit services organization" (a "CSO") as defined by Chapter 393, in that it provides the service of "obtaining an extension of consumer credit" for its customers. TEX. FIN. CODE § 393.001(3)(B).

13.     TitleMax also operates in Texas as a "credit access business" (a "CAB"), defined in Chapter 393 as "a credit services organization that obtains for a consumer or assists a consumer in obtaining an extension of consumer credit in the form of a deferred presentment transaction or a motor vehicle title loan."  *Id.* §§ 393.221(1), 393.601(2).  TitleMax is a CAB because it assists Texas consumers with obtaining loans secured with a motor-vehicle title.  TitleMax's business in Texas

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                                    PAGE 3

7

does not include "deferred presentment transactions," which are generally secured with a post-dated check or ACH authorization.

14.     The Lenders offer "extensions of consumer credit" as defined in Chapter 393.001 but are not governed or regulated by Chapter 393; they are governed by Chapter 302 of the Texas Finance Code.  *See* § 393.002(1)(a) ("This chapter does not apply to: a person authorized to make a loan or grant an extension of consumer credit under the laws of this state or the United States. . . .")  The Lenders offer loans to customers at an interest rate of 9.95% per annum as allowed by Chapter 302 of the Finance Code.  *See* § 302.001(a), (b), and (d) (explaining that a creditor may contract for, charge, and receive from an obligor a maximum rate of interest per year of 10 percent as well as receive a late fee if the loan is in default for a period of not less than 10 days).  As explained herein, the Lenders do not directly offer their loans to borrowers without the assistance of a CSO or CAB.

### B.     TitleMax's Licensure and Regulation

15.     As the Venn diagram below indicates, all CABs are CSOs but not all CSOs are CABs.



16.     TitleMax provides credit services to customers in compliance with Chapter 393 and the accompanying regulations.  With respect to its activities as a CAB, TitleMax is licensed by and subject to the supervisory oversight of the Office of Consumer Credit Commissioner ("OCCC").  The OCCC does not provide supervisory oversight concerning CSOs.

**PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**                                      **PAGE 4**

**8**

17.     TitleMax's credit services are extensively regulated under Texas law.  The Texas Legislature ("Legislature") expressly delegated its authority to the Finance Commission of Texas ("Finance Commission") to serve as the "primary point of accountability" for ensuring that the State's financial industry functions as a coordinated, uniform, statewide system and protects consumer interests.  TEX. FIN. CODE § 11.002(a).  The Legislature has charged the OCCC with the specific authority for enforcement of CAB-specific provisions of the Finance Code.  *Id.* §§ 11.002(a), 14.101.  The Legislature also empowered the OCCC with a comprehensive enforcement regime for ensuring statewide compliance concerning CAB transactions, including the authority to make mandatory and permissive determinations as to criminal offenses, as well as the ability to assess administrative penalties and order restitution for violations.  *Id.* §§ 14.251-14.252; 393.501.

18.     These statutes and their accompanying regulations govern TitleMax's activities in Texas and evidence the Legislature's intent to occupy the entire field of regulation as to this business.

19.     The Lenders are not regulated by the OCCC.

**C.     TitleMax's Offerings Prior to the City's Amended Ordinance**

20.     TitleMax is not a lender and does not make extensions of consumer credit.

21.     With respect to transactions involving motor vehicle title loans, TitleMax, as a CAB, assists consumers in obtaining loans from Ivy or NCP, secured by motor-vehicle titles, and provides credit enhancements, in the form of letters of credit in favor of a Lender, that functionally guarantee repayment of the loans made to the consumers.  TitleMax earns a CAB fee for its credit services.  The CAB fee paid to TitleMax is separate and distinct from the extensions of credit made by the Lender to the consumer and the interest paid to the Lender.  The CAB fee is earned on the applicable origination date, but TitleMax permits its consumers to pay the CAB fee over the course of the loan term in more than four payments.  TitleMax and the consumer enter into a Credit Services Contract

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 5

9

setting out the CAB fee, the schedule for repaying the CAB fee, and other matters between TitleMax and the consumer.

22.     The consumer participating in a motor-vehicle-title loan transaction enters into a separate single-payment loan agreement with the Lender.  The loan agreement sets forth the principal loan amount, applicable interest rate, loan repayment schedule, and other matters between the Lender and the consumer.  TitleMax is not a party to the loan agreement.  The amount of principal and interest payable to the Lender under each loan agreement is due and payable in one lump sum on the maturity date (which is approximately five months from the loan origination date).  TitleMax calls this transaction facilitated for the Lender the "4x5".

