**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TITLEMAX OF TEXAS, INC.,** | § | |
| **IVY FUNDING COMPANY LLC,** | § | |
| **and NCP FINANCE LIMITED** | § | |
| **PARTNERSHIP,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **No. 3:21-cv-1040-S-BN** |
| | § | |
| **CITY OF DALLAS,** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

TitleMax of Texas, Inc. ("TitleMax"), Ivy Funding Company LLC ("Ivy"), and NCP Finance Limited Partnership ("NCP") (Ivy and NCP collectively the "Lenders"), file this Brief in Support of their Motion for Preliminary Injunctive Relief as permitted by FED. R. CIV. P. 65. The Motion and this Brief are supported by the Declarations of Timothy Pearson ("Pearson Dec.") and Jose Urbaez Cotto ("Cotto Dec."), which are included as items A and B in the Appendix in Support of Motion for Preliminary Injunctive Relief ("App.") filed concurrently herewith.

## I.    INTRODUCTION

For years Plaintiffs have been filling a critical need for low- and moderate-income citizens of Dallas: cash to meet financial emergencies; their loans serve as lifelines for people who do not have access to the same sources of credit that are available to persons of more substantial means. Plaintiff TitleMax arranges and guarantees repayment of the loans, which are funded by a third-party lender, either Plaintiff Ivy or Plaintiff NCP.

In 2011 the City of Dallas enacted an ordinance, which became Article XI of Chapter 50 of the Dallas City Code, regulating certain types of short-term loans such as the ones arranged by TitleMax and its competitors.  Plaintiffs modified their loan products to comply with the ordinance ("Article XI" or the "2011 Ordinance"), and for the next ten years Plaintiffs were able to provide emergency credit to citizens of Dallas in full compliance with Article XI and Texas statutory law.

That changed on January 27th of this year, when the Dallas City Council enacted an ordinance (the "Amending Ordinance") that amended—and added significant restrictions to—Article XI. From all appearances, neither the proponents of the amendment nor any Councilmember ever seriously analyzed the professed needs for the Amending Ordinance or considered whether its provisions addressed those supposed needs in any way. The Amending Ordinance was recommended to the full Council by an Ad Hoc Committee (of the Council) devoted to pandemic relief.  Its proponents and Councilmembers justified the Amending Ordinance on the basis that COVID-19 made short-term loans (improperly categorized as all "payday"[1] loans) more problematic, but the lone speaker who addressed the issue quoted state-wide statistics showing that short-term loan volume had *decreased* while successful loan payoffs *increased* during the pandemic.  His testimony was ignored as the Council proceeded to adopt the Amending Ordinance as proposed.

The January 27th amendment was adopted based on no substantive analysis. Councilmembers simply indulged their collective distaste for Plaintiffs' loan products and services by accepting, nearly verbatim, an ordinance adopted a few months earlier by the Austin City

---

[1] Plaintiffs do not offer or facilitate "payday" loans.  Rather, Plaintiffs offer or arrange title-secured loans or unsecured personal loans.

Council.  TitleMax's experience in the wake of the Austin amendment would have provided useful information for the Council to consider as to the effect that the Amending Ordinance would have on short-term lenders as well as on the individuals who rely on these short-term loans.  No one bothered to ask.

Dallas residents annually seek and obtain hundreds of thousands of short-term loans to meet their emergency credit needs. But the City's staff made no attempt to contact or seek input from TitleMax or any of its competitors who collectively facilitate tens of millions of dollars of such loans every year or any of their customers.  The Amending Ordinance has devastated Plaintiffs' business in Dallas, where TitleMax has had to cease arranging unsecured loans altogether and its business facilitating title-secured loans has been eviscerated.  Absent injunctive relief, TitleMax expects to be forced to close its Dallas stores and lay off it Dallas employees.

With no other alternative, TitleMax turns to this Court for relief.

## II.   SUMMARY OF ARGUMENT

By adopting the Amending Ordinance, the City exceeded the powers of a Texas home rule city; impermissibly acted to regulate a subject matter pre-empted by state statutes; and deprived Plaintiffs of property without the due course of law guaranteed by Article 1, Section 19 of the Texas Constitution and the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.  To avoid the entire loss of Plaintiffs' Dallas business, the closing of TitleMax's Dallas stores, and the layoff of employees, Plaintiffs must obtain a return to the pre-January-27 *status quo* via a preliminary injunction precluding the enforcement of the restrictions added by the Amending ordinance, pending and through the trial of this case.

### III.    FACTUAL AND LEGAL BACKGROUND

TitleMax facilitates two types of loans in Texas: an unsecured personal loan, in amounts averaging about $500, and a loan it facilitates which is secured by a motor vehicle title, typically for larger amounts, averaging about $1,750.[2]   The personal loans are arranged in TitleMax's capacity as a "Credit Services Organization," or CSO, registered with the State as required by the Texas Finance Code.[3] Title-secured loans are arranged by TitleMax in its separate, State-licensed capacity as a "Credit Access Business," or CAB.[4]  Licensing as a CAB is a statutory prerequisite for arranging loans secured by a motor vehicle title.[5]  The Texas Finance Code imposes extensive disclosure requirements for loans arranged in each capacity.

Dallas's Article XI from its inception placed restrictions on *CAB* loans[6]; TitleMax's title-secured loans arranged at its Dallas stores comply with Article XI and its restrictions.   Until

---

[2] Pearson Dec. at 2, App. 2.

[3] Cotto Dec. at 2, App. 8.

