IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., IVY FUNDING COMPANY LLC, and NCP FINANCE LIMITED PARTNERSHIP, | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| V. | §<br>§ | No. 3:21-cv-1040-S-BN |
| CITY OF DALLAS, | §<br>§<br>§ | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiffs TitleMax of Texas, Inc., Ivy Funding Company LLC, and NCP Finance Limited Partnership filed a Verified Original Petition for Declaratory Relief and Application for Temporary and Permanent Injunctive Relief against the City of Dallas, challenging a recently amended ordinance concerning their industry. *See* Dkt. No. 1-3.

The City answered in state court and removed this action under 28 U.S.C. §§ 1331 and 1441(a). *See* Dkt. Nos. 1, 1-10. And United States District Judge Karen Gren Scholer referred the removed action to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and an order of reference. *See* Dkt. No. 4.

Plaintiffs moved for preliminary injunctive relief under Federal Rule of Civil Procedure 65 [Dkt. Nos. 11, 15, 16] (the PI Motion). The City responded. *See* Dkt. Nos. 19, 20. And Plaintiffs replied. *See* Dkt. Nos. 24, 25.

Through the PI Motion, Plaintiffs seek to "prohibit[ ] the City from enforcing against [them] 1. The changes and additions made to Article XI of the Dallas City Code by the Ordinance enacted on January 27, 2021; or in the alternative 2. The changes made by that Ordinance now reflected in Article XI, § 50-151.4 (d), (e) and (f), as they apply to loans secured by motor vehicle titles, arranged by TitleMax in its capacity as a Credit Access Business." *E.g.*, Dkt. No. 24 at 15.

The undersigned now enters these findings of fact, conclusions of law, and recommendation that the Court should deny the PI Motion.

## Applicable Background

Chapter 393 of the Texas Finance Code regulates short-term lending in the State. *Cf. Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 439 (5th Cir. 2004) (Texas's "usury statutes, *see* TEX. FIN. CODE § 301.001 *et seq.*, and the Credit Services Organization Act (CSOA), enacted in 1987, *see* TEX. FIN. CODE § 393[,] … govern interest and the conditions under which a broker may assess fees.").

TitleMax asserts that, as defined by Chapter 393, it operates both as a credit services organization (a CSO), by facilitating unsecured personal loans, and as a credit access business (a CAB), by facilitating loans secured with a motor vehicle title. *See* Dkt. No. 1-3, ¶¶ 12, 13. TitleMax further explains that CABs are a subset of CSOs. *See id.*, ¶ 15 ("[A]ll CABs are CSOs but not all CSOs are CABs."); *see also Consumer Serv. All. of Tex., Inc. v. City of Dall.*, 433 S.W.3d 796, 799-800 (Tex. App. – Dallas 2014, no pet.) ("Chapter 393 of the finance code regulates [CSOs]. During the 2011 Legislative Session, the Texas Legislature amended [this] Act, as relevant here, to

provide for the licensing and regulation of [CABs], a type of CSO." (citations omitted)).

And Plaintiffs explain that, while TitleMax "is not a lender and does not make extensions of consumer credit," Ivy and NCP do offer extensions of consumer credit and are governed by a separate chapter of the Texas Finance Code but "do not directly offer their loans to borrowers without the assistance of a CSO or CAB." Dkt. No. 1-3, ¶¶ 20, 14.

In 2011, the City passed Dallas City Ordinance No. 28287 (Article XI of Chapter 50 of the City Code) to regulate CABs physically located in Dallas. *See id.*, ¶¶ 27, 28; Dkt. No. 15 at 2. And "Plaintiffs modified their loan products to comply with the ordinance." Dkt. No. 15 at 2; Dkt. No. 1-3, ¶ 29.

But, on January 27, 2021, the City amended this ordinance. As Plaintiffs explain,

> [t]he Amending Ordinance changed the title of Article XI from "Credit Access Businesses" to "*Credit Services Organizations* and Credit Access Businesses," signaling a significant and unauthorized expansion of the City's purported regulatory authority to include CSOs. Toward that end, the Amending Ordinance added a definition of "Credit Services Organizations," DALLAS CITY CODE § 50.145(5), and a provision requiring a certificate of registration for any location where a person conducts the business of a CSO and specifying the information required for an application for such a certificate – obligations formerly required only for the conduct of the business of a CAB. *Id.* §§ 50-148(a), 149(a).
>
> Further, to the goal of regulating the business of non-CAB CSOs, the Amending Ordinance extended to CSOs other requirements formerly imposed by Article XI only on CABs, including the display of the CSO's certificate of registration at each of the CSO's business locations, *id.* § 50-150(b); maintenance of records, *id.* § 50-151.2; and restrictions on extensions of credit, *id.* § 50-151.4.
>
> As for restrictions on extensions of credit in particular, the Amending Ordinance imposed on CSOs upper limits on the amount that can be lent to a borrower in the form of a motor-vehicle-title loan to 3% of the customer's gross annual income or 70% of the retail value of the

motor vehicle. *Id.* § 50.151.4(b). This restriction ignored the statutory reality that non-CAB CSOs do not assist customers in obtaining loans secured by motor vehicle titles.

Further evidencing the City's intention to regulate and restrict CSOs to the same extent as CABs, the Amending Ordinance imposed on CSOs the 25%-reduction requirements and three-refinancing limitations formerly applicable only to CAB-assisted transactions. *See id.* §§ 50- 151.4(d), (e), (f). However, the Amending Ordinance imposes even more onerous repayment terms on both CAB and CSO customers by adding to Article XI a new definition, "Extension of Consumer Credit Transaction," *id.* § 50.145(9), and imposing the 25% reduction requirement – formerly applicable only to the principal amount of the loan – to "the total amount of the extension of credit transaction, including any principal, interest, fees, valuable consideration, credit access business fees, and any other charges or costs ...." *Id.* § 50- 151.4(f)(2).

In addition, the Amending Ordinance limits the fees that can be charged by a CSO to "0.1 percent per day of the outstanding balance of the extension consumer credit." *Id.* § 50-1516(b).

With respect to both CSO loans and CAB motor-vehicle-title loans, the Amending Ordinance purports to restrict the customer to making four or fewer payments of CAB or CSO fees. *Id.* § 50-151.4(d)(1), (f)(1). And, the Amending Ordinance eliminates the ability of a CSO or CAB to refinance or renew any "extension of consumer credit transaction, unless the total amount of the extension of the consumer credit transaction, including any principal, interest, fees, valuable consideration, credit access business fee, and any other charges or costs, is due in a single payment" although the CSO and CAB are not the entities that offer the extension of consumer credit (or loan) to the customer. *Id.* § 50-151.4(e). The Amending Ordinance in essence combines the independent obligations of a customer to the Lender and the CSO/CAB incorrectly into one obligation of a customer to the Lender and the CSO/CAB.

Dkt. No. 1-3, ¶¶ 31-36.

