# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC.,<br>IVY FUNDING COMPANY LLC,<br>and NCP FINANCE LIMITED<br>PARTNERSHIP,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF DALLAS,<br><br>        Defendant. | § § § § § § § § § § § § | No. 3:21-cv-1040-S-BN |

## PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION AND BRIEF IN SUPPORT

**FROST BROWN TODD LLC**

T. Ray Guy
Todd J. Harlow
Ben A. West
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545.3472
Telecopier: (214) 545.3473

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ................................................. 2

STANDARD OF REVIEW ....................................................................................... 4

OVERVIEW ............................................................................................................... 4

OBJECTIONS ............................................................................................................ 6

    A.    The Recommendation Imposed an Inappropriately High Standard for
        Obtaining Preliminary Relief. ................................................................... 6

        1.    Fifth Circuit law requires granting a preliminary injunction where it is
             necessary to preserve the Court's ability to render a meaningful decision on
             the merits and the existing status quo is causing irreparable harm ............... 7

        2.    Plaintiffs had no meaningful opportunity to seek a prohibitory injunction. 11

    B.    Plaintiffs Presented a Substantial Case on the Merits ......................................... 13

        1.    The Amending Ordinance impermissibly precludes the successful operation
             of a business licensed by and registered with the State. ................................ 13

        2.    The Amending Ordinance contravenes Plaintiffs' right to the due course of
             law guaranteed by the Texas Constitution. .................................................. 16

    C.    The irreparable injury to Plaintiffs outweighs any harm to the City if
        injunctive relief is granted; a preliminary injunction is in the public interest. 25

    D.    If the Court does not choose to enjoin enforcement of the entirety of the
        Amending Ordinance, it should at the least enjoin the new restrictions
        applicable to title-secured loans arranged in TitleMax's capacity as a CAB .... 26

CONCLUSION ........................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Brock Servs., L.L.C. v. Rogillio*,
  936 F.3d 290 (5th Cir. 2019) ................................................................................ 6

*Canal Auth. of Florida v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ................................................................................ 8

*City of Fort Worth v. McDonald*,
  293 S.W.2d 256 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.)........................................ 14, 15

*Crowley v. Local No. 82*,
  679 F.2d 978 (1st Cir. 1982) ................................................................................ 11

*Gonzales v. Mathis Indep. Sch. Dist.*,
  978 F.3d 291 (5th Cir. 2020) ................................................................................ 6

*Meis v. Sanitas Svc. Corp.*,
  511 F.2d 655 (5th Cir. 1975) ................................................................................ 8

*Miss. Power & Light Co. v. United Gas Pipeline Co.*,
  760 F.2d 618 (5th Cir. 1985) ................................................................................ 8

*Murphy v. Wright*,
  115 S.W.2d 448 (Tex. Civ. App.—Fort Worth 1938, no writ) ................................................... 14, 15

*Patel v. Dept. of Licensing and Regul.*,
  469 S.W.2d 69 (Tex. 2015) .................................................................................. 18, 20

*Stenberg v. Cheker Oil Co.*,
  573 F.2d 921 (6th Cir. 1978) ................................................................................ 11

**Statutes**

28 U.S.C. § 636(b)(1) ......................................................................................... 1, 4

Tex. Fin. Code § 393.603 *et seq.* ............................................................................ 14

**Other Authorities**

Constitution of the State of Texas Article 1, Section 19........................................................ 16, 17, 24

Dallas City Code Chapter 50 Article XI ......................................................................... 2, 9, 21, 22, 28

Fed. R. Civ. P. 72 ............................................................................................ 1, 4

Texas Finance Code Chapter 393 ................................................................................ 14, 25

United States Constitution .................................................................................... 16

Plaintiffs TitleMax of Texas, Inc. ("TitleMax"), Ivy Funding Company LLC ("Ivy"), and NCP Finance Limited Partnership ("NCP"), pursuant to 28 U.S.C. § 636(b)(1), FED. R. CIV. P. 72(b)(2), and Local Rule 72.1, respectfully file these their Objections, and Brief in Support, to the Findings, Conclusions, and Recommendation of the United States Magistrate Judge (Dkt. 27) (the "Recommendation"), issued on August 11, 2021.

Plaintiffs concurrently file their Objection Appendix (cited herein as "Obj. App. __").

## INTRODUCTION

On January 27, 2021, the Dallas City Council passed Ordinance No. 28287 (the "Amending Ordinance"), adding crippling new restrictions to the chapter of the City Code that has regulated Plaintiffs' business for a decade. In their Motion for Preliminary Injunctive Relief ("Motion") (Dkt. 11) and related filings,[1] Plaintiffs established that compliance with the Amending Ordinance is causing financial losses that Plaintiffs will never recover because of the City's invocation of sovereign immunity; and further, that the new restrictions will likely require the closing of all of Plaintiffs' operations in Dallas by the time of trial. A few weeks later, when Plaintiffs filed pleadings in reply to the City's opposition,[2] TitleMax had already made the decision to close one of its Dallas stores.

The City did not controvert Plaintiffs' evidence of harm caused by the Amending Ordinance, and the Recommendation correctly finds and concludes that Plaintiffs have established irreparable injury absent a preliminary injunction. However, the Recommendation misreads Fifth Circuit law in applying an erroneously burdensome standard for determining

---

[1] Plaintiffs' Amended Brief in Support of Their Motion for Preliminary Injunctive Relief (Dkt. 15) ("Ptfs Brief"); Plaintiffs' Appendix to Brief in Support of Their Motion for Preliminary Injunctive Relief (Dkt. 16).

[2] Plaintiffs' Reply to the Brief in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief (Dkt. 24); Plaintiffs' Appendix to Plaintiffs' Reply to the Brief in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief (Dkt. 25).

whether Plaintiffs met the requirements for a preliminary injunction; erroneously finds and concludes that Plaintiffs have not shown a likelihood of success on their claims that the City exceeded its powers and deprived Plaintiffs of property without due process or due course of law; and thus incorrectly recommends that the Court deny Plaintiffs' motion for a preliminary injunction.

Adoption of the Recommendation will effectively hand the City victory. By the time of trial, Plaintiffs will have suffered monetary losses that cannot be recovered from a sovereign-immune adversary; will be left with at best a decimated business in Dallas; and probably will have had to cease offering their remaining loan product in Dallas. The remedy of a preliminary injunction is designed for such circumstances. Plaintiffs accordingly object to certain of the Recommendation's findings and conclusions and request that the Court grant Plaintiffs' Motion, returning the parties pending trial to the regulatory structure that was in place for ten years prior to January 27, 2021.