23.     In addition to transactions involving motor-vehicle-title loans in which TitleMax acts as a CAB, TitleMax also provides separate services as a CSO.  Acting as a CSO, TitleMax assists consumers in obtaining unsecured loans from the Lender.  As with its services as a CAB for title-secured loans, Plaintiff TitleMax as a CSO provides credit enhancements, in the form of letters of credit, in favor of the Lender that functionally guarantee repayment of the loans made to the consumers.  As recognized by the Attorney General, unsecured loans arranged by a CSO do not constitute "deferred presentment" transactions and thus do not trigger the additional regulations applicable to CABs.  *See generally* Tex. Att'y Gen. Op. No. KP-0277 (2019) ("Opinion KP-0277").  TitleMax earns a CSO fee for its credit services.  The CSO fee paid to TitleMax is separate and distinct from the extensions of credit made by the Lender to the consumer and the interest paid to the Lender.  The CSO fee is earned on the applicable origination date, but TitleMax permits its consumers to pay the CSO fee over the course of the loan term in more than four payments.  TitleMax and the consumer enter into a Credit Services Contract setting out the CSO fee, the schedule for repaying the CSO fee, and other matters between TitleMax and the consumer.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                                    PAGE 6

10

24.     The consumer participating in an unsecured personal loan enters into a separate single-payment loan agreement with the Lender.  The loan agreement sets forth the principal loan amount, applicable interest rate, loan repayment schedule, and other matters between the Lender and the consumer.  TitleMax is not a party to the loan agreement.  The amount of principal and interest payable to the Lender under each loan agreement is due and payable in one lump sum on the maturity date (which is approximately five months from the loan origination date).

25.     The unsecured personal loans and motor-vehicle-title-secured loans facilitated by TitleMax and offered by the Lenders provide access to credit for low- and moderate-income customers who would otherwise be forced to go without credit.  Plaintiffs' typical customer does not have access to most traditional credit sources, either as a result of income constraints or credit concerns.  Even when available, those traditional credit sources can involve high transaction costs for higher-risk customers.  At the other end of the spectrum, unlicensed offshore lenders and the unsavory world of loansharking stand ready with the predatory practices that the ordinance at issue in this case was ostensibly intended to prevent.  In the absence of emergency credit on acceptable terms, consumers often suffer severe financial consequences, such as utility disconnects and costly reconnect fees; loss of essential work-related personal transportation; bounced-check charges; and, ultimately, personal bankruptcy.

26.     The loans facilitated by TitleMax and offered by the Lenders typically bridge short-term cash flow problems associated with unexpected events.  Absent unwarranted restrictions imposed by city ordinances, Plaintiffs stand ready to provide emergency short-term cash when traditional lenders will not do so.  Rather than protecting consumers, arbitrary restrictions and requirements such as are imposed by the ordinance at issue in this case adversely impact consumers who find that the loan products that they need are no longer available inside city limits.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 7

11

**D.    The City's Attempts to Regulate CABs and CSOs**

27.    On June 22, 2011, the Dallas City Council passed Dallas City Ordinance No. 28287 (the "Original Ordinance"), adding to Chapter 50 of the Dallas City Code a new Article XI, entitled "Credit Access Businesses," and regulating CABs with physical locations within the City of Dallas.

28.    Among other things, Article XI as enacted in 2011: required CABs operating within the City of Dallas to register with, be licensed by, and pay fees to the City; placed limits, determined by the consumer's income and/or the value of the consumer's motor vehicle, on the amount of cash that could be facilitated by a CAB to a consumer; required that any extension of consumer credit arranged by a CAB be repayable in not more than four installments, and that each payment reduce the principal amount of the extension of consumer credit by at least twenty-five percent (25%); and specified that any extension of consumer credit arranged by a CAB that was repayable in a single lump sum could not be renewed or refinanced more than three times, with proceeds from each renewal or refinancing reducing the principal amount of the extension of credit by at least twenty-five percent (25%).

29.    TitleMax has, at all times since its effective date, operated within the City of Dallas in compliance with the restrictions and limitations imposed by Article XI.

30.    However, on January 27, 2021, the Dallas City Council passed Ordinance No. 31747 (the "Amending Ordinance"), amending Article XI in significant respects that exceeded the authority of the City as a Home-Rule City.  Article XI, as amended, unduly restricts TitleMax's ability to serve low- and moderate-income customers within the city limits of Dallas,  rendering TitleMax's business of facilitating personal unsecured loans unsustainable and decimating the utility of TitleMax's title-secured CAB loans for Dallas customers.  The almost-certain result will be the closure of TitleMax's

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 8

12

locations serving the credit needs of customers within the city limits of Dallas and the corresponding cessation of lending by the Lenders to Dallas customers.