[4] *Id.*

[5] CAB licensure is also required to arrange "deferred presentment  transactions"—the colloquially-named "payday loans," in which the borrower delivers a post-dated check or ACH authorization when the loan is made. TitleMax does not arrange deferred presentment transactions.  *Id.*

[6] The short-term lending industry did not concede the validity of Article XI or of similar ordinances in the cities that followed Dallas' lead in initiating their own ordinances. However, court challenges seeking injunctive relief against the Dallas ordinance and others never reached the stage of consideration on the merits. In each case, the defendant city filed a plea to the jurisdiction, asserting that a court of equity should not enjoin the enforcement of a supposedly-criminal ordinance, and in each case a District Court and Court of Appeals agreed.  *See, e.g., Consumer Service Alliance of Texas, Inc. v. City of Dallas,* 433 S.W.3d 796 (Tex. App.—Dallas 2014, no pet.); *ACE Cash Express v. City of Denton,* 2015 WL 3523963 (Tex. App.—Fort Worth 2015, pet. denied).  A District Court in Austin recently dismissed, on that ground, TitleMax's challenge to the Austin ordinance from which Dallas's Amending Ordinance was copied.  However, while TitleMax's appeal from the Austin dismissal was pending, the Texas Supreme Court in *Texas Propane Gas Association v. City of Houston,* No. 19-0767 (April 16, 2021) concluded that violations of ordinances similar to Dallas's Article XI are not "criminal law matters" that must be raised in response to a criminal prosecution.  The attorneys for the City of Austin recognized the effect of the *Texas Propane* decision and conceded to the Seventh Court of Appeals—to which TitleMax's appeal had been assigned—that the Austin dismissal should be reversed, as it thereafter was. *TitleMax of Texas, Inc. v. City of Austin*, No. 07-20-00305-CV (Tex. App.—Amarillo, May 11, 2021) (Mem. Op.).

In short, no court has to date considered the merits of a challenge to an ordinance such as Dallas's Article XI, as this Court is now in a position to do.

---

January 27, Article XI did not address or restrict **CSO loans** such as TitleMax's unsecured personal loans.

Proponents of Dallas's Amending Ordinance, and Councilmembers who spoke in its favor, cited two purposes for its changes to the City's *status quo.* One stated justification was to respond to Opinion KP-0277 (App. K), issued in November of 2019 by Attorney General Paxton, which itself responded to a question whether CSOs were restricted by Texas law to arranging deferred-presentment or title-secured loans; Opinion KP-0277 clarified (for some) and confirmed (for most) that CSO-arranged unsecured personal loans were permissible under the Texas Finance Code. Throughout the City Council hearings—of the full Council on January 27, 2021, and of the Council's Ad Hoc Committee on COVID-19 Recovery and Assistance (the "COVID-19 Ad Hoc Committee") on December 3 and 17, 2020—proponents and Councilmembers and a representative from the City Attorney spoke of Opinion KP-0277 as having somehow created a "loophole" that the Amending Ordinance would close. The Amending Ordinance did in fact purport to bring CSOs within Chapter XI's ambit, adding among other things a devastating rate cap, discussed below. However, the Amending Ordinance also added a new requirement for *CAB* loans such as the title-secured loans TitleMax facilitates—an extension of Article XI that was never mentioned to, or commented upon by, the Councilmembers who voted for its approval.

The other stated justification and supposed need for the Amending Ordinance's dramatic expansion of Article XI was the ongoing COVID-19 Pandemic and its suspected adverse effects on short-term loan borrowers. Speaker after speaker, including the proponents who introduced the Amending Ordinance with a PowerPoint presentation at the December 3, 2020 meeting of the COVID-19 Ad Hoc Committee, referred to the pandemic as driving desperate Dallas residents to

obtain "payday" loans that they would be unable to repay. The one speaker who actually possessed real information on the subject testified to the contrary—that such short-term loans had markedly decreased, and that prompt payoffs had significantly increased, during the pandemic. He was ignored as the Council proceeded to vote unanimously in favor of the amendments.

TitleMax's corporate policy requires compliance with applicable statutes and ordinances,[7] no matter how misguided they may appear to be. In the case of the Amending Ordinance, and the earlier Austin ordinance from which it was copied, compliance has had devastating results. TitleMax and its Lenders have abandoned CSO-capacity unsecured loans in Dallas as money-losing drains on their resources.[8] TitleMax has attempted both in Austin and Dallas to conduct business with a revised and compliant form of title-secured loan, but the significantly-increasing loan defaults have rendered the business unprofitable and will almost certainly lead to the closing of TitleMax's Dallas (and Austin) operations, absent Dallas's agreement to suspend enforcement of—or this Court's injunction prohibiting—the Amending Ordinance pending trial.[9]

## IV.    ARGUMENT

### A.    Plaintiffs' evidence justifies and requires a preliminary injunction.

A preliminary injunction is issued to preserve the status quo and to prevent the irreparable loss of a party's rights prior to judgment. *Finlan v. City of Dallas*, 888 F. Supp. 779, 790 (N.D. Tex. Dallas 1995). A movant seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm in the absence of the injunction; (3) that the threatened injury outweighs any potential harm resulting from the

---

[7] Cotto Dec. at 3, App. 9.
[8] Pearson Dec.at 3-4, App. 3-4.
[9] *Id*. at 3-4.

injunction being granted; and (4) that the injunction is in the public interest. *Gonzales v. Mathis Indep. Sch. Dist.*, 978 F.3d 291, 294 (5th Cir. 2020).  A court may issue a preliminary injunction on a *prima facie* showing that the movant is entitled to relief. *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019).

Plaintiffs' substantial likelihood of prevailing at trial is addressed in Section B *et seq.* below.

### 1. Absent a preliminary injunction, Plaintiffs will suffer irreparable injury for which they have no adequate remedy at law.