The City characterizes these amendments, in part, as "designed and intended to limit and control the excessive ancillary credit charges and fees charged by credit brokers, credit arrangers, and credit enhancers." Dkt. No. 19 at 10. But Plaintiffs assert that, by amending its ordinance, the City "has devastated [their] business in Dallas, where TitleMax has had to cease arranging unsecured loans altogether and

its business facilitating title-secured loans has been eviscerated." Dkt. No. 15 at 3 ("Absent injunctive relief, TitleMax expects to be forced to close its Dallas stores and lay off it[s] Dallas employees.").

And Plaintiffs allege, in sum, that by amending the ordinance, "the City [1] exceeded the powers of a Texas home rule city; [2] impermissibly acted to regulate a subject matter pre-empted by state statutes; and [3] deprived [them] of property without the due course of law guaranteed by" the Texas Constitution "and the due process of law guaranteed by the" United States Constitutions. *Id.* They therefore filed a verified petition in state court, on April 9, 2021, seeking a judicial declaration on these allegations, *see* Dkt. No. 1-3 at 19, as well as a temporary and a permanent injunction, *see id.* at 19-22.

The City was served one week later. *See* Dkt. No. 1, ¶ 1. It removed Plaintiffs' suit on May 5, 2021. *See generally id.* And Plaintiffs filed their Rule 65 motion [Dkt. No. 11] on June 22, 2021.

## Legal Standards and Analysis

A preliminary injunction is "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (internal quotation marks omitted).

"To be entitled to a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened

injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009) (internal quotation marks omitted); *accord Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) ("The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest."); *see generally Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392, 398 (1981) (approving of the district court's and the United States Court of Appeals for the Fifth Circuit's relying on the balance of the four factors enunciated in *Canal Authority*).

A court can issue a preliminary injunction of one of two types: prohibitory or mandatory.

"[T]he issuance of a prohibitory injunction freezes the status quo, and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.' Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (citation omitted; quoting *Camenisch*, 451 U.S. at 395).

"A mandatory preliminary injunction, as opposed to a prohibitory injunction,

seeks to alter the status quo prior to litigation rather than maintain it. That is, it mandates that defendants take some action inconsistent with the status quo rather than prohibiting them from altering the status quo." *Texas v. Ysleta del Sur Pueblo*, EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018).

If a plaintiff seeks "a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990); *accord Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

Because "[a]n indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury, [o]nly in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. Unit A Jan. 1981) (internal quotation marks omitted).

The Fifth Circuit has also cautioned:

> It must not be thought, however, that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the

status quo.

*Canal Auth.*, 489 F.2d at 576 (citations omitted).

Despite these words of caution, the rule in this circuit remains that, "when a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction of this nature, especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.")); *see also Ysleta del Sur Pueblo*, 2018 WL 1566866, at *9 ("While the mandatory/prohibitory distinction is not crucial to the inquiry, the Fifth Circuit has repeatedly held that mandatory injunctions warrant an even higher standard than prohibitory injunctions." (citations omitted)).

The Fifth Circuit's pronouncement of that rule predates its *Canal Authority* decision, and "[t]he rule in this circuit is that where two previous holdings or lines of precedent conflict the earlier opinion controls and is the binding precedent in this circuit (absent an intervening holding to the contrary by the Supreme Court or this court en banc)." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 n.8 (5th Cir. 2006); *accord United States v. Sanchez-Pena*, 336 F.3d 431, 444 n.62 (5th Cir. 2003) ("'When faced with conflicting panel opinions, the earlier controls our decision.'" (quoting *United States v. Miro*, 29 F.3d 194, 199 n.4 (5th Cir. 1994))).

In deciding a motion for a preliminary injunction, the "court may employ

informal procedures and rely on generally inadmissible evidence." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 451 (5th Cir. 2014) (internal quotation marks omitted). "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence," and "can accept evidence in the form of deposition transcripts and affidavits." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

"A party ... is not required to prove his case in full at a preliminary-injunction hearing." *Camenisch*, 451 U.S. at 395. And a ruling on whether the movant has shown "a substantial likelihood it would prevail on the merits" does "not amount to a ruling on the merits." *Jonibach Management Trust v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 (5th Cir. 2014).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. Thus, the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits" and "may be challenged at a later stage of the proceedings." *Id.* (citations and internal quotation marks omitted); *accord Hollis v. Itawamba Cnty. Loans*, 657 F.2d 746, 748 n.2 (5th Cir. Unit A Sept. 1981) ("Although evidence received at a Rule 65(a) hearing may enter the

trial record, the court's findings of fact and conclusions of law with regard to the preliminary injunction are not binding at trial. Based as they usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions should not be used outside the context in which they originally were rendered." (internal quotation marks omitted)).

I.     Prohibitory Versus Mandatory

Plaintiffs assert that, "[t]o avoid the entire loss of [their] Dallas business, the closing of TitleMax's Dallas stores, and the layoff of employees, [they] must obtain a return to the pre-January-27 *status quo* via a preliminary injunction precluding the enforcement of the restrictions added by the Amending ordinance, pending and through the trial of this case." Dkt. No. 15 at 3; *see also id.* at 6 ("TitleMax has attempted both in Austin and Dallas to conduct business with a revised and compliant form of title-secured loan, but the significantly-increasing loan defaults have rendered the business unprofitable and will almost certainly lead to the closing of TitleMax's Dallas (and Austin) operations, absent Dallas's agreement to suspend enforcement of – or this Court's injunction prohibiting – the Amending Ordinance pending trial." (footnote omitted)).

Plaintiffs do not seek a prohibitory injunction. That is, they do not request that the Court maintain the status quo that existed when they filed this lawsuit in state court on April 9, 2021. By that time, the City of Dallas's amended ordinance had been in place for more than two months. By requesting that the Court preliminarily enjoin the City's enforcement of the amended ordinance – in effect for almost five months

when Plaintiffs filed the Rule 65 motion – Plaintiffs seek to mandate that the City act inconsistent with the status quo in place when Plaintiffs filed suit.

This request for a mandatory preliminary injunction does not affect how the Court should consider the *Canal Authority* factors. But Plaintiffs' moving for preliminary injunctive relief in this posture – asking that, while the parties litigate, the Court reverse the status quo by rescinding the amendments (or some of those amendments) to the ordinance – requires that the Court apply, as to its consideration of each of the four factors, "an even higher standard than [it would apply to requests for] prohibitory [preliminary] injunctions." *Ysleta del Sur Pueblo*, 2018 WL 1566866, at \*9.

II.    <u>Likely Irreparable Harm in the Absence of Preliminary Relief</u>

Starting with the second prong, the movant "must show that it is likely to suffer irreparable harm, that is, harm for which there is no adequate remedy at law," and "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Daniels Health Sci., L.L.C. v. Vascular Health Sci., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (internal quotation marks omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the United States Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

And the "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of

an injunction," and the Supreme Court has rejected a standard providing "that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." *Id.* at 21-22 (emphasis removed); *cf. S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 188 (5th Cir. 1982) ("In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular.").