## BACKGROUND AND PROCEDURAL HISTORY

For ten years the City has regulated short-term lending under an ordinance (the "2011 Ordinance") enacted in 2011 and codified as Article XI of Chapter 50 of the Dallas City Code. During that decade, Plaintiffs were able to conform their credit offerings to, and operate in compliance with, the 2011 Ordinance. The Amending Ordinance made changes and added restrictions that have devastated Plaintiffs' business and their ability to provide emergency cash to Dallas citizens who have few (if any) other options for meeting unexpected cash needs.

The City admittedly made no effort to solicit input from Plaintiffs or other companies whose businesses would be eviscerated by the Amending Ordinance—even though subcommittee and full Council discussion of the amendment involved three separate meetings

over the course of 55 days, beginning with a meeting at which third-party *proponents* of the Amending Ordinance were invited to make a presentation complete with PowerPoint slides distributed in advance.

Councilmembers and proponents of the Amending Ordinance advocated its passage on two grounds that were demonstrably incorrect. Two industry-related speakers (including TitleMax's General Counsel) learned of the Amending Ordinance one day before the January 27, 2021 meeting and were allotted brief speaking slots. In their three minutes each, they attempted to correct the misinformation but were ignored; not a single question was asked nor was any substantive comment made by any Councilmember in response to the industry-related speakers' comments. TitleMax's Motion pointed out the fallacies in the Council's actual reasoning, so for litigation purposes the City abandoned the two repeatedly expressed justifications for the Amending Ordinance in favor of a generic "protect-the-consumer" rationale. The Recommendation gave undue credence to the City's *post hoc* rationalization.

Plaintiffs have—of course—complied with the Amending Ordinance. The results have been disastrous for Plaintiffs' Dallas business, as should be expected for municipal legislation adopted with no consideration of whether its provisions would actually serve either the contemporaneously-stated goals or the new justification manufactured after Plaintiffs filed suit. Before the passage of the Amending Ordinance, TitleMax arranged (and NCP and Ivy funded) two types of loans in Dallas: unsecured personal loans and title-secured loans. The day after January 27, 2021, Plaintiffs were forced to cease arranging and funding unsecured personal loans. Plaintiffs' title-secured loan business has been decimated under the new repayment requirements for such loans. The result is that TitleMax is laying off employees, navigating steep defaults, and attempting to stem losses; and Plaintiffs overall are facing the substantial

likelihood of having to cease offering their remaining, title-secured loan product in Dallas before this case comes to trial.

TitleMax's evidence of the harm suffered as the consequence of the Amending Ordinance was uncontroverted.  Thus, the Recommendation correctly concludes that even under the heightened standard incorrectly imposed upon them, Plaintiffs have demonstrated "… an irreparable harm in the absence of a preliminary injunction."  Recommendation at 16.  However, the Recommendation erred in imposing on Plaintiffs an unduly rigorous standard for satisfying another requirement for preliminary injunctive relief, and in therefore concluding that Plaintiffs had not met that standard.

## STANDARD OF REVIEW

This Court's review of the Recommendation is *de novo*.  *See* 28 U.S.C. §636(b)(1) ("A judge of the Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); FED. R. CIV. P. 72(b)(3).

## OVERVIEW

Crucial to any realization of how the Amending Ordinance misses the mark is understanding the purpose for which borrowers seek loans through TitleMax and the consequence of putting such loans out of their reach.  Borrowers come to TitleMax because they have no little or savings with which to meet a financial emergency or address an unexpected adverse financial calamity; they do not generally seek or obtain loans from Plaintiffs for non-emergency purchases such as consumer goods, and TitleMax does not advertise its services for such purchases.[3]

---

[3] Declaration of Timothy Pearson (the "Pearson Dec.") at 2, Obj. App.2.

Further, studies have shown that *reducing* access to short-term loans options to meet a cash emergency—the implicit goal of the proponents of the Amending Ordinance—generally harms instead of helping the potential borrower.  For example, two PhD economists affiliated with the New York Federal Reserve Bank analyzed the economic consequences when two states banned short-term (or "payday") lending.  Their conclusion was that removing such loans as options harms, rather than helps, consumers.

> Georgians and North Carolinians do not seem better off since their states outlawed payday credit: they have bounced more checks, complained more about lenders and debt collectors, and have filed for Chapter 7 ("no asset") bankruptcy at a higher rate. The increase in bounced checks represents a potentially huge transfer from depositors to banks and credit unions.[4]

Borrowers choose TitleMax over other credit alternatives either because they *have* no other source of credit or they deem other sources less desirable.[5]  TitleMax's uncontroverted evidence is that "… most banks are not interested in making small dollar loans to [Plaintiffs'] customers ….  [A] loan arranged by TitleMax or one of its competitors is often the customer's only alternative, and in other cases the most financially advantageous alternative."[6]

Thus a city ordinance that makes short-term loans unavailable or unworkable doesn't mean that a Dallas citizen loses a chance to buy a flat-screen television or dine at Al Biernat's; it means that he or she won't have cash to meet a financial emergency, or will forced to utilize a more financially-disadvantageous source of credit.   As will be demonstrated below, the Amending Ordinance has had precisely that effect.

---

[4] Morgan and Strain, Payday Holiday: How Households Fare after Payday Credit Bans, Federal Reserve Bank of New York Staff Reports No. 309 (November 2007 and February 2008), at 26. "Banning payday loans did not save Georgia households $154 million per year, as … projected; it *cost* them millions per year in returned check fees. …  While our findings contradict the debt trap/addiction hypothesis against payday lending, they are consistent with the alternative hypothesis that payday credit is cheaper than the bounce 'protection' that earns millions for credit unions and banks." *Id.* (emphasis in original).

[5] Pearson Dec. at 2, Obj. App. 2.

[6] *Id.*

## OBJECTIONS

### A. The Recommendation Imposed an Inappropriately High Standard for Obtaining Preliminary Relief.

The requirements for preliminary injunctive relief are fourfold: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm in the absence of the injunction; (3) that the threatened injury outweighs any potential harm resulting from the injunction being granted; and (4) that the injunction is in the public interest. *Gonzales v. Mathis Indep. Sch. Dist.*, 978 F.3d 291, 294 (5th Cir. 2020). The moving party need not prove entitlement to summary judgment; the court may issue a preliminary injunction on a prima facie showing that the movant is entitled to relief. *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019).

The Recommendation's erroneous determination as to the first requirement—likelihood of success on the merits—foredoomed Plaintiffs' request for injunctive relief; indeed, the Recommendation does not even address the third and fourth requirements. The error permeating the Recommendation is the application of a heightened standard for review of Plaintiffs' effort to satisfy the requirements, owing to the conclusion that Plaintiffs' failure to move to enjoin the Amending Ordinance before it took effect required that their Motion be considered a request for a mandatory (rather than prohibitory) injunction:

> Plaintiffs do not seek a prohibitory injunction. That is, they do not request that the Court maintain the status quo that existed when they filed this lawsuit …. By that time, the City of Dallas's amended ordinance had been in place for more than two months. … Plaintiffs' moving for preliminary injunctive relief in this posture—asking that, while the parties litigate, the Court reverse the status quo by rescinding the amendments (or some of the amendments) to the ordinance—requires that the Court apply, as to its consideration of each of the four factors, "an even higher standard that [it would apply to requests for] prohibitory [preliminary] injunctions."