31.     The Amending Ordinance changed the title of Article XI from "Credit Access Businesses" to "*Credit Services Organizations and* Credit Access Businesses," signaling a significant and unauthorized expansion of the City's purported regulatory authority to include CSOs. Toward that end, the Amending Ordinance added a definition of "Credit Services Organizations," DALLAS CITY CODE § 50.145(5), and a provision requiring a certificate of registration for any location where a person conducts the business of a CSO and specifying the information required for an application for such a certificate—obligations formerly required only for the conduct of the business of a CAB.  *Id.* §§ 50-148(a), 149(a).

32.     Further, to the goal of regulating the business of non-CAB CSOs, the Amending Ordinance extended to CSOs other requirements formerly imposed by Article XI only on CABs, including the display of the CSO's certificate of registration at each of the CSO's business locations, *id.* § 50-150(b); maintenance of records, *id.* § 50-151.2; and restrictions on extensions of credit, *id.* § 50-151.4.

33.     As for restrictions on extensions of credit in particular, the Amending Ordinance imposed on CSOs upper limits on the amount that can be lent to a borrower in the form of a motor-vehicle-title loan to 3% of the customer's gross annual income or 70% of the retail value of the motor vehicle.  *Id.* § 50.151.4(b).  This restriction ignored the statutory reality that non-CAB CSOs[1] do not assist customers in obtaining loans secured by motor vehicle titles.

---

[1] Chapter 393 of the Texas Finance Code explains that any CSO acting to facilitate a motor vehicle title loan is a CAB. Thus, the Amending Ordinance's language in this way alone is inconsistent with state law and incorrect.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 9

13

34.     Further evidencing the City's intention to regulate and restrict CSOs to the same extent as CABs, the Amending Ordinance imposed on CSOs the 25%-reduction requirements and three-refinancing limitations formerly applicable only to CAB-assisted transactions.  *See id*. §§ 50-151.4(d), (e), (f).  However, the Amending Ordinance imposes even more onerous repayment terms on both CAB and CSO customers by adding to Article XI a new definition, "Extension of Consumer Credit Transaction,"[2] *id*. § 50.145(9), and imposing the 25% reduction requirement—formerly applicable only to the principal amount of the loan—to "the total amount of the extension of credit transaction, including any principal, interest, fees, valuable consideration, credit access business fees, and any other charges or costs . . . ."  *Id*. § 50-151.4(f)(2).

35.     In addition, the Amending Ordinance limits the fees that can be charged by a CSO to "0.1 percent per day of the outstanding balance of the extension consumer credit."  *Id*. § 50-1516(b).

36.     With respect to both CSO loans and CAB motor-vehicle-title loans, the Amending Ordinance purports to restrict the customer to making four or fewer payments of CAB or CSO fees. *Id*. § 50-151.4(d)(1), (f)(1).  And, the Amending Ordinance eliminates the ability of a CSO or CAB to refinance or renew any "extension of consumer credit transaction, unless the total amount of the extension of the consumer credit transaction, including any principal, interest, fees, valuable consideration, credit access business fee, and any other charges or costs, is due in a single payment" although the CSO and CAB are not the entities that offer the extension of consumer credit (or loan) to the customer.  *Id.* § 50-151.4(e).  The Amending Ordinance in essence combines the independent

---

[2] The term "extension of consumer credit transaction" does not exist in Chapter 393 of the Finance Code.  Rather, it conflicts with Chapter 393's definition of "extension of consumer credit" offered by a lender that is facilitated by a CSO. "Extension of consumer credit means the right to defer payment of debt offered or granted primarily for personal, family, or household purposes or to incur the debt and defer its payment." *See* Chapter 393.001(4).

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 10

14

obligations of a customer to the Lender and the CSO/CAB incorrectly into one obligation of a customer to the Lender and the CSO/CAB.

37.     The draconian penalty that Article XI threatens to impose—a fine of up to $500 per day, with each day or portion of a day during which a loan made in violation of the Ordinance is in effect, *id*. § 50-146(a), (b)—is exacerbated by the relaxed standard of liability therefor.  Article XI expressly dispenses with any requirement of culpable mental state.  *Id*. § 50-146(c), incorporating by reference *id*. § 1-5.1.

38.     The Amending Ordinance, which was based on—indeed was copied almost verbatim from—an ordinance adopted a few months earlier by the City Council of the City of Austin, was initially presented to and considered by the City Council's Ad Hoc Committee on COVID-19 Recovery and Assistance (the "Ad Hoc Committee").  At its December 3, 2020 meeting, the Ad Hoc Committee heard testimony solely from proponents of the Amending Ordinance; at the conclusion of the meeting, the Committee voted to recommend that the City Council adopt the Amending Ordinance.  Thus, the Amending Ordinance came before the City Council as the recommendation of a committee charged with "COVID-19 Recovery and Assistance."