"Federal courts have long recognized that, when the threatened harm is more than de minimis, it is not so much the magnitude but the <u>irreparability</u> that counts for purposes of a preliminary injunction." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (internal quotations omitted) (emphasis in original).  "The key word in this consideration is <u>irreparable</u>." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (emphasis added).  "An irreparable injury is one that cannot be remedied by an award of economic damages." *Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 755 (N.D. Tex. 2019).  "If determining the amount of damage would be extremely difficult, the court can consider the harm irreparable." *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015).  Irreparable harm must be imminent, and it cannot be speculative.  *Id.*

The Amending Ordinance has forced Plaintiffs to cease offering and arranging unsecured loans and reconfigure their  title-secured loans in Dallas.[10]  The revised form of title-secured loans is proving unacceptable to most of TitleMax's former and potential customers and its first-payment

---

[10] Cotto Dec.at 3-4, App. 10.

requirement is engendering disproportionate default rates among those customers who do sign on for the new version.[11] The combination of reduced loan volume due to potential customers unwilling to agree to the terms of the new title-secured loans and increased defaults for the ones that do accept the City-compliant loan model has destroyed the profitability of title-secured loans.[12]  Having lost the income from unsecured loans and losing money on facilitating title loans, TitleMax will likely be forced to close  Dallas stores absent the preliminary relief sought by the current Motion.[13]  The long term consequences will be laid-off employees,  vacant storefronts in Dallas, and fewer credit options for Dallas residents;[14] the immediate impact between now and the trial of this case will be a continued increase in defaults and continued lost income for Plaintiffs [15]—which cannot be recovered in damages since the City will undoubtedly assert sovereign immunity as precluding a monetary judgment.

The need and justification for immediate relief, pending trial, could not be more clear.

## 2. The irreparable injury to Plaintiffs outweighs any harm to the City if injunctive relief is granted; a preliminary injunction is in the public interest.

The City will suffer no harm if Plaintiffs are allowed to resume pre-January-27 business operations because of an injunction pending trial against enforcement of the changes made by the Amending Ordinance.

Article XI has been in effect and unchanged since its enactment in 2011.  The state regulatory regime with the so-called "loophole" (discussed below), Chapter 393 of the Texas

---

[11] Pearson Dec. at 4-5, App 4-5.
[12] *Id*. at 5, App. 5.
[13] *Id*.
[14] *Id*.
[15] *Id*.

Finance Code, was enacted the same year and has likewise existed in its present form and unchanged for the same decade. TitleMax has (and, TitleMax believes, its competitors have) been arranging loans in compliance with the City's ordinance for those ten years.  Plaintiffs are asking this Court to allow the loans offered and facilitated in Dallas to take the same structure during the months until the trial of this case as in the previous ten years.  The City cannot conceivably articulate harm to the City resulting from business conducted that the City permitted for the immediate past decade.

Neither the proponents nor any Councilmember justified the Amending Ordinance on the ground that short-term lending was costing the City money. Indeed, the City will likely lose tax revenue *absent* an injunction, as laid-off employees (of TitleMax and, likely, other short-term lenders) lose their purchasing power, and vacancies in TitleMax store locations reduce property valuations and tax revenues.  As set forth above, the harm to Plaintiffs from compliance with the Amending Ordinance is real, immediate, and devastating to their Dallas operations; harm to the City in the event of a preliminary injunction is nonexistent especially as the City did not speak to any customers about the alleged harm the Amending Ordinance was purported to remedy.

The issuance of an injunction will be in the public interest and indeed will advance that interest.  Plaintiffs' customers have always had the option of repaying a loan (whether unsecured or title-secured) in the manner now *required* by the Amending Ordinance–25%-per-month increments starting in 30 days—but have had the additional option of deferring payment until it became more convenient or until the necessary resources became available.  A preliminary injunction will restore, pending trial, the flexibility that Plaintiffs' customers have enjoyed for years, and in the meantime will preserve dozens of well-paying jobs in Dallas.  And the City has

no legitimate interest in destroying a business in advance of court determination whether the City was entitled to do so.

**B.      Plaintiffs have a likely right to the requested relief.**

The remaining element for the Court's consideration in determining whether to grant a preliminary injunction is whether the movants have shown a likelihood of success on the merits of its claims.  This step merely requires the movants to present a prima facie case, *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013); they are not required to prove they are entitled to summary judgment, nor are they required to prove their case in full.  *Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 684-685 (N.D. Tex. 2016).  Indeed, likelihood of success need only be "present to some degree," as "[w]here the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief."  *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).  When assessing a party's likelihood of success on the merits, a court should look to "standards provided by the substantive law."  *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011).

Here, Plaintiffs have demonstrated that allowing the Amending Ordinance to remain in effect until trial will devastate their short-term lending business.  The City has made no attempt to dispute that its Amending Ordinance will have this effect.  In the absence of an injunction, by the time this case is tried there will be no short-term lending business left to save.

Given the irreparable harm Plaintiffs are sure to suffer, they need only show some likelihood of success.  *See Productos*, 621 F.2d at 686. As explained below, Plaintiffs have adduced sufficient evidence to carry that burden.

**C.  The Amending Ordinance exceeds the authority of Dallas as a home rule city.**

The City, in response to the pending Motion, will undoubtedly cite authorities for the proposition that a home rule city like Dallas has broad regulatory authority.  That authority, however, is not unlimited, and the City has exceeded its powers on multiple grounds. An ordinance enacted by a home-rule city that seeks to regulate any subject matter that is preempted by state statute is unenforceable to the extent that it conflicts with that statute.  *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993).  Ordinances may be preempted if they are in direct conflict with legislation, or if they are inconsistent with it.  *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 796 (Tex. 1982).  "[M]unicipalities have no power to prohibit pursuit of occupations regulated by State law."  *City of Fort Worth v. McDonald*, 293 S.W.2d 256, 258 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.).  If the city's ordinance "amounts to a virtual prohibition against premises licensed by state laws, such ordinances will be held void and unenforceable."  *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. Civ. App.—Fort Worth 1938, no writ).

**1.  The Amending Ordinance impermissibly precludes the successful operation of a business licensed by the State.**

TitleMax has been issued a license by the Texas Finance Commissioner, pursuant to TEX. FIN. CODE § 393.603 *et seq.,* to operate in Texas as a CAB, the capacity in which TitleMax arranges title-secured loans.  The Finance Code authorizes TitleMax to do business as a CAB—subject to extensive disclosure requirements and other restrictions—once licensed by the Commissioner. A license to operate as a CAB is subject to revocation on specified grounds.  *Id.*  § 393.614. TitleMax's license has not been revoked; TitleMax is in good standing with the State.