"[W]hen the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction. It is thus well-established that an injury is irreparable only if it cannot be undone through monetary remedies. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 275, 279 (5th Cir. 2012) (citations and internal quotation marks omitted).

If the movant's "only alleged harm can be obviated by monetary relief, it does not constitute the 'irreparable' injury necessary to obtain the extraordinary relief of a preliminary injunction." *Id.* at 280 (footnote omitted). "There are a few narrow

- 12 -

exceptions to the rule that the possibility of an award of damages precludes a finding of irreparable harm sufficient to authorize a preliminary injunction," including "where the rights are economic, but because of their nature or the circumstances of the case establishment of the dollar value of the loss is especially difficult or speculative." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 630 n.12 (5th Cir. 1985); *see also Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages. However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions. We have previously stated that where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." (citations and internal quotation marks omitted)).

Courts in this district have also held that a movant's "delay in seeking a TRO and preliminary injunction militates against the issuance of a TRO or preliminary injunction." *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, No. 3:16-cv-1651-L, 2016 WL 4944370, at \*16 (N.D. Tex. Sept. 16, 2016).[1]

---

[1] *See also id.* (citing *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) ("The Board waited three months before petitioning the district court for temporary relief. Although the time span between commission of the alleged

The record reflects some delay in Plaintiffs' filing their Rule 65 motion after removal. But, through the Federal Rule of Civil Procedure 16(b) scheduling process, the undersigned is also familiar with the parties' attempts to resolve the current motion prior to seeking judicial intervention. As such, any minor delay is explainable and should not be held against Plaintiffs.

Relying on sworn declarations from two TitleMax executives, *see* Dkt. No. 16 at 3-12, Plaintiffs argue that

> [t]he Amending Ordinance has forced [them] to cease offering and arranging unsecured loans and reconfigure their title-secured loans in Dallas. The revised form of title-secured loans is proving unacceptable to most of TitleMax's former and potential customers and its first-payment requirement is engendering disproportionate default rates among those customers who do sign on for the new version. The combination of reduced loan volume due to potential customers unwilling to agree to the terms of the new title-secured loans and increased defaults for the ones that do accept the City-compliant loan model has destroyed the profitability of title-secured loans. Having lost the income from unsecured loans and losing money on facilitating title loans, TitleMax will likely be forced to close Dallas stores absent the

---

unfair labor practices and [this] filing … is not determinative of whether relief should be granted, it is some evidence that the detrimental effects of the discharges have already taken their toll on the organizational drive. It is questionable whether an order of reinstatement would be any more effective than a final Board order at this point." (citations omitted)); *H.D. Vest, Inc. v. H.D. Vest Mgmt & Servs., LLC*, No. 3:09-cv-390-L (N.D. Tex. June 23, 2009) ("Although Plaintiff first learned of the alleged infringing conduct around October 13, 2008, it did not file the present motion seeking injunctive relief until March 3, 2009, almost five months later. Based on these facts, the court determines that Plaintiff's undue delay is sufficient to rebut a presumption of irreparable harm." (citations omitted))); *see also Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, No. 3:05-cv-94-D, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006) ("Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm." (cleaned up; citations omitted)).

> preliminary relief sought by the current Motion. The long term consequences will be laid-off employees, vacant storefronts in Dallas, and fewer credit options for Dallas residents; the immediate impact between now and the trial of this case will be a continued increase in defaults and continued lost income for Plaintiffs ….

Dkt. No. 15 at 7-8 (footnotes omitted); *see also* Dkt. No. 25 (sworn declaration that TitleMax is closing its Store No. 22, in Dallas, because of "the loss of business at that location, which TitleMax's personnel reasonably believe is a direct result of restrictions imposed by the January 27, 2021 ordinance amending City Code Article XU of Chapter 50").

Plaintiffs' evidence therefore reflects an injury that is more than speculative. *See Daniels Health*, 710 F.3d at 585.

And Plaintiffs' further argument that their economic losses due to the ordinance as amended "cannot be recovered in damages since the City will undoubtedly assert sovereign immunity as precluding a monetary judgment," Dkt. No. 15 at 8 – an argument that the City does not rebut in its response – carries their burden to show that "a harm is irreparable [because] there is no adequate remedy at law," *Janvey*, 647 F.3d at 600; *see Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985) ("In short, '[t]he key word ... is *irreparable*,' and an 'injury is "irreparable" only if it cannot be undone through monetary remedies.' Thus, '[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[ ]s heavily against a claim of irreparable harm.' The absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury." (footnotes omitted)); *Fed. Trade Comm'n ex*

*rel. Yost v. Educare Centre Servs., Inc.*, EP-19-CV-196-KC, 2020 WL 4334117, at *3 (W.D. Tex. Apr. 3, 2020) (Accordingly, "the Fifth Circuit recognizes monetary injuries as irreparable when they arise in '[t]he absence of an available remedy by which the movant can later recover monetary damages.'" (quoting *Enter. Int'l*, 762 F.2d at 473; citing *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016) ("The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies," and "[n]o mechanism here exists for the power companies to recover the compliance costs they will incur if the Final Rule is invalidated on the merits." (citations and footnote omitted)))); *id.* ("Here, in the event that Movants prevail, any monetary costs they incur in complying with the Preliminary Injunction would not be recoverable on a claim for damages, given that Plaintiffs are a federal agency and the State of Ohio." (citations omitted)); *Teladoc, Inc. v. Tex. Med. Bd.*, 112 F. Supp. 3d 529, 543 (W.D. Tex. 2015) ("The possibility that the TMB will assert immunity from monetary damages as a state agency also weighs in favor of finding Plaintiffs face irreparable harm." (citations omitted))

Plaintiffs have therefore shown, even under a standard heightened by their seeking a mandatory injunction, an irreparable harm in the absence of a preliminary injunction.

III.    Likelihood of Success on the Merits

"To show a likelihood of success, [Plaintiffs] must present a prima facie case, but need not prove that [they are] entitled to summary judgment." *Daniels Health*, 710 F.3d at 582; *see also Janvey*, 647 F.3d at 596 ("All courts agree that plaintiff must

present a prima facie case but need not show that he is certain to win." (internal quotation marks omitted)).

"The only question that the district court ha[s] to decide on this element in the preliminary injunction proceeding [is] whether the [movant has] shown a substantial likelihood of ultimately succeeding on the merits, potential procedural hurdles notwithstanding." *Janvey*, 647 F.3d at 599 (citation omitted; emphasis removed). That is, "the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).

But "[m]erely finding that there is more likelihood than 'no chance' is not sufficient to sustain the granting of a preliminary injunction." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.3 (5th Cir. 1979).