Recommendation at 11 (citation omitted, brackets in original).  The findings and conclusions to which Plaintiffs object clearly reflect the application of that heightened standard.  *See, e.g.*, Recommendation at 21 ("[T]he standard a court would usually apply … is heightened by the fact that Plaintiffs seek a mandatory injunction and must therefore show 'a clear entitlement to the relief …'"), 39 (Plaintiffs "have  not shown that there is some likelihood that they will succeed on any of their substantive challenges, particularly under the heightened standard applicable to a mandatory injunction, which requires Plaintiffs to show 'a clear entitlement to the relief under the facts and the law.").

The Recommendation erred in imposing this "heightened standard."  The law in this Circuit does not, as the Recommendation posits, require an elevated standard where (as here) the Court will be unable to render a meaningful decision on the merits absent injunctive relief and the existing status quo is itself causing irreparable injury.  Under such circumstances, the Court is to *return* the parties to their *prior* status quo pending trial. Further, the Recommendation ignored the reality that Plaintiffs had no opportunity to seek a prohibitory injunction because the Amending Ordinance took effect immediately after its enactment, which itself followed a no-notice, stealth consideration of the ordinance by the City Council.

> **1.      Fifth Circuit law requires granting a preliminary injunction where it is necessary to preserve the Court's ability to render a meaningful decision on the merits and the existing status quo is causing irreparable harm.**

The Recommendation incorrectly assumed that if the relief sought is anything other than preservation of the existing status quo—in the Recommendation's words, a prohibitory injunction—the Court must apply a heightened and rigorous standard in determining whether the movants have satisfied all of the requisites for a preliminary injunction.

Actually, under venerable Fifth Circuit authority, the choice of the standard is not a binary, either/or proposition.  Where—as here—an injunction is necessary to preserve the Court's ability to render a meaningful judgment, and the existing status quo is itself causing irreparable injury, the Court may *either* order a mandatory injunction *or* return the parties to the *previous* status quo.

> Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary injunction application, *the most compelling reason* in favor of [granting a preliminary injunction] *is the need to prevent the judicial process from being rendered futile* by defendant's action or refusal to act.

*Canal Auth. of Florida v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974) (emphasis added, brackets in original) (quoting WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 2947).[7]

And as the Fifth Circuit went on to state,

> It often happens that this purpose is furthered by preservation of the status quo, but not always.  *If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation* so as to prevent the injury, *either by returning to the last uncontested status quo between the parties* … [or] by the issuance of a mandatory injunction ….

*Canal Auth.*, 489 F.2d at 576 (emphasis added).  In short, the timing of the initial request for injunctive relief and whether the requested injunction can be considered prohibitory is not controlling where irreparable injury can only be prevented by a return to a *previous* status quo. Where the existing status quo is causing irreparable harm to one side—as the Recommendation correctly found and concluded is true here—it is necessary, in the Fifth Circuit's words, to "alter the situation," *either* by a mandatory injunction as discussed in the Recommendation, *or by returning to the last uncontested status quo.* By declaration testimony Plaintiffs demonstrated the

---

[7] *See also Miss. Power & Light Co. v. United Gas Pipeline Co*., 760 F.2d 618, 627 (5th Cir. 1985); *Meis v. Sanitas Svc. Corp*., 511 F.2d 655, 656 (5th Cir. 1975) ("… generally accepted notion that the purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits …").

substantial continuing harm to their business operations and their well-founded concern that continued compliance with the Amending Ordinance, which has already forced the termination of one loan product in Dallas, would ultimately result in Plaintiffs' reluctant abandonment of their remaining loan product in this city.

TitleMax facilitates two types of loans in Texas: first, an unsecured personal loan, in amounts averaging about $500, in TitleMax's capacity (under state law) as a Credit Services Organization ("CSO"): and second, a separate loan arranged in TitleMax's capacity (again under state law) as a Credit Access Business ("CAB"), which is secured by a motor vehicle title, typically for larger amounts averaging about $1,750.[8]  From its inception in 2011, the Original Ordinance placed restrictions on title-secured loans (as well as deferred presentment, or "payday," loans, which TitleMax does not arrange) in Dallas; the title-secured loans TitleMax facilitates in its Dallas stores complied with the Original Ordinance and its restrictions.  The changes wrought by the Amending Ordinance were devastating to both types of loans.

The Original Ordinance did not address or restrict unsecured loans; the Amending Ordinance brought such loans within the City's regulatory regime and added restrictions, most notably limiting the total charges for interest and fees to 36.5% per year.[9]  At that rate of return Plaintiffs would have lost money because of the fixed costs associated with offering such smaller loans and high default rates.  Plaintiffs therefore ceased offering and arranging unsecured loans in Dallas the day after the Amending Ordinance was adopted.[10]  TitleMax had made the same

---

[8] Declaration of Jose Urbaez Cotto at 2, Obj. App. 8.
[9] DALLAS CITY CODE § 50-151.6(b), Obj. App. 14; Pearson Dec. at 2, Obj. App. 2.
[10] Pearson Dec. at 3, Obj. App. 3.

decision in Austin several months earlier when an almost identical ordinance was adopted by the City Council in Austin.[11]

As for title-secured loans, the most significant new restriction requires the borrower to repay the loan balance in not more than four payments, each at least 25% of the total outstanding balance (including interest, fees, and principal).[12]  The almost identical amendment in Austin has decimated Plaintiffs' title-secured lending, and in Dallas the effect of the Amending Ordinance has been the same.  Potential and past customers shy away from the title-secured loan, fearful of being unable to repay one-fourth of the loan balance in a month and the entire balance in four.  On the (substantially reduced) quantity of such loans that are issued, TitleMax experiences first-payment defaults and chargeoffs at rates far in excess of its pre-Amending Ordinance experience.[13]

The cumulative impact of the total loss of the unsecured loan product and decimation of the title loan facilitation is that when this suit was filed, "TitleMax [was] losing money in its Austin and Dallas stores and cannot continue to do so …,"[14]  and, "… the effect of the Amending Ordinance will likely be the closing of [TitleMax's] stores in Dallas ….  Closing the Dallas stores will mean 17 vacant store locations and the layoff of 44 employees."[15]  The losses (not just lost profits, but actual operating losses) are mounting.  When Plaintiffs filed their reply five

---

[11] *Id.*

[12] *Id.* at 3-4, Obj. App. 3-4.  Previously, Dallas customers taking out a TitleMax "4x5" title-secured loan could take as long as five months to repay the principal and interest, so long as TitleMax's fee was paid monthly. *Id.*

[13] *Id.* at 4, Obj. App. 4.  In Austin, post-amendment first-payment defaults—customers who failed to make their initial payments—at times exceeded 50%, as opposed to less than 20% before the amendment; loan chargeoffs, which rarely exceeded 5% of loans, steadily increased and exceed 25% of loans. *Id.*  Post-amendment chargeoffs in Dallas significantly exceed chargeoff rates in the rest of the state.