39.     The Purpose of Article XI, as set out therein, is ostensibly "to protect the welfare of the citizens and consumers in the city of Dallas by monitoring credit services organizations and credit access businesses in an effort to reduce abusive and predatory lending practices."  DALLAS CITY CODE § 50-144.  Neither at the December 3, 2020 meeting of the Ad Hoc Committee, nor at the January 27, 2021 meeting of the City Council, *did any of the speakers or Council Members attempt to relate the COVID-19 pandemic to a need for more intrusive regulation of short-term lending in Dallas*.  No proponent of the Amending Ordinance asserted that consumer utilization of short-term loans (let alone supposed "abusive and predatory lending practices") in Dallas had increased since

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 11

15

the onset of the pandemic.  The sole testimony on the issue, provided by a speaker at the City Council meeting, cited data from the Texas OCCC conclusively showing that the volume of consumer use of so-called payday loans had substantially *decreased,* and that successful paydowns of such loans had substantially *increased*, during the pendency of the current pandemic.

40.     Moreover, at the January 27, 2021 meeting of the City Council, the City admitted that it did not invite members of the industry to discuss the effect of the Amending Ordinance at the Ad Hoc Committee.  TitleMax did not even know an Ad Hoc Committee had been created or that the City was considering an amendment to Article XI until the day before the City Council meeting when TitleMax received notice that an amendment was on the agenda for the next day.  TitleMax personnel had to scramble to review the proposed amendment, register to speak for its allotted three minutes, and attend the City Council meeting and wait for its company representative to be called to provide testimony.

41.     There was no testimony from or discussion by proponents of the Amending Ordinance, or from members of the City Council or the representative of the Office of the City Attorney, that the changes memorialized in the Amending Ordinance would alleviate any supposed pandemic-caused hardships, or indeed aid Dallas residents and citizens in any manner.  When asked by one City Council member why this amendment was necessary, a representative of the Office of the City Attorney referenced Opinion KP-0277 (which clarified what existing law already said) but did not reference anything related to COVID-19 or any alleged harm being done to Dallas residents. The same representative of the Office of the City Attorney admitted, under questioning from a member of the City Council, that there had been no communication to or discussion with any representative of the short-term lending industry before the Amending Ordinance was presented to the Ad Hoc Committee or thereafter to the City Council.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                          PAGE 12

16

42.     In the end, City Council voted unanimously to pass the Amending Ordinance despite TitleMax's request that City Council sit down with it and other members of the industry to discuss any alleged problems with the existing Original Ordinance.

43.     While the Amending Ordinance requires the City to do certain things to enforce it and provide clarity to Dallas CABs and CSOs, the City has done none of that.  Rather, upon information and belief, it has not named a Director as defined in Section 50-145(7), it has not created guidance on how CSOs and CABs should provide annual reports submitted to the OCCC as detailed in Section 50-151.2(c), and it has not approved a list of Consumer Credit Counseling organizations or outlined what should be in the poster discussed in Section 50-151.5.

### E.     TitleMax's Offerings Post Amending Ordinance

44.     The unsecured personal loans and title-secured loans facilitated by TitleMax and funded by the Lenders before the enactment of the Amending Ordinance do not comply with the restrictions imposed by Article XI after the amendment.  Continued facilitation of such loans after the effective date of the Amending Ordinance would have subjected TitleMax and the personnel in its stores to the imposition of devastating, $500-per-day-per-outstanding-loan fines.  In addition, TitleMax's practices do not include, and indeed its policies prohibit, the operation of its business in violation of regulatory statutes or ordinances.  Thus, the passage of the Amending Ordinance forced TitleMax to work with the Lenders and revise its credit services offered relating to motor vehicle title loans in its Dallas locations.  But TitleMax was forced to cease facilitating new personal unsecured loans funded by the Lenders in light of the new restriction imposed by Section 50-151.6(b), under which "[t]he sum of all valuable consideration, fees, or other charges ... may not exceed 0.1 percent per day of the outstanding balance of the extension of consumer credit."  Accordingly, as of the effective date of the Amending Ordinance, TitleMax and the Lenders no

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 13

17

longer assist customers in obtaining—and Dallas residents needing emergency credit no longer have access to—unsecured personal loans at TitleMax's Dallas locations.