Doing business as a CSO, the capacity in which TitleMax formerly arranged unsecured loans in Dallas (and continues to do so elsewhere in the State), does not require a license, but does require registration with the Commissioner and the payment of a filing fee. *Id.* § 393.101 *et seq.* TitleMax's registration as a CSO is current and in good standing. Indeed, the Attorney General of Texas, in Opinion KP-0277 (App. K)—the opinion that ostensibly provoked the Amending Ordinance—has made it clear that CSOs are permitted to operate, and arrange unsecured loans, in this State.

The restrictions imposed by the Amending Ordinance on doing business as a CSO in Dallas—notably, the limitation on the total consideration that can be paid by the consumer—render it impossible to arrange unsecured loans without losing money. In direct response to the Amending Ordinance, TitleMax has ceased arranging unsecured personal loans in Dallas, as it did a few months earlier in Austin.[16] Compliance with the new restrictions imposed by the Amending Ordinance on loans arranged by a CAB has so drastically reduced loan volume and increased loan defaults that TitleMax is losing money on its title-secured loans, and may be forced to shutter Dallas stores in the near future.[17]

Thus, the City Council by passing the Amending Ordinance has done, *de facto*, what it could not have done *de jure*: prohibit the operation in Dallas of a business licensed and authorized by the State of Texas.

That result should not surprise given the manner in which the Amending Ordinance was proposed, considered, and adopted, without notice to or consultation with the companies that

---

[16] Pearson Dec. at 3-4, App. 3-4.
[17] *Id.* at 5, App. 5.

annually provide tens of millions of dollars of emergency credit to Dallas citizens and which the Amending Ordinance directly affects.  No one among Councilmembers or City staff sought to understand the business, and none inquired into the likely impact of the Amending Ordinance.  At the January 27 meeting at which the Council voted to adopt the Amending Ordinance, an Assistant City Attorney was asked by Councilmember Gates, "[D]id you talk with the industry at all when you were ... working through this ordinance?"  His candid reply was, "I'm not aware of any conversations with the industry."[18]  Councilmember Gates asked a follow-up question of Council Chair Thomas: "[H]ave we tracked … how many … business operating like this are in our city?"  Chair Thomas relied, "Yeah, no, I don't know the answer."[19]

**2.  The City Council did not have the authority to close a so-called "loophole" in state statutes with an ordinance amending the City Code.**

Transcripts of the meetings at which Councilmembers considered and ultimately approved the Amending Ordinance reveal that proponents and Councilmembers took on themselves the responsibility to address and close what they perceived as a gap in the state statutory regulatory scheme for so-called "payday" lending.   For example, at the January 27 Council meeting:

> **Chairman Thomas:** "… the anti-poverty coalition … approached myself and several other councilmembers to make sure that the loophole that was created by the opinion of the attorney general was addressed."[20]

---

[18] Transcript at 18, App. 53

[19] *Id.* at 18-19, App. 53 Remarkably, one Councilmember seemed to fault TitleMax and its competitors for failing to appear and testify at meetings of the COVID Ad Hoc Committee—meetings of which they were given no notice and not informed that the Amending Ordinance was under consideration: "This twice went to the Ad Hoc Committee.  … There were no speakers against it."  *Id* at 10, App. 51 (Councilmember Mendelsohn). It is hardly surprising that industry participants—indeed, anyone other than the proponents whose advocacy of the Amending Ordinance was directed to this particular Committee—would fail to monitor agendas of an Ad Hoc Committee whose charge was "COVID 19 Recovery and Assistance."

[20] Transcript at 8, App. 50.

**Councilmember Mendelsohn:** "It's [Chapter 50] been a highly successful ordinance before the loophole."[21]

**Assistant City Attorney Burgess:** "So yeah, [the proposed amendment] closes that loophole."[22]

The Amending Ordinance was initially brought to an earlier December 3, 2020 meeting of the Council's Ad Hoc Committee on COVID-19 Recovery and Assistance by Reverends Britt and Ayers, whose accompanying PowerPoint presentation included a slide that was titled "AG OPINION CREATES LOOPHOLES," which incorrectly summarized Texas law and the effect of Opinion KP-0277, and which also incorrectly claimed that short-term lenders had begun offering "new products that they are calling 'personal loans' and 'signature loans'."[23]  The presenters repeatedly emphasized, and Councilmembers accepted and parroted, the "loophole" pejorative:

**Reverend Britt:** "[W]e had become aware of … a recommendation by the … attorney general that … it's a work around of the existing ordinance ….  So … there was an AG opinion, Attorney General opinion that created loopholes in this ordinance …."[24]

**Reverend Ayers:** "If we just mirror [the Austin ordinance], this covers what the Attorney General's opinion has done was create more loopholes for the industry to operate."[25]

**Deputy Mayor Pro Tem McGough:** "[I]f the loophole is where it sounds like it is, we need to keep moving forward …."[26]

---

[21] *Id*. at 10, App. 51.
[22] *Id*. at 17, App. 52.
[23] App.76.
[24] Transcript at 2-3, App. 57.
[25] *Id*. at 11, App. 59.
[26] *Id*. at 33, App. 64.

At the subsequent meeting, the Chair of the Ad Hoc COVID Committee congratulated its members for voting to recommend the Amending Ordinance to the full Council for adoption: "I believe we should be ready in January in order to vote so we can fix this gap that exists."[27]

The term "loophole" is a meaningless pejorative that can be applied to any practice that is not prohibited but that the speaker or writer thinks should be.  Further, TitleMax did nothing to take advantage of Opinion KP-0277; TitleMax and its competitors had correctly understood Texas law, and had been offering unsecured loans long before the Attorney General clarified that law for those who had misunderstood it.