"To assess the likelihood of success on the merits, [the Court] look[s] to standards provided by the substantive law." *Janvey*, 647 F.3d at 596 (internal quotation marks omitted). If a plaintiff fails to identify an enforceable right that a preliminary injunction might safeguard, the plaintiff cannot prevail on the merits and therefore cannot show a substantial likelihood of ultimately succeeding on the merits. *See Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013); *Janvey*, 647 F.3d at 599. And the Fifth Circuit has held that, where plaintiffs "cannot show a substantial likelihood of prevailing on the merits because the law on the question at the heart of the dispute does not favor their position," "even if Plaintiffs have some chance of prevailing after an adjudication on the merits, the preliminary injunction was issued in error." *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*,

608 F.3d 217, 225 (5th Cir. 2010).

According to recent Fifth Circuit case law, a preliminary injunction applicant cannot avoid showing a substantial likelihood that it will prevail on the merits. *See Sepulvado*, 729 F.3d at 420 ("Because we have determined that [Sepulvado] cannot show a substantial likelihood of success ..., we need not address [the state]'s additional arguments regarding the other necessary elements for preliminary injunctive relief. Our ruling on the initial element is sufficient for reversal. The holding on the initial element is sufficient to vacate the injunction." (citations and internal quotation marks omitted); *La Union*, 608 F.3d at 225 ("The award of preliminary injunctive relief is an extraordinary remedy that should only issue if the movant shows a substantial likelihood of prevailing on the merits.").

And, notwithstanding the related but distinct standard for obtaining a stay pending appeal, the undersigned has located no Fifth Circuit decision holding that a movant seeking a preliminary injunction – as opposed to a stay pending appeal – can meet its burden by presenting only a substantial case on the merits, even where there is a serious legal question involved and the balance of the equities (or relative threatened harms) may heavily favor maintaining the status quo. *Cf. Southerland v. Thigpen*, 784 F.2d 713, 715 (5th Cir. 1986) ("In ruling on applications to this Court for stay pending appeal, we have held that where the last three *Canal Authority* factors (irreparable injury, balance of harm as between the parties, and not disserving the public interest) weigh heavily in favor of granting a stay, the first *Canal Authority* factor, likelihood of success on the merits, may be considered as

requiring not a probability of success on the merits, but merely 'a substantial case on the merits.' Assuming, *arguendo* only, that this standard should be applied to our review of the district court's denial of the preliminary injunction, it does not affect the result here, as we conclude that plaintiffs have not presented a substantial case on the merits for this purpose. We likewise believe that the district court recognized as much, as it noted that '[w]hile the *Canal Authority* test has been interpreted to be flexible, it cannot be satisfied without some likelihood of success.' In essence, the district court held that plaintiffs had demonstrated no substantial case on the merits. We agree." (citations omitted)).

But an older line of Fifth Circuit decisions holds that, "[a]s long as this [likelihood-of-success] factor is present to some degree, it is not even necessary that a substantial likelihood of success be shown" and that, "[w]here the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). The Fifth Circuit has further explained:

> The prerequisite, as an absolute, is more negative than positive: one cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate. In its negative sense, the factor is critical; but viewed positively, the importance and nature of the requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship faced by each of the parties. This is so because, as we have noted, none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus.

*State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) (citation

omitted). And, again, "where two previous holdings or lines of precedent conflict the earlier opinion controls and is the binding precedent in this circuit (absent an intervening holding to the contrary by the Supreme Court or this court en banc)." *Rios*, 444 F.3d at 425 n.8.

But, under this same line of authority, "[n]o matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will eventually prevail on the merits. Nor is there need to weigh the relative hardships which a preliminary injunction or the lack of one might cause the parties unless the movant can show some likelihood of ultimate success." *State of Tex.*, 518 F.2d at 180; *accord Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) ("An absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." (internal quotation marks omitted)).

And this line of cases still requires that a movant "clearly carr[y] the burden of persuasion," that is, "his burden of proof as to [a preliminary injunction's four] prerequisites." *Canal Auth.*, 489 F.2d at 573; *accord State of Tex.*, 518 F.2d at 179 (noting that a preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of what we have recognized as the four prerequisites to such relief"). Most importantly, so does governing Supreme Court authority. *See Winter*, 555 U.S. at 22 (explaining that preliminary injunctive relief is

"an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

To prevail on this prong, Plaintiffs must at least present a prima facie case – that is, show that there is some likelihood that they will succeed on any of their claims – that, in amending its ordinance, (1) the City exceeded its home-rule powers, or (2) the City acted to regulate a subject matter preempted by the Texas Finance Code, or (3) the City deprived Plaintiffs of property in violation of their constitutionally-protected rights to due course or due process. And, again, the standard a court would usually apply to this prong is heightened by the fact that Plaintiffs seek a mandatory injunction and must therefore show "a clear entitlement to the relief under the facts and the law." *Justin Indus.*, 920 F.2d at 268 n.7.

> A. <u>Home-rule Powers and Preemption</u>

"Home-rule cities, like the City of [Dallas], derive their powers from the Texas Constitution." *City of Hous. v. Bates*, 406 S.W.3d 539, 546 (Tex. 2013) (citing TEX. CONST. art. XI, § 5; TEX. LOC. GOV'T CODE § 51.072(a) ("The municipality has full power of local self-government.")); *accord In re Sanchez*, 81 S.W.3d 794, 796 (2002) (per curiam). They "possess the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power." *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dall.*, 852 S.W.2d 489, 490-91 (Tex. 1993) (citing *MJR's Fare of Dall. v. City of Dall.*, 792 S.W.2d 569, 573 (Tex. App. – Dallas 1990, writ denied)). Cities such as Dallas therefore "have broad discretionary powers, provided that no ordinance 'shall contain any provision inconsistent with the

Constitution of the State, or of the general laws enacted by the Legislature of this State.'" *Id.* at 490 (quoting TEX. CONST. art. XI, § 5).

To "limit a home-rule city's broad powers," the Legislature must express "its intent to do so with 'unmistakable clarity.'" *Bates*, 406 S.W.3d at 546 (citation omitted); *accord Dall. Merch.'s*, 852 S.W.2d at 491 ("[I]f the Legislature chooses to preempt a subject matter usually encompassed by the broad powers of a home-rule city, it must do so with unmistakable clarity." (citing *City of Sweetwater v. Geron*, 380 S.W.2d 550, 552 (Tex. 1964))).

But where "'[a]n ordinance of a home-rule city'" "'attempts to regulate a subject matter preempted by a state statute,'" it "'is unenforceable to the extent it conflicts with the state statute.'" *Bates*, 406 S.W.3d at 546 (quoting *Dall. Merch.'s*, 852 S.W.2d at 491; citing TEX. CONST. art. XI, § 5).