[14] *Id.* at 5, Obj. App. 4.

[15] *Id.* at 5.

weeks after filing the Motion, TitleMax had already decided to close one of its Dallas stores.[16] Adverse effects continue to materialize.  At this writing, TitleMax—trying to stem losses and save its Dallas and Austin business—has reduced the staffing at its stores in those cities from two or three team members to a single team member per store, reducing their hours and pay in the process,[17] and still faces the real possibility of having to cease offering  Plaintiffs' remaining loan product in Dallas before this case comes to trial in 2022.[18]

Four and a half decades after it was handed down, *Canal Authority* remains the law in this Circuit, as well as the subject of approving citations by other Courts of Appeals.[19]  The Recommendation (at 20) cites *Canal Authority* but only for its recitation of the uncontestable proposition that movants must still carry the burden as to the four requisites for a preliminary injunction; it ignores the more significant tenets of *Canal Authority* as applied to this case.  With Plaintiffs' Dallas business destroyed, and with the City undoubtedly availing itself of its sovereign immunity defense to any damage award, any victory at trial will for Plaintiffs be an empty one.  The remaining judicial process will indeed be rendered futile absent immediate injunctive relief.  The last uncontested status quo is the regulatory framework of the pre-January-27, 2021 Original Ordinance—without the fee-and-rate cap on unsecured loans, and without the draconian repayment schedule mandated for title-secured loans.  The Fifth Circuit's well-reasoned directives in *Canal Authority* do not countenance the Recommendation's penalization of Plaintiffs by imposing unduly restrictive review standards.

**2.      Plaintiffs had no meaningful opportunity to seek a prohibitory injunction.**

---

[16] Second Declaration of Jose Urbaez Cotto (the "Second Cotto Dec.," originally filed July 29, 2021) at 1, Obj. App. 99.

[17] Third Declaration of Jose Urbaez Cotto (Third Cotto Dec.) at 2, Obj. App. 102.

[18] *Id.*

[19] *See, e.g., Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978); *Crowley v. Local No. 82*, 679 F.2d 978, 995 (1st Cir. 1982), *reversed on other grounds*, 467 U.S. 526, 104 S. Ct. 2557 (1984).

The Recommendation also penalizes Plaintiffs for failing to seek relief on a timetable rendered impossible by the City's actions.

The Amending Ordinance was formally considered by Councilmembers in three sessions: initially, at a meeting of the Council's Ad Hoc Committee on COVID-19 Recovery and Assistance (the "COVID Committee") on December 3, 2020; at another COVID Committee meeting two weeks later, on December 17, 2020; and then at the full Council meeting at which the Amending Ordinance was adopted, on January 27, 2021.  At no time during those eight weeks did the City notify participants in the affected industry that any such ordinance was under consideration.[20]  An Assistant City Attorney explaining the ordinance at that January 27, 2021 Council meeting was asked by a Councilmember, "[D]id you talk with the industry at all when you were ... working through this ordinance?"  His candid reply was, "I'm not aware of any conversations with the industry."[21]

Industry representatives learned of a hearing to consider the Amending Ordinance on *January 26th*.[22]  On one day's notice, two industry speakers had to obtain the proposed ordinance, review it, and manage to obtain a place on the Council's agenda for an individual three-minute telephonic presentation in opposition to the amendment.  But by that time, the die was cast.  No Councilmember reacted to either speaker with a question or comment, and no one

---

[20] Consideration of the subject matter of the Amending Ordinance undoubtedly began *before* that initial December 3rd COVID Committee meeting, given that the amendment was on the printed Agenda for the December 3rd meeting, Obj. App. 68-80, including the multi-page PowerPoint slides presented at the meeting by the proponents of the Amending Ordinance. *Id.* 73-80.

[21] Transcript at 17-18, Obj. App. 52-53.

[22] Third Cotto Dec. at 1, Obj. App. 101.

took either speaker up on their requests to discuss the Amending Ordinance before passing it.[23]

There was therefore no chance to seek or obtain injunctive relief *before* the Amending Ordinance was adopted, and since it took immediate effect, Plaintiffs likewise had no realistic opportunity to obtain a prohibitory injunction *after* its adoption.   The Recommendation improperly penalizes Plaintiffs and rewards the City for the stealth process under which the Amending Ordinance was proposed, considered (by as-yet undetermined City attorneys, staff, and/or Councilpersons), discussed in meetings, and enacted.   It is inappropriate to impose on Plaintiffs a heightened standard of review for failure to seek advance court intervention when they had no realistic opportunity to do so.[24]

## B.   Plaintiffs Presented a Substantial Case on the Merits.

### 1.   The Amending Ordinance impermissibly precludes the successful operation of a business licensed by and registered with the State.

In the course of applying the wrong standard of review, the Recommendation gave substantial deference to the regulatory authority of a home-rule city like Dallas.   *See* Recommendation at 21 *et seq.*   But when evaluated under the proper standard, and in light of the overwhelming evidence of devastating and irreparable harm, Plaintiffs presented more than a prima facie case that the City has exceeded its powers on multiple grounds. Plaintiffs will focus here on a single one of those grounds.

---

[23] Transcript, January 27, 2021 Council meeting, at 5, 7, Obj. App. 49, 50.  TitleMax's General Counsel Victoria Newman thereafter did respond to some of a Councilmember's questions that the assistant city attorney was unable to answer.  *Id.* at 21-24, Obj. App. 53-54.

[24] The Recommendation correctly declines to penalize Plaintiffs for delay, after filing suit, in seeking injunctive relief.  Plaintiffs chose to present their request for injunctive relief on an orderly schedule, with briefing by both sides, instead of seeking a no-notice temporary restraining order from the state District Court in which this case was originally filed. And as the Recommendation notes (at 14), Plaintiffs attempted to negotiate a voluntary abatement of the Amending Ordinance before filing the instant Motion; the City took a remarkable 35 days to respond by rejecting any such abatement.

"[M]unicipalities have no power to prohibit pursuit of occupations regulated by State law." *City of Fort Worth v. McDonald*, 293 S.W.2d 256, 258 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.).  If the city's ordinance "amounts to a virtual prohibition against premises licensed by state laws, such ordinances will be held void and unenforceable." *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. Civ. App.—Fort Worth 1938, no writ).