45.     TitleMax does at present facilitate—and the Lenders fund—title-secured loans, in a new form that complies with the Amending Ordinance, at its Dallas locations.  However, customer demand for such loans in Dallas—as was the case with TitleMax's business in Austin following the enactment of the ordinance from which the Amending Ordinance was copied—is significantly reduced from the demand for the more flexible but now noncompliant title loan formerly offered in Dallas.  Customer frustration is also significantly higher as customers demand flexibility and workable payment options rather than forced reductions with less time to pay.  Customers confronted with the terms required for the title-secured loans that comply with the Amending Ordinance are apprehensive of their ability to pay down 25% of the total principal, interest, and fees at once, and thus leave the TitleMax location without completing the loan transaction.

46.     While TitleMax and Lenders will continue to attempt to do business in Dallas as limited by the Amending Ordinance—having been forced to cease facilitating personal unsecured loans and facilitating solely a customer-unfriendly form of title-secured loan—it is TitleMax's expectation that continued operation under such limitations will be at a loss, forcing TitleMax to exit business within the City of Dallas and depriving Dallas residents and citizens of access to credit through TitleMax.

## CAUSES OF ACTION

## COUNT I: DECLARATORY RELIEF

47.     Plaintiffs incorporate the allegations in Paragraphs 1 through 46.

48.     Home-rule cities like the City of Dallas have the full power of self-government. However, they are prohibited by the Texas Constitution from enforcing local laws that are

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 14

18

inconsistent with state laws.  *See* TEX. CONST. art. XI, § 5(a) (No city ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State.").

49.     Article XI prohibits what is expressly authorized by state law and is therefore unenforceable.  Its provisions are inconsistent with—not ancillary to or in harmony with—the general scope and purpose of the Texas Finance Code, which comprehensively regulates CABs and CSOs like TitleMax.

50.     The Legislature's comprehensive regulation of all aspects of the finance industry—and in particular its entrustment of extensive oversight of CABs to the Finance Commission and OCCC to ensure uniformity and consistency—evidences its clear and unmistakable intent to preempt local laws that threaten standardized application of statewide laws.

51.     Article XI intrudes on a state-occupied field and the provisions identified here are inconsistent with state law.  As such, it is in violation of the Texas Constitution and those provisions are therefore preempted and unenforceable.

52.     DALLAS CITY CODE §§ 50.145 and 50.151.4 directly conflict with Section 393.602(b) of the Finance Code because they seek to regulate CAB fees in a more restrictive way than the Texas statute.  Article XI does so by prohibiting CAB fee agreements that the Finance Code expressly authorizes.

53.     Section 393.602(b) authorizes CABs to negotiate the terms of their CAB fee agreements with customers subject only to the following restrictions:

> A credit access business may assess fees for its services as agreed to between the parties. ***A credit access business fee may be calculated daily, biweekly, monthly, or on another periodic basis***. A credit access business is permitted to charge amounts allowed by other laws, as applicable. A fee may not be charged unless it is disclosed.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 15

19

Tᴇx. Fɪɴ. Cᴏᴅᴇ § 393.602(b) (emphasis added).

54.     The OCCC has expressly authorized CABs like TitleMax to arrange (1) a single-payment loan between a lender and the consumer; and (2) a separate agreement between the CAB and the consumer.  Under this separate, second agreement, the consumer pays a CAB fee to the CAB in multiple payments.  This transaction is reported as a multi-payment transaction for the ***limited purposes*** of periodic reporting to the OCCC and certain disclosures.

55.     By contrast, Section 50-551.4(d)(1) of Article XI requires repayment of the "total amount of the extension of consumer credit transaction, including any principal, interest, and fees, valuable consideration, credit access fees," in "four ***or fewer payments***" (emphasis added). Moreover, Section 50-551.4(e) prohibits a CSO or CAB from refinancing an extension of consumer credit transaction, unless the total amount of the extension of consumer credit transaction including CAB fees is due "***in a single payment***" (emphasis added).  Section 50-551.4 places constraints on a CAB and its customer's ability to agree to multiple CAB fee payments—even though they are expressly allowed by Section 393.602(b) of the Texas Finance Code. Article XI thus directly conflicts with Texas laws, "thwart[s] the Legislature's intent that 'uniformity shall prevail throughout the state,'" and are therefore preempted and unenforceable. *See BCCA Appeal Grp., Inc. v. City of Houston,* 496 S.W.3d 1, 14 (Tex. 2016) (quoting *City of Weslaco v. Melton,* 308 S.W.2d 18, 19-20 (Tex. 1957)).