But the larger point is that one of the two stated purposes for the additional restrictions in the Amending Ordinance was to fill a gap in the state statutes that regulate the activities of TitleMax and its competitors.   If one accepts the proponents' and Councilmembers' characterization of the Legislature's repeated decisions not to restrict CSO-arranged unsecured loans as a "loophole," the Council did not have the authority to close it.  *See, e.g., Combs v. Health Care Services Corp.*, 401 S.W.3d 623 (Tex. 2013) ("If the Legislature considered this a loophole worth closing, it could have done so."); *City of Lubbock v. Cornyn*, 993 S.W.2d 461, 464 (Tex. App.—Austin 1999, no pet.) ("In 1997, the Texas Legislature attempted to close this loophole …"); *State v. Williams & Mettle Co.*, 888 S.W.2d 162, 163 (Tex. App.—Austin 1994, pet. denied) ("The Legislature closed this loophole by adopting a mandatory transfer provision …"); *Tandy Corp. v. Sharp* 872 S.W.2d 814, 816 (Tex. App.—Austin 1994, pet. denied) ("To close this loophole, the legislature amended Section 171.153(c) …").

---

[27] Transcript at 3, App. 82.

Neither the proponents nor the Council had the authority to undertake a City-self-help solution to a perceived deficiency in the state regulatory regime for short-term lenders. The Amending Ordinance exceeds the legitimate authority of Dallas as a home-rule city.

### 3. The subject matter of the Amending Ordinance is pre-empted by Chapter 393 of the Texas Finance Code.

Chapter 393 of the Finance Code sets out detailed requirements and restrictions on the operations of CSOs registered with the Commissioner (TEX. FIN. CODE § 393.105 *et seq.*) and of CABs licensed by the Commissioner (TEX. FIN. CODE § 393.222 *et seq.*): requirements for disclosures, specifications of the form of the contracts, posting of fee schedules, and a required notice of the consumer's right to cancel, among others.[28]

Chapter 393 has not been amended since its enactment in 2011. Proponents of the Amending Ordinance and Councilmembers who voted to adopt it described their persistent efforts to persuade the Legislature to amend the statute with additional restrictions on short-term lenders and their frustration that the Legislature, with equal consistency, declined to do so. For example, at the December 3, 2020 meeting of the COVID-19 Ad Hoc Committee:

> **Councilmember Atkins:** "You look at … senators, the people on the [Legislature's] floor who approved it. We couldn't even get it to the floor. We couldn't give the floor a vote."[29]

> **Reverend Ayers:** "So we have never stopped going to Austin. Every two years we're down, we work with a coalition. … So it's a coalition of us who go every two years trying to get some substantive changes. And as you know, we still have not closed the loophole."[30]

---

[28] *See* App. 24-47.
[29] Transcript at 17, App. 60.
[30] *Id*. at 19, App. 61.

**Reverend Britt:** "And … so that means we need the city of Dallas to go down to Austin with us and also … continue the lobbying effort …."[31]

**Deputy Pro Tem Mayor McGough:** "… I've been to DC and Austin and all the … places where we've advocated for this."[32]

At the January 27, 2021 meeting of the full Council:

**Councilmember Atkins:** "Remember when we go to Austin, you don't even get on the floor.  You look at … senators, the people on the [Legislature's] floor who approved it.  We couldn't even get this on the … desk.  It don't get off, you don't get off the floor.  You don't get to be heard … We need to bring it up in a legislative session."[33]

The reality that Chapter 393's text has been static for a decade and through five subsequent Legislative sessions—despite, as the cited comments reflect, every-second-year attempts at amendment—makes it clear that the Legislature is satisfied with the regulatory regime, including both Chapter 393 and the regulations adopted by the Finance Commission, that has been in place for those ten years.  The Legislature has obviously concluded that Chapter 393 in its present form and as administered by the Finance Commission adequately regulates TitleMax and its competitors; the statute pre-empts the field of regulation of short-term lenders in Texas.  *See* OCCC Bulletin ("If the *legislature* finds that this business practice conflicts with its intent, it could consider passing additional legislation that would put further regulatory restrictions of CSOs that obtain extensions of credit for consumers.") (emphasis added)[34].  The Amending Ordinance, imposing requirements and restrictions far in excess of anything that the

---

[31] *Id*. at 24, App. 62.
[32] *Id*. at 33, App. 64.
[33] Transcript at 13-14, App. 51-52.
[34] Quoted in Opinion KP-0277 at 4, App. 96.

Legislature, the Finance Commission, or the Office of Consumer Credit Commissioner have found necessary, improperly encroached upon the statutory regulatory scheme.

**D.      The Amending Ordinance violates Article 1, Section 19 of the Texas Constitution and the Due Process Clause of the United States Constitution.**

The Texas Constitution provides that "[n]o citizen of this state shall be deprived of life, liberty, property, privileges or immunities . . . except by the due course of the law of the land." TEX. CONST. art. I, § 19. And the United States Constitution states that "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. It is well-established that a business entity is considered a "person" and is entitled to Fourteenth Amendment due-process rights.  *Ne. Ga. Radiological Assocs., P.C. v. Tidwell*, 670 F.2d 507, 512 (5th Cir. Unit B 1982) (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 779 (1978)). Further, municipal ordinances adopted under state authority constitute "state action" and fall within the scope of the Fourteenth Amendment.  *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958).

**1.      The due process and due course required by law are well settled by both state and federal jurisprudence.**

"Deprivation by the state of a protected interest in life, liberty, or property is a prerequisite to a claim for denial of due process."  *Shelton v. City of College Station*, 780 F.2d 475, 479 (5th Cir. 1986).   Courts have routinely held that the opportunity to pursue one's livelihood is a "constitutionally protected interest."  *Cowan v. Corley*, 814 F.2d 223, 227 (5th Cir. 1987).  Such a liberty interest "may not be arbitrarily denied," and any ordinance seeking to restrict that liberty interest must be "rationally related to a legitimate public interest."  *Santos v. City of Houston, Tex.*, 852 F. Supp. 601, 607 (S.D. Tex. 1994) (citing *Cowan*, 814 F.2d at 227 and *Shelton*, 780 F.2d at 477).   While statutes (and, by extension, ordinances) are presumed to be constitutional, a party

challenging the law may overcome that presumption by showing either: (1) the ordinance's purpose "could not arguably be rationally related to a legitimate government interest;" or (2) the ordinance's "real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in the light of, the governmental interest." *Patel v. Dept. of Licensing & Regul.*, 469 S.W.3d 69, 87 (Tex. 2015).