Even so, "'the mere fact that the legislature has enacted a law addressing a subject does not mean the complete subject matter is completely preempted.'" *Dall. Merch.'s*, 852 S.W.2d at 491 (quoting *City of Richardson v. Responsible Dog Owners*, 794 S.W.2d 17, 19 (Tex. 1990)). And "a general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached." *City of Beaumont v. Fall*, 291 S.W. 202, 206 (Tex. 1927) (quoted in *Dall. Merch.'s*, 852 S.W.2d at 491); *accord Bates*, 406 S.W.3d at 546 ("If a reasonable construction giving effect to both the state statute and the ordinance can be reached, then a city ordinance will not be held to have been preempted by the state statute." (citation omitted)).

"Furthermore, '[t]he entry of the state into a field of legislation ... does not automatically preempt that field from city regulation; local regulation, ancillary to and in harmony with the general scope and purpose of the state enactment, is acceptable.'" *BCCA Appeal Grp., Inc. v. City of Hous.*, 496 S.W.3d 1, 7 (Tex. 2016) (quoting *City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 796 (Tex. 1982)).

Courts "presume a home-rule city charter provision to be valid" and "cannot interfere unless it is unreasonable and arbitrary, amounting to a clear abuse of municipal discretion." *Sanchez*, 81 S.W.3d at 796 (citing *City of Brookside Vill.*, 633 S.W.2d at 792; *City of Hous. v. Todd*, 41 S.W.3d 289, 295 (Tex. App – Houston [1st Dist.] 2001, pet. denied)).

Against this legal framework, Plaintiffs argue specifically as to preemption that

> Chapter 393 of the Finance Code sets out detailed requirements and restrictions on the operations of CSOs registered with the Commissioner ... and of CABs licensed by the Commissioner ... : requirements for disclosures, specifications of the form of the contracts, posting of fee schedules, and a required notice of the consumer's right to cancel, among others.
>
> Chapter 393 has not been amended since its enactment in 2011. Proponents of the Amending Ordinance and Councilmembers who voted to adopt it described their persistent efforts to persuade the Legislature to amend the statute with additional restrictions on short-term lenders and their frustration that the Legislature, with equal consistency, declined to do so.
> ....
> The reality that Chapter 393's text has been static for a decade and through five subsequent Legislative sessions – despite, as the cited comments reflect, every-second-year attempts at amendment – makes it clear that the Legislature is satisfied with the regulatory regime, including both Chapter 393 and the regulations adopted by the Finance Commission, that has been in place for those ten years. The Legislature has obviously concluded that Chapter 393 present and as administered

by the Finance Commission adequately regulates TitleMax and its competitors; the statute pre-empts the field of regulation of short-term lenders in Texas. *See* [Office of the Consumer Credit Commissioner] Bulletin ("If the *legislature* finds that this business practice conflicts with its intent, it could consider passing additional legislation that would put further regulatory restrictions of CSOs that obtain extensions of credit for consumers.") (emphasis added). The Amending Ordinance, imposing requirements and restrictions far in excess of anything that the Legislature, the Finance Commission, or the Office of Consumer Credit Commissioner have found necessary, improperly encroached upon the statutory regulatory scheme.

Dkt. No. 15 at 16-18 (footnotes omitted).

In their motion, Plaintiffs do not point to a specific provision of Chapter 393 that, they contend, expressly preempts Dallas's amended ordinance and instead seem to argue that the Act's comprehensive, static structure implies preemption.

But, while the Texas Supreme Court has "stated that '[a] limitation on the power of home rule cities by general law ... may be either an express limitation or one arising by implication,'" it has "never delineated the distinction between the two." *BCCA Appeal Grp.*, 496 S.W.3d at 7 (quoting *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 645 (Tex. 1975)). Courts instead "focus on whether the Legislature's intent to provide a limitation appears with 'unmistakable clarity.'" *Id.* at 7-8 (citing *Dall. Merch.'s*, 852 S.W.2d at 494; *Tyra v. City of Hous.*, 822 S.W.2d 626, 628 (Tex. 1991)); *see also Republic Waste Servs. of Tex., Ltd. v. Tex. Disposal Sys., Inc.*, 848 F.3d 342, 345 (5th Cir. 2016) ("Further, 'if the limitations arise by implication, the provisions of the law must be "clear and compelling to that end."' *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 807 (Tex. 1984) (providing that a statutory enumeration of powers is not to 'be construed as an implied limitation on home rule powers').").

And, "[b]ecause the critical inquiry in determining whether an ordinance is preempted is whether the Legislature expressed its preemptive intent through clear and unmistakable language, [courts should] begin with statutory construction analysis." *BCCA Appeal Grp.*, 496 S.W.3d at 8 (citing TEX. CONST. art. XI, § 5(a); *Dall. Merch.'s*, 852 S.W.2d at 491).

Plaintiffs' failure to conduct a statutory construction analysis in support of their preemption argument prevents the undersigned from finding that they have shown that they will likely succeed on this argument considering the applicable case law set out above, under which the Court begins with the presumption that a home-rule city's ordinance is valid.

From this starting point, the proponent of preemption must demonstrate that the Legislature has expressed its intent to limit a home-rule city's broad powers with unmistakable clarity. That showing appears difficult to make without including and relying on an analysis of the statute's provisions compared with those of the ordinance. *Cf. BCCA Appeal Grp.*, 496 S.W.3d at 9 ("We must determine whether the Act and the Water Code reflect unmistakably clear legislative intent to limit the City's authority to enact an ordinance to enforce the state air-quality standards and, if so, whether the Ordinance's enforcement provisions are inconsistent with the statutory provisions." (citations omitted)); *Republic Waste Servs. of Tex.*, 848 F.3d at 347 ("[W]e hold that the language in Section 364.034(h) fails to indicate with unmistakable clarity that the legislature intended to restrict a home-rule city's authority to enter into an exclusive contract for solid waste disposal services to a

- 25 -

construction project. Accordingly, we hold that the district court erred in granting Texas Disposal's Rule 12(b)(6) motion to dismiss." (citation omitted)).

And preemption of a city ordinance may be avoided "[i]f a reasonable construction giv[es] effect to both the state statute and the ordinance." *Bates*, 406 S.W.3d at 546; *see also Nat'l Solid Wastes Mgmt. Ass'n v. City of Dall.*, 903 F. Supp. 2d 446, 469 (N.D. Tex. 2012) ("When the state legislature intends to preempt a subject traditionally within a home-rule city's broad powers, it must do so with 'unmistakable clarity.' Accordingly, courts do not find conflict between a general law and a city ordinance 'if any other reasonable construction leaving both in effect can be reached.'" (citations omitted)).

On reply, Plaintiffs do discuss a specific provision of the Finance Code, Section 393.602(b), to counter the City's argument that that provision may be read to support a municipality's regulating in this field. *See* Dkt. No. 24 at 7 ("The City quotes the third sentence of that section, permitting CABs to charge 'amounts allowed by other laws,' for the unlikely proposition that a Legislature that forbade statewide agencies from setting fee restrictions intended to allow such restrictions to be enacted, piecemeal throughout the state, by municipal governing bodies. Apart from the illogic of this contention, the City ignored three of the four sentences of that statute, which also provides that a CAB may assess fees '*as agreed to between the parties*,' that a CAB fee may be 'calculated daily, biweekly, monthly, or on another periodic basis,' and that a CAB fee 'may not be charged unless it is disclosed.'" (quoting TEX. FIN. CODE § 393.602(b))). But Plaintiffs' argument neither persuades that, through this

provision of the Finance Code, the Legislature has expressed its intent to limit a home-rule city's broad powers with unmistakable clarity nor shows that no reasonable construction could give effect to both this provision and the City's amended ordinance.