Both the secured and unsecured products Plaintiffs offer and arrange in Texas are sanctioned and regulated by State law. TitleMax's facilitation of title-secured loans is conducted under a license from the Texas Finance Commissioner, pursuant to TEX. FIN. CODE § 393.603 *et seq.,* to operate as a CAB.  A licensee's authorization to do business as a CAB is subject to extensive disclosure requirements and other restrictions and is subject to revocation on statutorily specified grounds.  *Id.*  § 393.614. TitleMax arranges unsecured loans (outside of Dallas and Austin) in its capacity as a CSO, for which it must register with the Commissioner and pay a filing fee.  *Id.* § 393.101 *et seq.*[25]  Both TitleMax's license from the State to operate as a CAB and its registration with the State to operate as a CSO are current and in good standing.  As set out above, the restrictions imposed by the Amending Ordinance have killed Plaintiffs' state-registered CSO unsecured loan line of business and crippled Plaintiffs' state-licensed CAB title loan business, with the likely result—not controverted by the City—of ultimately killing that business as well.

The Recommendation gives lip service to the rule that a home-rule city may not prohibit operation of a state-authorized business, then dismisses that rule by purporting to distinguish two cases (cited above) which apply it.  But a city council should not be permitted to effectively

---

[25] One of the two stated grounds for the Council's adoption of the Amending Ordinance was a misreading and misunderstanding of Attorney General Opinion KP-0277 (Obj. App. 93-98), in which the Attorney General made it clear that CSOs are allowed to operate, and arrange unsecured loans, under authority of state statutes.

exclude state-licensed and -registered lines of business by crafting a *de facto* prohibition that hasn't yet been addressed by an appellate court.  Capping returns on unsecured loans at a money-losing percentage is no less a prohibition on doing business than the ordinance declaring marble boards a nuisance in *City of Fort Worth v. McDonald*. Mandating an unrealistic repayment schedule that scares most customers away from title-secured loans (and results in draconian chargeoffs on the loans that are taken out), making it impossible to avoid losing money facilitating such loans, is no less preclusive than was the zoning ordinance in *Murphy v. Wright*.

The Recommendation blesses the Amending Ordinance's business-killing restrictions because they do not "prohibit[ ] a business regulated by the State from operating – at all …." Recommendation at 28.  But an ordinance that renders it impossible to do business without losing money effectively prohibits such a business from operating—"at all."  Limiting returns on high-overhead, high-default-rate small loans to (say) 2% per annum would obviously amount to a *de facto* prohibition on making such loans; Plaintiffs' uncontroverted evidence is that in their line of business, a 36.5% limitation is effectively such a prohibition.  Likewise, mandating repayment requirements for title-secured loans that render such loans useless to consumers means that business would consist of overhead without income.  Plaintiffs' undisputed evidence is that for its potential customers, a cash emergency does not engender confidence in ability to pay 25% of the outstanding balance at each payment date, and that customers therefore eschew such loans.

Indeed, the best evidence in the record indicates that crippling the short-term loan business was precisely the intent behind the Amending Ordinance.  Proponents of the amendment submitted a PowerPoint slide deck for inclusion in the meeting agenda for the

December 3, 2020 COVID-19 Committee meeting.[26]  One of the slides touted the impact of Dallas's 2011 Ordinance ("and its expansion to 45+ cities"): "Total Number of New Loans (decreasing); Total Number of Refinances (decreasing); Dollar amount of new loans (decreasing); Total amount of fees (decreasing); Total number of vehicles repossessed (decreasing)."[27]  Speaking to the COVID-19 Committee and referring to that slide, Reverend Ayers elaborated on the supposed benefits of limiting short-term loans:

> [T]he Dallas ordinance and its expansion of that to 45 plus other cities, it really did help. And we saw a decrease in the number of new loans and the number refinances and the number of–in the dollar amount of new loans, as well as the amount of fees (sic) decrease in a total number of vehicles repossessed also went down because of the particular practices, policies and practices put in place ….[28]

The changes advocated by the proponents and adopted by the City Council had precisely the apparently-intended effect: reducing consumer access to sources of credit that by authority of state statute are licensed by and registered with the State.

The rule of law is undisputed; the evidence is uncontroverted.  Contrary to the literalistic reasoning of the Recommendation, Plaintiffs established a prima facie case that Dallas exceeded its authority as a home-rule city by mandating monetary losses in the operation of a State-authorized business and that will likely force its abandonment.  The Recommendation is incorrect and should not be followed.

**2. The Amending Ordinance contravenes Plaintiffs' right to the due course of law guaranteed by the Texas Constitution.**

In enacting the Amending Ordinance, the City deprived Plaintiffs of property rights without extending to Plaintiffs due process of law under the United States Constitution or the due

---

[26] Obj. App. 73-80.
[27] *Id.* 79.
[28] Transcript, December 3, 2020 Meeting at 9, Obj. App 58.

course of law guaranteed by Article 1, Section 19 of the Constitution of the State of Texas.  The Recommendation concludes that Plaintiffs failed to demonstrate a likelihood of success on either their federal due process claim, Recommendation at 34, or their state due course claim.  *Id*. at 38-39. Plaintiffs disagree on both counts and will continue to assert through discovery and trial that the City's adoption of the Amending Ordinance contravened federal due process.  However, as the Recommendation notes in passing, the Texas Supreme Court has recently ruled that the protections afforded by Section 19 exceed those granted pursuant to federal due process: "Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution."  Recommendation at 31, *citing Patel v. Dept. of Licensing and Regul.*, 469 S.W.2d 69, 87 (Tex. 2015).   Accordingly, for purposes of these Objections and this Court's consideration of their Motion for Preliminary Injunctive Relief, Plaintiffs will focus on the Texas Constitution's guarantee that "No citizen of this State shall be deprived of life, liberty, property, privileges, or immunities, or any manner disenfranchised, except by the due course of the law of the land."  TEX. CONST. ART 1, § 19.

In the face of the challenge to the Amending Ordinance, the City has abandoned the justifications cited to and articulated by the Council in favor of a generic rationale which the Recommendation accepted: "to protect low-income borrowers from abusive and predatory lending practices and charges."  Recommendation at 33-34.  The City certainly chose laudatory-sounding language to justify its new restrictions; no reasonable person could oppose protecting the citizens of Dallas from abuse and predation. The problem is that the City's lofty rhetoric cannot be reconciled with state-sanctioned activity and the real-world effect of the new restrictions.   The Texas Supreme Court has outlined the elements of a due-course challenge

based on the *effect* of a regulation adopted pursuant to an otherwise acceptable purpose. To overcome the presumption of constitutionality,

> [T]he proponent of an as-applied challenge to an economic regulation statute under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be related to, or is so burdensome as to be oppressive in light of, the governmental interest.