56.     Section 50-151.6 of Article XI directly conflicts with Sections 393.201(a) and (b) and Section 393.202 of the Finance Code because it seeks to regulate contract terms, contract forms, and CSO fees for unsecured personal loans that do not involve a motor-vehicle-title-loan or a deferred presentment (or payday) loan in a more restrictive way than the Texas statute does.  Sections 393.201(a) and (b), and Section 393.202, set out the "form and terms" for "[e]ach contract for the

Pʟᴀɪɴᴛɪғғs' Vᴇʀɪғɪᴇᴅ Oʀɪɢɪɴᴀʟ Pᴇᴛɪᴛɪᴏɴ ғᴏʀ Dᴇᴄʟᴀʀᴀᴛᴏʀʏ Rᴇʟɪᴇғ ᴀɴᴅ
Aᴘᴘʟɪᴄᴀᴛɪᴏɴ ғᴏʀ Tᴇᴍᴘᴏʀᴀʀʏ ᴀɴᴅ Pᴇʀᴍᴀɴᴇɴᴛ Iɴᴊᴜɴᴄᴛɪᴏɴ          Pᴀɢᴇ 16

20

purchase of the services of a credit services organization by a consumer," which must be "in writing, dated and signed by the consumer."  Contrary to Section 151.6 of Article XI, the CSO contract "forms and terms" specified in the Finance Code do not limit the "sum of all valuable consideration, fees, or other charges owed by the consumer to the credit services organization" to "0.1 percent per day of the outstanding balance of the extension of consumer credit."  Moreover, the contract between the Lender and the customer is *not regulated;* Article XI nonetheless requires a CSO to mandate terms and conditions with respect to the Lender and its relationship with the customer.  Efforts to impose limitations on CSO forms and terms that conflict with the Finance Code already have been rejected. "[T]he plain language of chapter 393 does not restrict credit services organizations, other than when operating as credit access businesses, from obtaining for a consumer or assisting a consumer in obtaining an extension of consumer credit in another form."  Opinion KP-0277 at 3.  "While the Legislature identified two forms of debt that qualify as extensions of consumer credit in connection with regulation of a credit services organization—payday loans and motor-vehicle-title loans—it did not create an exhaustive list of the types of debt a credit services organization may assist a consumer in obtaining under chapter 393."  *Id.* at 5.  "Furthermore, nothing in chapter 393 requires that the extension of credit be secured in order for a credit services organization to assist a consumer in obtaining it."  *Id.*  "Chapter 393 of the Finance Code does not restrict credit services organizations, other than when operating as credit access businesses, from obtaining for a consumer or assisting in obtaining an extension of consumer credit in a form other than a deferred presentment transaction or motor vehicle title loan."  *Id.* at 6.  Article XI, as amended, thus directly conflicts with Texas laws and '"thwart[s] the Legislature's intent that 'uniformity shall prevail throughout the state,'" and are therefore preempted and unenforceable.  *See BCCA Appeal Grp.,* 496 S.W.3d at 14 (quoting *City of Weslaco,* 308 S.W.2d at 19-20).

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                    PAGE 17

21

57.     The police power of a municipality such as the City extends only to those regulations that are reasonably necessary to protect the public health, safety and morals.  An ordinance or other regulation that extends beyond the legitimate scope of operation of the municipality's police power violates the Texas and United States Constitutions.  Specifically, Article XI as amended has already deprived TitleMax, and will continue to deprive TitleMax, of property and privileges without the "due course of the law of the land . . ." in contravention of Article I, § 19 of the Texas Constitution, and without due process of law in violation of the Fourteenth Amendment to the United States Constitution.  Such a regulation is unconstitutional if "(1) [its] purpose could not arguably be rationally related to a legitimate government interest; or (2) when considered as a whole, [its] actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest."  *Patel v. Tex. Dep't of Licensing and Regulation,* 469 S.W.3d 69, 87 (Tex. 2015).

58.     The stated purpose of Article XI, as amended, is "to protect the welfare of the residents and consumers in the City of Dallas by monitoring credit service organizations and credit access businesses in an effort to reduce abusive and predatory lending practices." DALLAS CITY CODE § 50-144.  In actuality, the provisions of Article XI are not rationally related to its stated purpose. Rather than protecting the welfare of low- and moderate-income residents and consumers in Dallas, Article XI will in practice deprive them of needed sources of emergency cash, either leaving such consumers without access to emergency short-term credit or forcing them to utilize less desirable (and in some cases illegal and/or financially ruinous) sources of emergency cash.  While Article XI's stated purpose may arguably be related to a valid city governmental purpose, its actual and real-world effect is not rationally related to that purpose and is so burdensome as to be oppressive to Plaintiffs.

---

**PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**          **PAGE 18**

22

59.     In sum, Plaintiffs' rights, status, and other legal relations are affected by the Amended Ordinance.  A justiciable controversy exists between Plaintiffs, on the one hand, and the City on the other, regarding the validity of the Amended Ordinance as applied to TitleMax. The declaratory judgments requested herein will resolve the controversy between the parties.