2.  **The City did not consult with the short-term lending industry, or with consumers of loans arranged by TitleMax and its competitors, before enacting an ordinance that would eviscerate the business.**

Short-term lenders are required to provide extensive data concerning loans arranged in Texas to the Office of the Consumer Credit Commissioner ("OCCC"); the OCCC in turn compiles that data and makes it available on its website to any person or entity that cares to review it.   A copy of the OCCC's summations for the years 2019 and 2020, certified by the OCCC as required by Texas Rule of Evidence 902(4), is included in the Appendix as pages 99-195.[35]

If the proponents or the City had cared to look, they would have seen that in 2019—the last full year preceding the proposal of the Amending Ordinance—short-term lenders arranged 366,826 new loan transactions, for a total loan volume of $265,471,953, within the region that includes Dallas.[36] As a starting point for consideration of an ordinance with potentially devastating effect on a particular industry and its consumers, it would seem useful for the Councilmembers to be informed of the size of that business and the number of

---

[35] Plaintiffs have added pagination—not included in the materials as furnished and certified by the OCCC—for reference.

[36] App. at 115-118, including single-payment and installment payment deferred presentment loans and single-payment and installment payment title-secured loans in 2019 in the Dallas-Plano-Irving Metropolitan Division.

constituents who might be affected by ordinance-imposed constrictions.  And if any effort had been made to contact and consult with industry participants during the six weeks between the COVID-19 Ad Hoc Committee's vote to approve the Amending Ordinance and its consideration by the full Council, Councilmembers could have been informed of the anticipated effect of capping returns on unsecured loans and mandating repayment schedules that consumers would find daunting, unacceptable, and frankly, insurmountable.

No such consultation or investigative effort was made. Indeed, when two industry-knowledgeable speakers spoke, Councilmembers had no responsive comments and asked no questions of them until an Assistant City Attorney proved unable to answer some very basic questions.  Both of the speakers offered to work with the City on amendments that would address the proponents' and Councilmembers' concerns if consideration of the Amending Ordinance were tabled;[37] no Councilmember even commented on, much less sought to accept, those offers.

Whatever might constitute due process or due course of law in the enactment of an ordinance, it certainly does not consist of voting to approve the Amending Ordinance without any investigation; with complete disregard for the information that industry participants, in the short time allotted to them, bring before the Council; and with equal disdain and disregard for offers to work with the City on mutually-acceptable amendments.

**3. The scant justifications offered to and by the City Council and its COVID-19 Ad Hoc Committee were in some instances not valid purposes, and in others the Amending Ordinance did not bear a reasonable relation to the stated purpose.**

---

[37] Transcript at 4-5, 8-9, App. 49-50.

**a. Closing a supposed statutory "loophole" is not a valid purpose for a city ordinance.**

As set out above (Section C.2), one of two justifications offered by proponents of the Amending Ordinance and the Councilmembers who approved it was the entirely improper goal of closing a statutory gap with a city ordinance.  Neither federal due process nor state-required due course of law can conceivably be satisfied by legislative action to advance in improper purpose.

**b. The supposed additional pandemic-related burden on "payday" loan customers did not exist and thus was not a valid governmental purpose supporting the Amending Ordinance.**

The second and last justification repeatedly offered in support for the Amending Ordinance was to provide relief to consumers ostensibly driven to short-term loans, and/or experiencing difficulty repaying them, because of the COVID-19 pandemic.  Indeed, the Amending Ordinance was initially presented to, and then recommended to the full Council by, an Ad Hoc Committee on *COVID-19 Recovery and Assistance.*  At the December 3, 2020 meeting of that Committee, the proponents made repeated references to the virus:

> **Reverend Britt:** "Well, because of this age of COVID, we have residents who are particularly financially vulnerable  …. So it was a problem prior to the pandemic. And this has just simply made—it's blown up even more."[38]
>
> **Reverend Ayers:** "… I think COVID only exacerbates this issue, and it makes it more … sense of urgency. …  [W]ith COVID, we absolutely need to do what we need to do to take those protections."[39]

At the December 17 meeting at which the COVID-19 Ad Hoc Committee voted to recommend the Amending Ordinance to the full Council, Chairman Thomas—thanking his colleagues for

---

[38] Transcript at 2, App. 57.
[39] *Id*. at 10-11, App. 59.

their votes—said, "I believe we should be ready in January to vote so we can fix this gap that exists.  So many people who have been impacted … by COVID won't be impacted by potential predators as it relates to payday loans."[40]

One of the two industry speakers who managed to secure last-minute, three-minute speaking slots for the January 27 Council meeting attempted to inform the Council that customers of TitleMax and its competitors were if anything *better off*—less in need of, and more readily able to repay, short-term loans—during the pandemic than before: "[P]redictions about a tsunami of payday loans during the pandemic are false.  In fact, consumers have acted responsibly. Repayments have risen to unprecedented highs and loan demand has plummeted as a result of federal stimulus and federally enhanced unemployment benefits."[41] His testimony was ignored; Councilmembers continued to cite the pandemic as necessitating the Amending Ordinance *after* hearing Mr. Norcross and Ms. Newman:

> **Councilmember Mendelsohn:** "And especially as we are hopefully coming out of COVID and people's resources are stretched, then we know that when they're desperate, they turn to … payday lenders and lose their cars, everything they have."[42]

> **Councilmember Atkins:** "[W]e gotta find a way to make sure during this pandemic … people don't have jobs they're gonna do anything.  If I sit there with my child, I need milk, I need to pay my rent, I will do whatever necessary to borrow the money …."[43]