In sum, Plaintiffs have not carried their burden to show why there is no reasonable construction that can give effect to Chapter 393 and Dallas's ordinance as amended.

Related to the preemption argument, Plaintiffs contend that the City has acted impermissibly "to close a so-called 'loophole' in state statutes" – the term "loophole" having been used by City officials during their discussion of the amendment. Dkt. No. 15 at 13-16. Although Plaintiffs characterize the term "as a meaningless pejorative," they further argue that

> the larger point is that one of the two stated purposes for the additional restrictions in the Amending Ordinance was to fill a gap in the state statutes that regulate the activities of TitleMax and its competitors. If one accepts the proponents' and Councilmembers' characterization of the Legislature's repeated decisions not to restrict CSO-arranged unsecured loans as a "loophole," the Council did not have the authority to close it.

*Id.* at 15 (citations omitted).

But home-rule cities, like Dallas, do have the authority to enact ordinances in fields regulated by the State where the local regulation is "ancillary to and in harmony with the general scope and purpose of the state enactment." *City of Brookside Vill.*, 633 S.W.2d at 796. And, for the same reasons that Plaintiffs have not carried their burden as to preemption, they have not shown that the City's so-called closing a "loophole" in state regulation is not "ancillary to and in harmony with the

general scope and purpose of" Chapter 393.

Plaintiffs further bolster their preemption argument with a broader argument that the City has exceeded its wide-ranging home-rule city authority because the ordinance as amended "impermissibly precludes the successful operation of a business licensed by the State." Dkt. No. 15 at 11-13.

> The restrictions imposed by the Amending Ordinance on doing business as a CSO in Dallas – notably, the limitation on the total consideration that can be paid by the consumer – render it impossible to arrange unsecured loans without losing money. In direct response to the Amending Ordinance, TitleMax has ceased arranging unsecured personal loans in Dallas, as it did a few months earlier in Austin. Compliance with the new restrictions imposed by the Amending Ordinance on loans arranged by a CAB has so drastically reduced loan volume and increased loan defaults that TitleMax is losing money on its title-secured loans, and may be forced to shutter Dallas stores in the near future.
>
> Thus, the City Council by passing the Amending Ordinance has done, *de facto*, what it could not have done *de jure*: prohibit the operation in Dallas of a business licensed and authorized by the State of Texas.

*Id.* at 12.

Plaintiffs support this argument with two Texas intermediate court of appeals decisions: "'[Municipalities have no power to prohibit pursuit of occupations regulated by State law.' *City of Fort Worth v. McDonald*, 293 S.W.2d 256, 258 (Tex. Civ. App. – Fort Worth 1956, writ ref'd n.r.e.). If the city's ordinance 'amounts to a virtual prohibition against premises licensed by state laws, such ordinances will be held void and unenforceable.' *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. Civ. App. – Fort Worth 1938, no writ)." Dkt. No. 15 at 11.

Both cases are distinguishable from the facts here. In both, the home-rule city's ordinance prohibited a business regulated by the State from operating – at all – in

the municipality (either by declaring it to be a nuisance or by enacting prohibitory zoning). As explained by the facts of each case, neither municipal ordinance was ancillary to, and in harmony with, the state statute, and the broader takeaway is that no reasonable construction could give effect to both the state statute and municipal ordinance at issue:

> In *McDonald*, the City of Fort Worth enacted an ordinance that defined marble boards as a nuisance per se; made their ownership, operation, or exhibition a misdemeanor; prescribed a fine up to $200 for each day of violation; and provided for summary seizure by any police officer. A state statute at the time levied an occupation tax on owners of "skill or pleasure coin-operated machines," which included marble machines, marble table machines, and marble shooting machines. The court of appeals held that merely because a city has the power by charter and statute to define and prevent a nuisance does not mean a city "may 'by an arbitrary standard, declare that to be a nuisance which is not so in fact.'" The court concluded a city has no right to supersede a revenue statute by declaration that a licensed business is a nuisance. However, the court noted no general statute allowed the Fort Worth City Council to "prevent or prohibit" marble boards.

*RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 598 (Tex. App. – San Antonio 2012) (quoting 293 S.W.2d at 258); *see also Murphy*, 115 S.W.2d at 452 ("The testimony offered upon the hearing in this case is undisputed that there is no place within the city of Denton plaintiff could operate a dance hall and not violate the provisions of the ordinance attacked. As before indicated, we do not think such an ordinance is regulatory, but is as effectively prohibitory in the city of Denton as it would have been had it not contained the provisions against operation 'within less than 500 feet from any occupied building, church or school, private residence or place of business.' The provisions of law which authorize a city to regulate the location and operation of places of amusement mean regulation and not prohibition. Even such a

regulation must be a reasonable one; but if such an attempted regulation amounts to a virtual prohibition against premises licensed by state laws, such ordinances will be held void and unenforceable.").

B.    Due Course of Law and Due Process of Law

Plaintiffs also bring constitutional claims based on the City's January 2021 amendment to the ordinance, under Texas's due course of law guarantee and the due process clause of the Fourteenth Amendment to the United States Constitution. *See* Dkt. No. 15 at 18-28.

"The Texas Constitution provides that '[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.' TEX. CONST. art. I, § 19. The due process clause of the Fourteenth Amendment to the United States Constitution uses similar language[: '[N]or shall any State deprive any person of life, liberty, or property, without due process of law....' U.S. CONST. amend. XIV, § 1.]" *Tex. S. Univ. v. Villareal*, 620 S.W.3d 899, 905 (Tex. 2021) (footnote omitted; noting that the Texas Supreme Court has "'consider[ed] federal interpretations of procedural due process to be persuasive authority in applying [Texas's] due course of law guarantee.'" (quoting *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995))).

The Fifth Circuit has held that "[t]he protections afforded by the Texas Constitution's Due Course of Law Clause and the United States Constitution's Due Process Clause are generally the same." *Lindquist v. City of Pasadena*, 669 F.3d 225, 238 (5th Cir. 2012) (citing *Tex. Worker's Comp. Comm'n v. Patient Advocates of Tex.*,

136 S.W.3d 643, 658 (Tex. 2004) ("Texas's due course of law clause and the federal

due process clause are textually different, but we generally construe the due course

clause in the same way as its federal counterpart.")).