*Patel*, 469 S.W.3d at 87. Plaintiffs have definitively shown that the real-world effect of the Amending Ordinance bears no relation to the City's *post hoc* rationale for the ordinance—and, further, that it is so burdensome, both as to Plaintiffs and the Dallas citizens it was ostensibly enacted to protect, as to be oppressive in light of that supposed interest.

### a. The rationales proposed by the proponents of the Amending Ordinance and accepted by Councilmembers were false and unsupportable.

In the Motion and Plaintiffs' other filings leading up to the issuance of the Recommendation, Plaintiffs recounted the misconceptions and false premises that apparently motivated the proposal and passage of the Amending Ordinance.[29] The level of detail in those earlier filings won't fit with the page limits applicable to these Objections, but a summary will show how disconnected that process was from the reality of the Amending Ordinance's carnage.

The proponents' and Councilmembers' stated reasons for adding new restrictions to the City's decade-long regulation of short-term lending were twofold: one, the Attorney General's issuance of Opinion KP-0277, and the other, the assumed effect of the COVID-19 pandemic on such lending. In Opinion KP-0277, the Attorney General confirmed that companies like TitleMax are allowed by state law to arrange, in their capacity as CSOs, unsecured personal loans. But the Opinion was misinterpreted by proponents of the Amending Ordinance as having

---

[29] Ptfs Brief [Dkt. 15] at 4-5, 20-26.

created a "loophole" which short-term lenders would begin to exploit to arrange loans previously unauthorized by state law.  Opinion KP-0277 did nothing of the kind. It created nothing; rather, it confirmed existing Texas law as industry participants and other knowledgeable observers had understood it for years.  TitleMax (and, to its knowledge, its competitors) did not change any of its business practices as a result of Opinion KP-0277; TitleMax simply continued its years-long practice of arranging unsecured loans, in full compliance with state law and Dallas's Original Ordinance, in addition to arranging title-secured loans in its capacity as a CAB.

Nevertheless, the proponents of the Amending Ordinance advocated its passage largely on the basis of the need to close the supposed (and supposedly new) "loophole," in their PowerPoint presentation[30] and in their remarks[31] to the COVID Committee on December 3, 2020.  Councilmembers adopted and repeatedly echoed this rationale, at that same December 3, 2020 meeting,[32] at another meeting of the COVID Committee on December 17, 2020,[33] and at the January 27, 2021 meeting at which the full Council adopted the Amending Ordinance.[34]

A second justification offered by the proponents was the COVID-19 pandemic, which, they assumed and forcefully claimed, had exacerbated the usage of short-term loans and such loans' adverse effects on low-income citizens: "Well, because of this age of COVID, we have residents who are particularly financially vulnerable …. So it was a problem prior to the pandemic. And this has just simply made—it's blown up even more."[35]  Indeed, it is significant that the initial presentation of the Amending Ordinance was to the Council's Ad Hoc Committee on *COVID-19 Recovery and Assistance.*  Once again, Councilmembers adopted and repeated this

---

[30] Agenda, December 3, 2020 Meeting, Obj. App. 73-80.
[31] Transcript,  December 3, 2020 Meeting, at 6, 10-11, Obj. App. 58-59.
[32] *Id.*  at 33, Obj. App. 64.
[33] Transcript, December 17, 2020 Meeting, at 3, Obj. App. 82 ("… so we can fix this gap that exists …").
[34] Transcript, January 27, 2021 Meeting, at 16, Obj. App. 52.
[35] Transcript, December 3, 2020 Meeting, at 2, Obj. App. 57. *See also id.* at 10-11, Obj. App. 59.

rationale at the December 3rd[36] and December 17th[37] COVID Committee Meetings and the January 27, 2021 Council meeting.[38] One of the two industry representatives who spoke at the final meeting attempted to inform the Council that customers of TitleMax and its competitors were, if anything, *better off* as to short-term loans—less in need of them, and more readily able to repay them—than before the pandemic:  "[P]redictions about a tsunami of payday loans during the pandemic are false.  In fact, consumers have acted responsibly. Repayments have risen to unprecedented highs and loan demand has plummeted as a result of federal stimulus and federally enhanced unemployment benefits."[39] His testimony was ignored.  TitleMax's evidence filed concurrently with the Motion conclusively proved the witness correct.   Post-pandemic, both statewide and in the Dallas area, short-term loan volume fell drastically, almost certainly because federal assistance dollars readily replaced short-term loans as sources of emergency cash.  Borrowers who did take out such loans post-pandemic were much more likely to be able to repay their loans given the availability of government assistance.[40]

### b.  The Council gave no consideration to the real-world effect of the Ordinance.

It should not surprise that an ordinance adopted based on misinformation would have adverse effects on all directly interested parties.   And of equal significance as those misconceptions is what the transcripts prove was *not* considered by the Council.  As noted above, a statute or ordinance fails the due course of law test if, among other possible shortcomings, its "real-world effect … could not arguably be related to, or is so burdensome as to be oppressive in light of, the governmental interest."  *Patel*, 469 S.W.3d at 87.  Neither the

---

[36] *Id.* at 30, Obj. App. 64 ("… with [pandemic] rental assistance coming to an end this month, people will turn to payday loans …").
[37] Transcript, December 17, 2020 Meeting at 3, Obj. App. 82.
[38] Transcript, January 27, 2021 Meeting at 11, 14, Obj. App. 51-52.
[39] *Id.* at 4, Obj. App. 49.
[40] Pearson Dec. at 5, Obj. App. 5; *see* Ptfs' Brief [Dkt. 15] at 22-23.

proponents nor Councilmembers gave any apparent consideration to how the Amending Ordinance would operate in practice or the burdens it would impose—not just on industry participants like Plaintiffs, but also on actual and potential customers. Those effects have been (and were predictably anticipated to be, had anyone asked) substantially adverse to both sides of the lending transaction.

An especially glaring omission was *any* discussion—pro or con—of the Amending Ordinance's changes concerning CAB-capacity title-secured loans. As mentioned above, proponents and Councilmembers discussed at length their desire to close the supposed state statutory "loophole" by adding CSOs to the previous regulation of CABs Article XI.[41] The Amending Ordinance did that, and imposed a cap of 36.5% per annum on the fees and interest that a CSO can charge to a customer in Dallas;[42] the effect of this restriction—forcing Plaintiffs to abandon unsecured loans in Dallas—has been discussed herein.