60.     Plaintiffs seek judicial declarations under Chapter 37 of the Texas Civil Practice and Remedies Code, the Texas Declaratory Judgments Act, and requests the Court to declare that:

> a.   The Amended Ordinance is pre-empted by State legislation governing short-term lending services offered by CSO and CABs;
>
> b.   The Amended Ordinance exceeds the City's powers as a Home-Rule City;
>
> c.   The Amended Ordinance deprives TitleMax of the due course of law guaranteed by the State Constitution; and
>
> d.   The Amended Ordinance deprives TitleMax of due process of law guaranteed by the United States Constitution.

61.     Plaintiffs retained the undersigned attorneys to represent it in this cause and agreed to pay such counsel reasonable and necessary attorneys' fees.  Plaintiffs seek to recover from the City such reasonable and necessary attorneys' fees as are equitable and just, as authorized by Chapter 37 of the Texas Civil Practice and Remedies Code.

### COUNT II: REQUEST FOR TEMPORARY INJUNCTION

62.     Plaintiffs incorporate the allegations in Paragraphs 1 through 61.

63.     Plaintiffs seek a temporary injunction, and, at the conclusion of trial, a permanent injunction order against the City.

64.     Plaintiffs need immediate relief, as TitleMax has ceased facilitating and the Lenders have ceased funding the "4x5" title secured loans and new unsecured loans, and TitleMax is not able to offer

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                      PAGE 19

23

to facilitate a refinance for existing unsecured loan customers in Dallas without threat that the City will seek enforcement against it in court.

65.     To obtain injunctive relief, the applicant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002). Such relief is appropriate in this case. As described more fully below, Plaintiffs are entitled to a declaratory judgment that the referenced provisions of Article XI are preempted, unconstitutional, and unenforceable.

66.     Plaintiffs have adequately pleaded a cause of action for declaratory relief against the City and have established a probable right to the requested relief. A probable right of recovery is shown by alleging a cause of action and presenting evidence to sustain it. *Fox v. Tropical Warehouses, Inc.,* 121 S.W.3d 853, 857 (Tex. App.—Fort Worth 2003, no pet.). To satisfy this element, Plaintiffs need not prove their case with absolute certainty. *State v. S. W. Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex. 1975) (applicant need only show probable right and probable injury). A reasonable probability of success, not an overwhelming likelihood, is all that need be shown for preliminary injunctive relief. *See id.*

67.     Plaintiffs have been irrevocably harmed by the passage of Article XI as TitleMax now is unable to facilitate "4x5" loans in the City of Dallas and has had to completely upend its product offerings with the Lenders to comply with Dallas' misinformed ideas of what Dallas residents need or want. As a result, many customers will be unable to obtain emergency funds or manage their existing accounts with TitleMax and Lenders. Plaintiffs suffer imminent and irreparable harm each day that passes as TitleMax and the Lenders have turned off a product offering in the City of Dallas and its new product offered for the Lenders is unworkable for most borrowers, thereby suffering loss of business

**PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**                    **PAGE 20**

24

and loss of goodwill.  Moreover, the very customers who are supposed to be "protected" by this Amended Ordinance are further harmed by a lack of access to credit and liquidity.

68.     This business harm as evidence of irreparable harm is especially compounded where, as here, a plaintiff does not otherwise have an adequate remedy at law.  *See Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.,* 812 S.W.2d 663, 666 (Tex. App.—Houston [14th Dist.] 1991, no writ) ("It is not enough for some legal remedy to exist, but the remedy at law must also be as practical, available, and effectual as the remedy at equity.").

69.     Further, and importantly, under Texas law, a violation of a constitutionally guaranteed right causes irreparable injury that warrants injunctive relief.  *Southwestern Newspapers Corp. v. Curtis,* 584 S.W.2d 362, 368 (Tex. Civ App.—Amarillo 1979, no writ).  Moreover, an injunction may issue if the harm is in the form of business disruption.  *Lavigne v. Holder,* 186 S.W.3d 625, 629 (Tex. App.—Fort Worth 2006, no pet.); *Liberty Mut. Ins. Co.,* 812 S.W.2d at 666 ; *see also Henry v. First Nat'l Bank of Clarksdale,* 595 F.2d 291, 305 (5th Cir. 1979) (explaining that irreparable injury would occur where withholding the injunctive relief "would have entailed the virtual disappearance of the plaintiff as a functional entity"); *see also IAC, Ltd. V. Bell Helicopter Textron, Inc.,* 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.) (explaining that loss of business goodwill is sufficient to show irreparable injury).  Each of these circumstances is met here, where Plaintiffs have been irreparably harmed and suffered an interruption in business due to the unconstitutional application of the Ordinance and the City Code Provisions.  Until and unless the City is enjoined from the application of Article XI against TitleMax, Plaintiffs have suffered and will continue to suffer from imminent and irreparable harm in the form of the loss of their business and their ability to service customer needs.  Moreover, customers will be harmed by a lack of access to credit and liquidity.

**PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**                    **PAGE 21**

25

70.     Plaintiffs have a likelihood of success on the merits and is entitled to injunctive relief to prevent the City from inflicting irreparable harm upon Plaintiffs.

71.     Plaintiffs request that the Court set their application for temporary injunction for hearing, and after hearing the application, issue a temporary injunction against the City based on the foregoing information, as well any additional information or evidence as may be properly submitted to the Court for consideration.

72.     Pursuant to TEX. CIV. PRAC. & REM. CODE §§ 37.011 and 65.011, Plaintiffs seek a temporary injunction prohibiting the City from Article XI's application to TitleMax pending trial of this matter.

73.     TitleMax will post security in connection with a temporary injunction to protect the City from the harm, if any, it may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues.

### COUNT III: PERMANENT INJUNCTION

74.     Plaintiffs incorporate the allegations in Paragraphs 1 through 73.

75.     Plaintiffs also seek a permanent injunction prohibiting the City from any attempts to enforce  Article XI against TitleMax.

76.     Permanent injunctive relief is warranted in that Plaintiffs have a cause of action against the City because the referenced provisions of Article XI are preempted by state law, their enactment exceeded the authorized powers of a home-rule city, and their enforcement and the threat thereof deprive Plaintiffs of property and privileges without due course and due process of law; there is a probable right to the relief sought; and there is a probable, imminent, and irreparable injury to vested property rights in the interim. Enforcement of the referenced provisions of Article XI has and will result in irreparable injury to vested property rights.

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                        PAGE 22

26

## PRAYER

Plaintiffs ask that the Court grant temporary injunctive relief as requested above and set the case for trial.  Plaintiffs further request that, upon final hearing, the Court enter a declaratory judgment and permanent injunction, as requested above, and for such other and further relief, legal or equitable, general or special, to which Plaintiffs are entitled.

Dated: April 9, 2021

**FROST BROWN TODD LLC**

By:   */s/ T. Ray Guy*
  T. Ray Guy
  State Bar No. 08648500
  rguy@fbtlaw.com

By:   */s/ Todd J. Harlow*
  Todd J. Harlow
  State Bar No. 24036724
  tharlow@fbtlaw.com

By:   */s/ Ben A. West*
  Ben A. West
  State Bar No. 24084074
  bwest@fbtlaw.com

2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545.3472
Telecopier: (214) 545.3473

**ATTORNEYS FOR PLAINTIFFS**

**PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION**  **PAGE 23**

**27**

## VERIFICATION

**THE STATE OF GEORGIA**          §
                                  §
**COUNTY OF CHATHAM**             §

On this day, JOSE URBAEZ COTTO appeared in person before me, being known by me to be the person whose signature appears below, and who, after being duly sworn stated under oath that he is the Compliance Manager for Plaintiff TitleMax of Texas, Inc., and that the allegations of fact contained in the foregoing Plaintffs' Original Petition for Declaratory Relief and Application for Temporary and Permanent Injunction are true and correct based on his personal knowledge.

_____
JOSE URBAEZ COTTO

SUBSCRIBED AND SWORN TO on April 9, 2021 before me, the undersigned notary, in certification of which I execute my hand and seal of office.

_____
Notary Public in and for
The State of Georgia

My Commission Expires:    07·09·2023

4822-5802-8766v7

---

PLAINTIFFS' VERIFIED ORIGINAL PETITION FOR DECLARATORY RELIEF AND
APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION                     PAGE 24

28

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Debbie Williams on behalf of T. Ray Guy
Bar No. 8648500
dwilliams@fbtlaw.com
Envelope ID: 52323739
Status as of 4/12/2021 3:04 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ben West | | bwest@fbtlaw.com | 4/9/2021 3:42:58 PM | SENT |
| Todd J.Harlow | | tharlow@fbtlaw.com | 4/9/2021 3:42:58 PM | SENT |
| Angele Ortiz | | aortiz@fbtlaw.com | 4/9/2021 3:42:58 PM | SENT |
| Beverly Cezar | | bcezar@fbtlaw.com | 4/9/2021 3:42:58 PM | SENT |
| Vanessa Barrs | | vbarrs@fbtlaw.com | 4/9/2021 3:42:58 PM | SENT |
| T. RayGuy | | rguy@fbtlaw.com | 4/9/2021 3:42:58 PM | SENT |