The OCCC statistics that Mr. Norcross would have offered if given the opportunity—which with additional data and more current data are reflected in Item L of the Appendix—bear out Mr. Norcross's testimony.  The potential impact of COVID-19 is generally thought to have been

---

[40] Transcript at 3, App. 82.
[41] Transcript at 4, App. 49.
[42] *Id* at 11, App. 51.
[43] *Id*. at 16, App. 52.

realized in this country beginning sometime in March of 2020; the economic effects—both adverse, and as well the ameliorative effects of responsive governmental assistance—first became markedly evident in the second quarter of 2020.  As for loan volume, the OCCC statistics show that the volume of short-term loans did in fact decrease, as Mr. Norcross testified, with the onset of the pandemic.  In the Dallas-Plano-Irving Region in the second quarter of 2020 there were 25,095 single-payment title-secured transactions (including loans and refinances),[44] down from 34,997 in the same quarter of 2019.[45]   In that same second quarter of 2020 there were 7,675 installment title-secured transactions,[46] compared with 14,453 in the same quarter of 2019.[47]  For so-called "payday" loans—deferred presentment transactions, which TitleMax does not arrange— in the second quarter of 2020 there were 18,971 single-payment transactions (again, loans and refinances) in this Region,[48] down from 46,679 in the same quarter of 2019.[49]

Full-year decreases were also dramatic, even though full year-over-year comparisons obviously include the first quarter of 2020, largely unaffected by the pandemic that emerged during that quarter.  New single-payment auto title loan transactions in 2020 in this Region totaled 16,598,[50] down from 25,203 in 2019;[51] new installment auto title loans, 17,465 in 2020,[52] down from 28,292 in 2019;[53] single-payment "payday" loan transactions, 47,658 in 2020 in this

---

[44] App. 160.
[45] *Id*. at 113.
[46] *Id*. at 161.
[47] *Id*. at 114.
[48] *Id*. at 158.
[49] *Id.* at 111.
[50] *Id.* at 149.
[51] *Id*. at 102.
[52] *Id.* at 150.
[53] *Id*. at 102.

Region,[54] down from 77,184 in 2019.[55]  Figures for other types of short-term loans for the state as a whole or for other Regions reflect similar decreases.

The OCCC's statistics also convincingly disprove the canard that the pandemic caused repayment problems for consumers who *did* take out short-term loans. The OCCC also tracks refinancings, transactions in which a borrower reopens a short-term loan rather than paying it off in full on the due date. Comparisons of the refinancing statistics for the second quarters of 2019 and 2020, as well as the third and fourth quarters and the full years, likewise contradict the narrative of pandemic-related short-term loan hardships. For example, only 19.44% of single-payment auto title loans in this Region were refinanced in the second quarter of 2020,[56] down from *50.81%* in the same quarter of 2019;[57] 21.77% of single-payment "payday" loans were refinanced in the second quarter of 2020,[58] down from 32.34% in the same quarter of 2019.[59] The year-over-year decreases continued throughout the third and fourth quarters and for the full year.

It isn't difficult to deduce the likely reason for both reduced usage of, and increased ease of repayment of, short-term loans.  In the second quarter of 2020, the federal government began distributing COVID relief to citizens who might otherwise have needed emergency loans: $1,200 per individual, $2,400 per couple, and $500 per eligible child.   Other such government payments followed these initial grants.  As stated above, title-secured loans arranged by TitleMax in Texas

---

[54] *Id*. at 147.
[55] *Id*. at 100.
[56] *Id*. at 160.
[57] *Id*. at 113.
[58] *Id*. at 158.
[59] *Id*. at 111.

average about $1,750; unsecured loans, substantially less. A governmental deposit of $2,400 or more into a family's bank account would have been a welcome substitute obviating the need for a loan to meet an emergency cash need—or a ready source of repayment of an existing loan.

Perhaps it seemed obvious to the proponents and the Council that a fearsome pandemic would render low-wage-earner citizens more likely to take out loans from TitleMax and its competitors and less likely to be able to repay those loans.  But that assumption could easily have been disproven by a brief investigation by anyone on the City's staff or the Council or a discussion with just one consumer; even in the absence of any such pre-vote due diligence, Councilmembers were given cause, by the testimony of two speakers, to question the "it must be true" assumption when they heard testimony to the contrary.  Regardless, Plaintiffs have now presented objective and incontrovertible evidence that the COVID-19 virus did not cause citizens to resort in increasing numbers to short-term loans or to suffer financial ruin from inability to repay them.  The pandemic did not provide a legitimate governmental interest for changing the *status quo* by adding restrictions on arrangers and lenders of short-term financing.

### c.  The Attorney General's Opinion KP-0277 addressed only CSO-arranged loans and could not have provided justification for the Amending Ordinance's additional restrictions and requirements for CAB loans.

TitleMax reiterates that virtually everything that proponents, the City Attorney' office, and Councilmembers said or hypothesized about Opinion KP-0277 was incorrect.  The Opinion did not create a "loophole," nor did it change existing law; rather, it declared and clarified that Chapter 393 had from its enactment permitted CSO-arranged loans other than title loans and deferred presentment transactions.  TitleMax and its competitors did not rush to begin arranging,

or even increase their facilitation of, unsecured loans following publication of the Opinion; for its part, TitleMax had been arranging unsecured loans in its capacity as a CSO for years.

But even if the Amending Ordinance's advocates had been correct in contending that Opinion KP-0277 had opened the floodgates for CSO-arranged unsecured loans, the Opinion could not have provided a justification for a new restriction on the title-secured loans arranged by TitleMax as a CAB. The Opinion did not address title-secured loans (or deferred presentment loans, which—again—TitleMax does not arrange) at all except to note and reject an argument that such loans were the only types permitted by the state regulatory regime of Chapter 393.