Even so, following *Patel v. Texas Department of Licensing and Regulations*, 469

S.W.3d 69 (Tex. 2015), a Due Course of Law challenge under the Texas constitution

may no longer be tantamount to a federal due process challenge. *See, e.g.*, *Hackbelt*

*27 Partners v. City of Coppell*, 661 F. App'x 843, 846 n.1 (5th Cir. 2016) (per curiam).

But the undersigned will start with federal due process protections.

> "Procedural due process imposes constraints on governmental
> decisions [that] deprive individuals of 'liberty' or 'property' interests
> within the meaning of the Due Process Clause of the ... Fourteenth
> Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The
> Supreme Court "consistently has held that some form of hearing is
> required before an individual is finally deprived of a property interest."
> *Id.* at 333. However, "[w]here a rule ... applies to more than a few people,
> it is impracticable that everyone should have a direct voice in its
> adoption," so legislative bodies may implement general policies without
> providing notice-and-hearing procedures to all affected parties. *Bi-
> Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).
> As a result, "it is well established law that once an action is
> characterized as legislative, procedural due process requirements do not
> apply." *Jackson Court Condos., Inc. v. City of New Orleans*, 874 F.2d
> 1070, 1074 (5th Cir. 1989). This is because when a legislative action
> "affects a general class of persons, those persons have all received
> procedural due process – the legislative process." *Cnty. Line Joint
> Venture v. City of Grand Prairie, Tex.*, 839 F.2d 1142, 1144 (5th Cir.
> 1988).

*Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, No. 3:17-cv-1596-N, 2018 WL

4026373, at *4 (N.D. Tex. Mar. 14, 2018); *compare cf. Jackson Court Condos.*, 874

F.2d at 1074 ("[W]here a zoning decision has been made by an elected body ... we have

characterized the action as legislative or 'quasi-legislative' negating procedural due

process claims."), *with cf. Cnty. Line Joint Ventures*, 839 F.2d at 1142 ("[A] municipal

body's action may be more likely termed adjudicative if an appointed group, such as a zoning board, makes a specific decision regarding a specific piece of property.").

It is not clear that Plaintiffs assert a separate procedural due process claim under the Fourteenth Amendment. But, if they do, *County Line Joint Ventures* shows why such a claim will likely not succeed. *See* 839 F.2d at 1145-46 ("The enactment of the ordinance was a result of a purely legislative act by the city council of Grand Prairie, an elected body which wields broad power to make a decision in the area of city planning and zoning. The ordinance in question applies generally to all [specific use permits (SUPs)] in existence and those thereafter created. County Line presented no evidence that the city council aimed the ordinance specifically at County Line rather than calling for termination of all SUPs which had suffered non-use for a period of at least six months. Because the city council possesses extensive legislative powers and had enacted an ordinance general in scope, we must apply the legislative model to the ordinance here in question and reject County Line's argument that it has a cognizable claim for relief for violation of procedural due process.").

To determine whether a plaintiff "has alleged a substantive due process violation" based on a city's amendment of an ordinance, a "court reviews [the city's] actions 'against the deferential "rational basis" test that governs substantive due process.'" *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 481(5th Cir. 2006) (quoting *Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000)).

> In the initial step of this analysis, [Plaintiffs] must demonstrate that [they have] a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies. *Simi*, 236 F.3d at 249-50.… [Assuming they do], the next step in the substantive due

process inquiry is whether the action is rationally related to a legitimate government interest. *Simi*, 236 F.3d at 250-51 (citing *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)). [And the Fifth Circuit] has said that "[t]he question is only whether a rational relationship exists between the [policy] and a conceivable legitimate objective. If the question is at least debatable, there is no substantive due process violation." *Simi*, 236 F.3d at 250-51 (citing *FM Props. Operating Co.*, 93 F.3d at 175 (alteration in original)).

*Id.*

Plaintiffs argue that the amendment of the ordinance was (1) unfair, insofar as "the City did not consult with the short-term lending industry, or with consumers of loans arranged by TitleMax and its competitors, before enacting an ordinance that would eviscerate the business," and (2) not justified, insofar as "scant justifications offered to and by the City Council and its COVID-19 Ad Hoc Committee were in some instances not valid purposes, and in others the Amending Ordinance did not bear a reasonable relation to the state purpose." Dkt. No. 15 at 19-28.

But, as the Fifth Circuit observed in *FM Properties*, "'the "true" purpose of the [policy], (i.e., the actual purpose that may have motivated its proponents, assuming this can be known) is irrelevant for rational basis analysis. The question is only whether a rational relationship exists between the [policy] and a conceivable legitimate governmental objective.'" 93 F.3d at 174-75 (quoting *Smithfield Concerned Citizens for Fair Zoning v. Twn. of Smithfield*, 907 F.2d 239, 246 (1st Cir. 1990)). And, "[i]f the question is at least debatable, there is no substantive due process violation." *Id.* at 175 (citing *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926); *Shelton v. City of College Station*, 780 F. 2d 475, 483 (5th Cir. 1985) (en banc)).

The City explains that it "has a legitimate interest in seeking to protect low-

income borrowers from abusive and predatory lending practices and charges. The Amended Ordinance is rationally related to furthering this objective because the Amended Ordinance is designed to limit the charges, fees, and assessments that low-income borrowers can be charged by loan brokers, loan arrangers, credit enhancers, and similar entities ancillary to making small consumer loans to those borrowers." Dkt. No. 19 at 21; *see also id.* at 22 ("The City has a legitimate governmental interest in preventing low-income residents from being unduly exploited and oppressed by loan brokers, loan arrangers, and credit enhancers charging very high fees for facilitating small loans. Plaintiffs have suggested several theories why they believe the City enacted the Amended Ordinance – suggesting that all reasons are invalid, irrational, arbitrary, and improper, but the actual purpose that may have motivated proponents of the Amended Ordinance to act as they did in enacting the ordinance is irrelevant for rational basis analysis. The question under a rational basis analysis of an ordinance is only whether a rational relationship exists between the ordinance and any conceivable legitimate governmental objective." (citation omitted)).

Because the City has shown that the amendments to the ordinance are rationally related to a conceivable legitimate governmental objective, Plaintiffs will not likely succeed on their federal substantive due process claim.

Turning finally to the Due Course of Law challenge based on *Patel*, in that decision, the Texas Supreme Court observed that

> Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution. That burden has been recognized in various

> decisions of Texas courts for over one hundred and twenty-five years. We continue to do so today: the standard of review for as-applied substantive due course challenges to economic regulation statutes includes an accompanying consideration as reflected by cases referenced above: whether the statute's effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest.

469 S.W.3d at 87 (citing *Mayhew v. Twn. of Sunnyvale*, 964 S.W.2d 922, 938 (Tex. 1998) (holding that an ordinance "will violate substantive due process only if it is *clearly* arbitrary and unreasonable"); citations omitted).

> In sum, statutes are presumed to be constitutional. To overcome that presumption, the proponent of an as-applied challenge to an economic regulation statute under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.