But the Amending Ordinance also added major and crippling restrictions for *CAB-capacity title-secured loans*, most notably requiring repayment of such loans in not more than four payments with at least 25% of the balance to be repaid with each payment.[43] *The Council gave no apparent consideration to this change,* which has decimated Plaintiffs' title-secured lending business. The proponents' December 3, 2020 PowerPoint presentation[44] made no mention of proposed changes concerning CAB loans. The Assistant City Attorney who addressed the Council in January told the Council that the amendment "has broadened the

---

[41] The Amending Ordinance adding the phrase "credit services organization or" to the multiple references in the Original Ordinance to "credit access business." Obj. App. 15-23 (*passim*) (blackline comparison of Amending Ordinance to Original Ordinance).
[42] Dallas City Code Chapter 50, Article XI, § 50-151.6(b), Obj. App.14.
[43] *Id*. § 50-151.4(d), Obj. App. 13.
[44] Obj. App. 73-80.

definition [s]o it applies to credit services organizations …"[45] but didn't inform the Councilmembers that CAB loans were also affected by the Amending Ordinance.   No Councilmember asked about or otherwise mentioned CAB or title-secured loans.   From all appearances, Councilmembers had no idea that they were adding a game-changing repayment obligation for title-secured loans.

The transcripts are likewise bereft of any consideration by the Council of how, if at all, the new restrictions would actually help customers with either type of loan.   Even if the City's new "provide relief to the consumer" rationale actually motivated Councilmembers' votes, there was no discussion of whether capping returns on unsecured loans would save the consumer money or instead would remove such loans as a source of emergency cash; or whether mandating quick and substantial paydown requirements for title-secured loans would benefit the borrower, or instead force him into early default and potential repossession, or scare him away from such loans and toward more detrimental forms of credit.

Councilmembers no doubt acted with good intentions when they cast their votes. Unfortunately, they were inadequately informed and ill prepared for the task.

**c.   The real-world effect of the Amending Ordinance has been burdensome and oppressive—to Plaintiffs, *and* to consumers.**

The uncontroverted evidence submitted by Plaintiffs is that the Amending Ordinance has had severe and adverse consequences, both for TitleMax and the Lenders on one side of the transaction, and for Dallas borrowers on the other.   As shown above (*see infra* at 17), the

---

[45] Transcript, January 27, 2021 meeting at 16-17, Obj. App. 52.   A Senior Assistant City Attorney, addressing the December 3, 2020 meeting of the COVID-19 Committee, likewise informed the Committee members that Chapter 50 of the City Code was "the chapter that deals with these credit access businesses.   And now we're adding credit services organizations to fall under that umbrella as well…. [I]t brings credit services organizations into our regulatory scheme …."   Transcript, December 3, 2020 meeting at 37-38, Obj. App. 65-66.   She did not mention the changes with respect to credit access business loans.

proponents obviously intended for the Amending Ordinance to adversely affect Plaintiffs and others in the short-term lending industry; there is no indication that proponents or Councilpersons had any concept of the real-world consequences of their changes on Dallas citizens who might otherwise avail themselves of Plaintiffs' loans.

As shown (without contradiction) by Plaintiffs' evidence, customers seek and obtain Plaintiffs' short-term loans to meet financial emergencies, for which they often have no other source of ready cash.   Thus, any governmental action that puts such a loan beyond a citizen's reach actually harms the consumer by removing an option—often the least harmful one–for alleviating a financial emergency.

The day after the Amending Ordinance was enacted, Plaintiffs' unsecured loans were no longer available in Dallas.  On January 27th, a Dallas construction worker needing $500 to repair the truck that takes him to work could walk into a TitleMax store, read the extensive disclosures of the fees charged and repayment terms, decide whether or not to take out a loan on those terms, and walk out in half an hour with a debit card loaded with the cash he needed for his truck repairs.  The next day he could not do so.  The new 36.5% cap did not, in the City's words, "protect [him] from being unduly exploited and oppressed …;"[46] instead it removed a source— very likely his best or only source—of much-needed cash.

As for title-secured loans, the newly mandated rigid and fast repayment schedule has had a similar effect.  For Plaintiffs the combination of reduced loan volume and increased defaults and chargeoffs has destroyed the economics of offering title-secured loans.[47]   For most of the potential customers, the onerous and often-unrealistic repayment schedule effectively puts such

---

[46] Recommendations at 34.
[47] Pearson Dec. at 5, Obj. App. 5.

loans out of reach.   In its briefing, the City now contends that consumers benefit by saving fees and interest by reason of faster payback.  In practice, most of those consumers entirely lose the benefit of cash to meet their financial emergencies.  They save fees and interest, but only because they cannot take out a loan at all.

When Plaintiffs filed their Motion in June, with five months' experience operating under the Amending Ordinance and additional months of experience under the Austin ordinance, Plaintiffs' evidence predicted that TitleMax would likely have to close Dallas stores absent preliminary injunctive relief.[48]  By the time Plaintiffs filed their Reply Brief on August 22, 2021, the long-term consequences were already being felt, with TitleMax having made the decision to close one Dallas store because of the Ordinance.[49]   A few weeks later, at this filing, the consequence of the City's ill-considered amendment has become even more pronounced; in an effort to stop hemorrhaging losses in Dallas, TitleMax has reduced staffing to one employee at each Dallas store.[50]

In short: Plaintiffs have presented more than a prima facie showing that their rights to the due course of law under Article 1, Section 19 of the Texas Constitution were violated, flagrantly, by the Amending Ordinance.  The real-world effect of the ordinance when considered as a whole—to Plaintiffs, and to the Dallas consumers for whom it was supposedly enacted—are so burdensome as to be oppressive in light of the high-sounding but misguided purpose of preventing abuse of Dallas citizens.  The Council gave no consideration to whether the particular revisions they enacted would serve their expressed concerns; as shown above and by Plaintiffs' evidence, they do not do so.

---

[48] *Id.*
[49] Second Cotto Dec. at 1, Obj. App.99.
[50] Third Cotto Dec. at 2, Obj. App. 102.

**C. The irreparable injury to Plaintiffs outweighs any harm to the City if injunctive relief is granted; a preliminary injunction is in the public interest.**

The Recommendations omitted any discussion of the final two requisites for issuance of preliminary injunctive relief: that the irreparable injury to the movant outweighs any harm that the injunction might cause the opposing party, and that a preliminary injunction is in the public interest.   Plaintiffs have satisfied both factors.

The injury that has been, and is being, and will be suffered by Plaintiffs has been laid out above and in Plaintiffs' previous filings; their evidence is unopposed, and indeed the Recommendations concede the inevitability of irreparable harm.  On the other hand, the City will suffer no harm if Plaintiffs are allowed to resume pre-January-27, 2021 business operations because of a preliminary injunction. The Original Ordinance has been in effect and unchanged (until January 27) since its enactment in 2011.  Plaintiffs have operated in compliance with the Original Ordinance, and Dallas citizens have been receiving loans made in compliance, for those ten years.  Plaintiffs simply ask this Court to order that their loans and the City's regulation of those loans be the same between now and the trial of this case as they were for the previous ten years.   The City cannot conceivably articulate any harm to the City resulting from business conducted in a form that the City found acceptable for the immediate past decade.

Neither the proponents nor any Councilmember justified the Amending Ordinance on the ground that short-term lending was damaging the City.  Indeed, the City will likely lose tax revenue *absent* an injunction, as laid-off employees (of TitleMax and, likely, its competitors) lose their sales-tax-generating purchasing power, and vacancies in TitleMax store locations

reduce property valuations and tax revenues.[51]   The harm to Plaintiffs from compliance with the Amending Ordinance is real, immediate, and devastating; harm to the City in the event of a preliminary injunction is nonexistent.

The issuance of an injunction will be in the public interest and indeed will advance that interest, preserving Dallas citizens' choice to accept or reject Plaintiffs' loans. Plaintiffs' customers have always had the *option* of repaying a loan (whether unsecured or title-secured) in the manner now *required* by the Amending Ordinance (25%-per-payment total reduction) but have had the additional option of deferring payment until the necessary resources became available.   A preliminary injunction will restore, pending trial, the flexibility that Plaintiffs' customers have enjoyed for years, and in the meantime will preserve dozens of well-paying jobs in Dallas.   And the City cannot articulate a legitimate interest in destroying a business in advance of the court determination of whether the City was entitled to do so.

**D. If the Court does not choose to enjoin enforcement of the entirety of the Amending Ordinance, it should at the least enjoin the new restrictions applicable to title-secured loans arranged in TitleMax's capacity as a CAB.**

The City's currently expressed purpose in passing the Amending Ordinance was:

> to provide some protection and assistance to low-income consumers/borrowers to limit and reduce the undue oppression and exploitation of these low-income consumers at the hands of the loan brokers, loan arrangers, and credit enhancers which charge exorbitant fees and charges ….

Defendant's Brief in Opposition to Plaintiffs' Motion for Preliminary Injunctive Relief (Dkt. 19), at 21; *see also id*. at 22 ("high cost predatory loans … abusive charges and fees …").

---

[51] Two Councilpersons remarked derisively on the number of short-term lenders within short stretches of City streets. *See* Transcript, December 3, 2020 COVID-19 Committee Meeting at 34, Obj. App. 64 (Deputy Mayor Pro Tem McGough: "… store after store right next to each other …"); January 27, 2021 Council Meeting at 11-12, Obj. App. 1 (Councilperson Atkins: "We counted so many of the payday lenders store after [store] on Camp Wisdom [Road]").   It seems unlikely that active locations offend sensibilities more than would vacant storefronts.

Summarized and shorn of pejoratives, the City's justification for the Amending Ordinance is to limit fees and charges that the City deems too high.

The Amending Ordinance at least superficially addresses the City's generic goal as to Plaintiffs' unsecured, CSO-capacity loans, by limiting the total consideration that can be charged the borrower to 0.1% per day, 36.5% per year.  As Plaintiffs have shown, this limitation impermissibly makes it impossible to conduct in Dallas a state-authorized line of business, and further contravenes constitutionally guaranteed due course of law by its oppressive and burdensome operation in practice.  But it arguably represents at least a clumsy *attempt* to address the City's supposed concern with high fees and its desire to reduce them.

Yet the rigid, quick-payback, 25%-per-payment reduction requirement for title-secured CAB loans lacks even that superficial connection to the purpose recited by the City.  The ordinance does not cap the fees that can be charged on such loans.  It *limits* the fees only by limiting the duration of such loans.  But the borrower has always had the option of paying down the loan early, without penalty, at 25% per payment or more if he or she chose to do so.  Thus, the Ordinance's changes as to CAB-capacity title-secured loans bear no reasonable relation to the City's after-adopted purpose of protecting borrowers from high fees and charges.

In essence, what the Councilmembers did in enacting the CAB-related changes in the Amending Ordinance was to declare that they knew what was best for low-income, cash-strapped borrowers—more so than the borrowers themselves, who might otherwise, with full awareness of their upcoming cash flows and of Plaintiffs' well-disclosed charges and fees, figure out the repayment schedule best for them.  Well-intentioned paternalism does not amount to a rational relationship to a high-sounding governmental purpose.  And of course, neither CAB

loans in general, let alone the new schedule-and-amounts-of-repayment requirements, were even mentioned in any of the three Council considerations of the Amending Ordinance.

Enforcement of the entirety of the Amending Ordinance should be enjoined. But in the (hopefully unlikely) eventuality that the Court disagrees with Plaintiffs (and agrees with the Recommendation) as to CSO-capacity unsecured loans, the Court should nevertheless overrule the Recommendation, and issue a preliminary injunction, as to the provisions in the Amending Ordinance applicable to CAB-capacity title-secured loans: Section 50-151.4(c), (d), (e), (f) and (g) of Article XI of the Dallas City Code.

**CONCLUSION**

The Court's ability to render a meaningful ruling on the merits is in jeopardy as Plaintiffs suffer, because of the Amending Ordinance, losses which the sovereign-immune City will never reimburse and face the likely closing of their CAB business in Dallas. The City has effectively prohibited one state-registered line of business and crippled a separate state-licensed line which as a result hangs in the entirely-uncertain balance. The Recommendation applied an inapposite and unduly-harsh standard in determining, erroneously, that Plaintiffs had not demonstrated the requisite prima facie case on the merits.

Granting the requested preliminary injunction will not harm the City, but will merely return the parties to the regulatory regime that the City found sufficient for a decade before January 27th of this year. *Denying* the injunction will multiply the monetary losses being suffered by Plaintiffs and probably kill their remaining existing Dallas loan product. Under these circumstances, the governing Fifth Circuit law requires preliminary relief restoring the status quo that existed before it was upended by the Amending Ordinance.

In the event that the Court disagrees with Plaintiffs as to enjoining the entirety of the Amending Ordinance, it should nevertheless preliminarily enjoin its additional restrictions on Plaintiffs' CAB-capacity title-secured loans—new restrictions that entirely escaped the attention of the City Council that enacted them.

The standard of review applied in the Recommendation was wrong and should not be followed; the Recommendation's findings and conclusions as to Plaintiffs' showing of their potential success on the merits were in error; the recommendation that preliminary injunctive relief be denied should not be followed.

Respectfully submitted,

**FROST BROWN TODD LLC**

*/s/ T. Ray Guy*
T. Ray Guy
State Bar No. 08648500
rguy@fbtlaw.com
Todd J. Harlow
State Bar No. 24036724
tharlow@fbtlaw.com
Ben A. West
State Bar No. 24084074
bwest@fbtlaw.com

2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201
Telephone: (214) 545.3472
Telecopier: (214) 545.3473

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing was sent to all counsel of

record via *electronic filing* on September 7, 2021.


/s/ T. Ray Guy
T. Ray Guy