But the Amending Ordinance didn't just – as the Assistant City Attorney informed the Council—"… expand the definition to include [CSOs] in our regulations …";[60] it also added new restrictions on *CAB* transactions, including the new line-of-business-killing requirement that the customer commit to repaying 25% of the total outstanding loan balance (inclusive of all fees, interest, and principal) thirty days after funding.

Thus, whatever might be the merits (or lack of same) for citing Opinion KP-0277 as justification for bringing CSOs into the ambit of Article XI, neither the Opinion nor its supposed CSO-transaction "loophole" bear any relevance to, nor can they serve as a rational basis for, the changes that the Amending Ordinance wrought for Plaintiffs' title-secured loans.

> **d. Even if the two stated rationales for the Amending Ordinance could constitute valid governmental purposes, the specific changes in the Ordinance bear no relation to either such purpose.**

---

[60] Transcript at 17, App. 52.

The transcripts of the three hearings—two of the COVID Ad Hoc Committee, and one of the full Council—reflect no consideration of how the most significant changes in the Amending Ordinance, which went well beyond closing the supposed CSO loophole, would serve interests such as protecting pandemic-stricken consumers from the claimed ravages of short-term loans. Indeed, one of the two original proponents of the Amending Ordinance admitted that it was simply "pretty much a cut and paste job" from the earlier Austin ordinance.

The Amending Ordinance did indeed add CSOs to the coverage of Article XI. But it also added other new restrictions, including two with devastating effects on Plaintiffs' Dallas operations. First, for CSO-arranged loans, the Amending Ordinance added a limitation that "The sum of all valuable consideration, fees, or other charges owed by the customer to the credit services organization may not exceed 0.1 percent per day of the outstanding balance of the extension of consumer credit." DALLAS CITY CODE § 50.156(b).[61]   Second, it required that every loan in Dallas—whether CSO or CAB—require repayment in not more than four payments, each of which must reduce the "total amount of the extension of consumer credit transaction" by at least 25%. *Id*. § 50-151.4(d).

The proponents did not explain, and their PowerPoint presentation did not address, how such changes might benefit consumers, let alone how they related to the pandemic or the "loophole." If asked or given an opportunity to meet, TitleMax's representatives could have informed the Council or the City Attorney that TitleMax would have to cease making unsecured

---

[61] The Amending Ordinance introduced "Extension of Consumer Credit Transaction" as a defined phrase meaning "… the entirety of the agreements made by a consumer to obtain an extension of consumer credit, and includes any loan agreement between the lender and the customer, and any fee agreement between the credit services organization or credit access business (sic)." DALLAS CITY CODE §50-145(9), App. 11 and 16.

loans available to consumers—as it had in Austin—because Plaintiffs would lose money arranging loans with a 0.1% cap on the their return.  If consulted, TitleMax's representatives could have explained that most borrowers would not risk signing on for a loan with terms requiring them to repay 25% of the total balance within 30 days, and that a disproportionate percentage of those borrowers who *did* take out such a loan would find themselves in default in 30 days—as had been the case in Austin.  If the Council had accepted the two speakers' entreaties to bring TitleMax into discussions of the Amending Ordinance, TitleMax's representatives could and would have informed the Council that the overall effect of the Amending Ordinance would be TitleMax's likely exit (and, TitleMax believes, that of most of its competitors) from the Dallas market, thus removing TitleMax as a short-term credit option for a Dallas resident in need of short-term, emergency cash.

In short, apart from the issue of whether the two stated purposes for the Amending Ordinance were permissible objectives for a City governing body or addressed the reality of the pandemic's effect on Plaintiffs' business, the Council gave no consideration to the sweeping changes and limitations contained in that Ordinance or whether they bore any relation to any stated or otherwise legitimate governmental objective.

Perhaps even worse, the Council gave no apparent thought to the residents the Amending Ordinance was intended to benefit.  Wholly absent from any of the public discussion was any serious inquiry into where Dallas residents would turn for short-term credit in the absence of viable, and legitimate, short-term lending options.

## V.   CONCLUSION

Plaintiffs have met, indeed far surpassed, the requirement that they show some likelihood of success on the merits in order to obtain a preliminary injunction.  The Amending Ordinance effectively forecloses lines of business that are explicitly permitted by the state, by licensing in one instance and by registration in the other. The words of the proponents of the Amending Ordinance and of the Councilmembers who voted to adopt it amount to admissions:

- that the Amending Ordinance was an impermissible effort to close a perceived gap in a statutory regulatory regimen;
- that the City and others have repeatedly and unsuccessfully lobbied for more pervasive regulation in state statutes that have remained static for ten years and five sessions of the Legislature;
- that for due process/due course of law consideration, one of the two stated purposes of the Amending Ordinance—closing a statutory "loophole" —is not a valid City purpose, and the other—protecting citizens from pandemic-related short-term-loan hardships—is demonstrably false and unnecessary;
- that the Council gave no consideration to whether the new restrictions imposed by the Amending Ordinance would serve *any* legitimate City purpose;
- that the Council was never informed that the Amending Ordinance would restrict title-secured lending, which was not a subject of the Attorney General opinion to which the Amending Ordinance was ostensibly a response.

The City will not be harmed if a preliminary injunction is granted. Plaintiffs, on the other hand, have already been forced to cease one line of business to comply with the Amending Ordinance, and will almost certainly have to close stores and in Dallas in the absence of preliminary relief.

Plaintiffs therefore are entitled to, and request, a preliminary injunction precluding enforcement of the changes brought about by the Amending Ordinance between now and the trial of this case.

**FROST BROWN TODD LLC**

_____

T. Ray Guy
State Bar No. 08648500
rguy@fbtlaw.com
Todd J. Harlow
State Bar No. 24036724
tharlow@fbtlaw.com
Ben A. West
State Bar No. 24084074
bwest@fbtlaw.com

2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545.3472
Telecopier: (214) 545.3473

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing was sent to all counsel of

record via _electronic filing_ on June _____, 2021.

_____

T. Ray Guy