*Id.*

For the reasons explained just above, the City has shown that the amendment's purpose is arguably rationally related to a legitimate governmental interest.

Alternatively, *Patel* requires that Plaintiffs must show that, "when considered as a whole, the [amended ordinance's] actual, real-world effect as applied to [them] could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." Concerning this as-applied aspect of *Patel*, Plaintiffs argue that

> [t]he uncontroverted evidence is that instead of protecting consumers by lowering the fees on TitleMax's unsecured loans, the new cap on charges and fees has forced Plaintiffs to remove such loans as an option for

credit-needy citizens altogether. The undisputed proof is that many potential consumers of title-secured loans choose to forego such loans knowing that 25% of the total loan must now be repaid at every payment – and that consumers who do agree to such restrictive payment terms default in previously unprecedented numbers. (*See* Pearson Dec. at 4, Pls. App. 4). Finally, the City derides but does not dispute the reality that Plaintiffs' Dallas business is in jeopardy and may not survive from now until trial. In fact, one store is already closing as a result (Second Cotto Dec. at 1, Reply App. at 0001). In short, the new restrictions limit consumers' emergency-cash options and are – in the words of the Texas Supreme Court – "so burdensome as to be oppressive," both to Plaintiffs and to Dallas consumers, in light of the governmental interest.

Dkt. No. 24 at 10.

Since *Patel*, "[t]he Supreme Court of Texas has made clear that its holdings in that case must remain 'properly limited to the particular legal framework' in which they were made." *Transformative Learning Sys. v. Tex. Educ. Agency*, 572 S.W.3d 281, 293 (Tex. App. – Austin 2018, no pet.) (quoting *Hegar v. Tex. Small Tobacco Coal.*, 496 S.W.3d 778, 788 n.35 (Tex. 2016)).

And, in applying the "so burdensome as to be oppressive" test announced in *Patel*, the Texas Supreme Court

focused on the [Eyebrow] Threaders' constitutional right to occupational freedom and the State's concession that "as many as 320 of the curriculum hours [were] not related to activities that threaders actually perform." *See* [469 S.W.3d] at 89-90. The evidence showed that the Threaders were entirely shut out from practicing their trade until they completed the "oppressive" required training and that the threader trainees had to pay out-of-pocket expenses for that training "and at the same time lose the opportunity to make money actively practicing their trade." *Id.* at 88-90.

*Tex. Alcoholic Beverage Comm'n v. Live Oak Brewing Co., LLC*, 537 S.W.3d 647, 656 (Tex. App. – Austin 2017, pet. denied); *see also Transformative Learning Sys.*, 572 S.W.3d at 293 ("*Patel* involved a challenge to occupational licensing regulations

requiring cosmeticians providing threading services to undergo a minimum of 750 hours of training at their own expense. To comply with the statute, the 'threader trainees have to pay for the training and at the same time lose the opportunity to make money actively practicing their trade.' The court analyzed these requirements under our constitution's substantive-due-course provisions, which, the court concluded, 'were undoubtedly intended to bear at least some burden for protecting individual rights.' Ultimately, the court determined that the licensing regime imposed such an unreasonably oppressive burden on the threaders that it violated their right to due course of law." (citations omitted)).

Comparing Plaintiffs' arguments with the facts underlying *Patel*, the adverse economic burden that they pin on Dallas's amended ordinance is not close to the same as those faced by the Threaders in *Patel* such that Plaintiffs now face an unreasonably oppressive burden as found on the facts underlying *Patel*. The amended ordinance, for example, neither "erect[s] an economic barrier of entry into a given profession," nor does it prevent Plaintiffs "from operating within their chosen trade" or from "pursu[ing] economic or professional opportunity," nor does the amended ordinance impose an economic burden "not related to activities that [Plaintiffs] actually perform." *E.g.*, *Live Oak Brewing*, 537 S.W.3d at 656-57 (noting that, "[i]n contrast with the cosmetology scheme at issue in *Patel*, [the statute challenged by the beer manufacturers,] section 102.75(a)(7)[,] addresses one aspect of the multi-faceted business relationship between beer distributors and manufacturers in the context of the three-tier system" and concluding that, "unlike the entry barrier faced by the

Threaders in *Patel*, appellees have not demonstrated that section 102.75(a)(7) has deprived them of occupational freedom, i.e., that it has prevented them from operating within their chosen trade – brewing and selling beer – within the confines of the unchallenged three-tier system"); *Transformative Learning Sys.*, 572 S.W.3d at 293 ("The *Patel* standard and the rights at issue therein are not an issue in the present dispute. The Supreme Court of Texas has made clear that its holdings in that case must remain 'properly limited to the particular legal framework' in which they were made. And, as set out in the earlier discussion of TLS's takings claim, the statute at issue here does not erect an economic barrier of entry into a given profession. Section 12.128 does not inhibit an individual's ability to pursue economic or professional opportunity."); *see also Live Oak Brewing*, 537 S.W.3d at 658 ("Even if we agree with appellees, however, that section 102.75(a)(7) directly benefits distributors at the expense of manufacturers and that territorial rights are valuable, we cannot conclude that prohibiting appellees from receiving a lump sum payment for the assignment of territorial rights equates with their deprivation of a constitutionally protected liberty interest such as that protected in *Patel. See Patel*, 469 S.W.3d at 91 (although recognizing that 'judicial deference is necessarily constrained where constitutional protections are implicated,' explaining 'that Courts must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and maintain a high bar for declaring any of them in violation of the Constitution').").

Plaintiffs have therefore not shown a likelihood of success as to their Due

Course of Law challenge based on *Patel*. And so they have not shown that there is some likelihood that they will succeed on any of their substantive challenges, particularly under the heightened standard applicable to a mandatory injunction, which requires Plaintiffs to show "a clear entitlement to the relief under the facts and the law." *Justin Indus.*, 920 F.2d at 268 n.7.

IV.   <u>Balance of the Equities and the Public Interest</u>

The last two prongs of the "preliminary injunction analysis implicate the discretion of [the district] court to craft a remedy and weigh the evidence." *Janvey*, 67 F.3d at 601. "The third preliminary injunction factor requires [the movant] to show that, absent an injunction, its threatened injury outweighs any harm [the party opposing injunctive relief] will suffer as a result of the injunction." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Where a movant shows that its "harm is irreparable," its opponent "would need to present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement." *Id.* But "a showing of substantial likelihood of success on the merits does not create a presumption that harm to the plaintiff outweighs harm to the defendant." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

As Plaintiffs have not carried their burden under the likelihood-of-success prong, the Court need not consider the final two prongs of the analysis. *See State of Tex.*, 518 F.2d at 180; *Lakey*, 667 F.3d at 574.

**Recommendation**

The Court should deny Plaintiffs TitleMax of Texas, Inc., Ivy Funding Company LLC, and NCP Finance Limited Partnership's motion for a preliminary injunction under Federal Rule of Civil Procedure 65 [Dkt. No. 11].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: August 11, 2021

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE