IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., IVY FUNDING COMPANY LLC, and NCP FINANCE LIMITED PARTNERSHIP, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-cv-1040-S-BN |
| CITY OF DALLAS, | § § | |
| Defendant. | § § | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
OBJECTIONS TO MAGISTRATE JUDGE'S RECOMMENDATION THAT
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION BE DENIED**

CHRISTOPHER J. CASO
City Attorney

Gary R. Powell
Texas Bar No. 16195500
gary.powell@dallascityhall.com
Senior Assistant City Attorney

Kathleen M. Fones
Texas Bar No. 24050611
kathleen.fones@dallascityhall.com
Senior Assistant City Attorney

Dallas City Attorney's Office
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
214-670-3519 / fax 214-670-0622

Attorneys for Defendant City of Dallas

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................. 2

III.    ARGUMENT ...................................................................................................... 9

        A.      LEGAL STANDARD FOR INJUNCTIVE RELIEF ........................................... 10

        B.      THE AMENDED ORDINANCE DOES NOT AMOUNT TO A
                PROHIBITION OF A BUSINESS LICENSED BY THE STATE ..................... 14

        C.      THE AMENDED ORDINANCE DOES NOT VIOLATE PLAINTIFFS'
                RIGHTS UNDER THE TEXAS DUE COURSE OF LAW PROVISION
                OR THE DUE PROCESS CLAUSE UNDER THE FOURTEENTH
                AMENDMENT .......................................................................................... 17

        D.      PLAINTIFFS HAVE NOT MADE THE SHOWING REQUIRED FOR A
                PRELIMINARY INJUNCTION ....................................................................... 21

IV.     CONCLUSION .................................................................................................. 24

CERTIFICATE OF SERVICE ....................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Austin Apartment Ass'n v. City of Austin,*
    89 F. Supp. 3d 886 (W.D. Tex. 2015) ............................................................ 21

*Barr v. Lee,*
    140 S. Ct. 2590 (2020) ................................................................................... 14

*Big Tyme Investments, LLC v. Edwards,*
    985 F.3d 456 (5th Cir. 2021) .................................................................... 21, 22

*Brock Services, L.L.C. v. Rogillio,*
    936 F.3d 290 (5th Cir. 2019) .................................................................... 11, 12

*Canal Authority of the State of Florida v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ........................................................................ 12

*City of Fort Worth v. McDonald,*
    293 S.W.2d 256 (Tex. Civ. App.—Fort Worth 1956,
    writ ref'd n.r.e.) ............................................................................................ 16

*F.C.C. v. Beach Communications, Inc.,*
    508  U.S. 307 (1993) ...................................................................................... 21

*FM Properties Operating Co. v. City of Austin,*
    93 F.3d 167 (5th Cir. 1996) .......................................................................... 17

*Heller v. Doe,*
    509 U.S. 312 (1993) ...................................................................................... 21

*Martinez v. Matthews,*
    544 F. 2d 1233 (5th Cir. 1976) ..................................................................... 11

*Maryland v. King,*
    567 U.S. 1301 (2012) .................................................................................... 23

*Mayhew v. Town of Sunnyvale,*
    964 S.W. 2d 922 (Tex. 1998) ........................................................................ 18

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) .................................................................. 10, 11

*Nken v. Holder,*
    556 U.S. 418 (2009) ...................................................................................... 13

*Patel v. Texas Department of Licensing & Regulation*,
    469 S.W.3d 69 (Tex. 2014) ........................................................ 17, 18

*PCI Transportation, Inc. v. Fort Worth & Western Railroad Company*,
    418 F.3d 535 (5th Cir. 2005) ........................................................ 11

*Planned Parenthood Ass'n of Hidalgo County, Texas, Inc. v. Suehs*,
    692 F.3d 343 (5th Cir. 2012) ........................................................ 21

*Shelton v. City of College Station*,
    780 F.2d 475 (5th Cir. 1985) ........................................................ 17

*Texas Midstream Gas Services LLC v. City of Grand Prairie*,
    608 F.3d 200 (5th Cir. 2010) ........................................................ 17

*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) ........................................................ 23

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    468 U.S. 1323 (1984) ........................................................ 23

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................ 13

## STATE CONSTUTION AND STATUTES

Tex. Fin. Code § 302.001 ........................................................ 2

## CHARTER PROVISIONS AND ORDINANCES

Dallas, Tex., Code § 50-144 ........................................................ 19

Dallas, Tex., Code § 50-151.3 ........................................................ 16

Dallas, Tex., Code § 50-151.4 ........................................................ 8

Dallas, Tex., Code § 50-151.6 ........................................................ 7

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
OBJECTIONS TO THE RECOMMENDATION THAT PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION BE DENIED**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

On August 11, 2021, U.S. Magistrate Judge Horan issued his "Findings, Conclusions, and Recommendation" (Dkt. 27) (the "FCR"), which correctly recommended that this Court should deny Plaintiffs' motion for a preliminary injunction. The FCR is thorough and thoughtful and should be followed by this Court.  Defendant City of Dallas (the "City") files this response in opposition to Plaintiffs' objections to the FCR because Plaintiffs, without merit, seek to enjoin and prohibit the City from enforcing a lawfully enacted and valid City ordinance that Plaintiffs erroneously assert is in violation of state and federal law.  Plaintiffs' motion for a preliminary injunction should be denied.

## I.      INTRODUCTION

Ordinance No. 31747 (the "Amended Ordinance") is a valid and proper exercise of the City's authority as a home-rule city to protect the general and economic welfare of its low-income residents and does not violate the "due course of law" provision of the Texas Constitution, Art. I § 19. The City has a legitimate and genuine governmental interest in seeking to protect low-income residents from financial exploitation by predatory lenders charging loan fees, broker fees, and commission charges that often exceed 200%-500% APR – in addition to the interest (which is typically 10% per annum) charged to the borrower on each small consumer loan. These fees and charges typically dwarf the interest charges such that the interest charged is a small fraction of the charges made part of the borrower's repayment obligation.

The Amended Ordinance also is designed and intended to address the "cycle of debt" problem that arises when borrowers make several payments on a consumer loan but the payments do not reduce the principal owed because the amounts paid over several payments are applied only

to brokers' fees, commissions, and charges with the principal amount (and additional fees and charges) remaining due as a balloon payment months later. Balloon payments that often exceed the amount borrowed even after several payments often force a borrower to seek to refinance the loan (with another round of increased charges and fees) or face repossession of their vehicle, which creates a cycle of debt that can be hard to escape. The Amended Ordinance requires that the consumer loan be structured so that the loan is repaid in no more than 4 installments, with each payment reducing the total owed by at least 25% (including principal, interest, and ancillary charges like brokers' fees and commissions). The Amended Ordinance, therefore, is rationally related to the City's legitimate governmental interest in protecting low-income consumers from financial exploitation by credit brokers and loan arrangers.

The Amended Ordinance does not violate the due process provisions of either the Texas or U.S. Constitutions. For purposes of Plaintiffs' objections to the FCR, Plaintiffs decided to focus their Objections on one of the four legal theories asserted in their Motion for Preliminary Injunction, their claim that the Amended Ordinance "contravenes Plaintiffs' right to due course of law guaranteed by the Texas Constitution." (*See* Dkt. 34 at 13, 16.) Accordingly, the City's Response will address only Plaintiffs' "due course of law" claim under the Texas Constitution and the related points raised in Plaintiffs' Objections and will not revisit the other three legal theories that were addressed in the City's previous Response (Dkt. 19).

## II.     BACKGROUND

Texas state law limits and regulates the amount or rate of interest a lender can charge and collect on loans at the maximum amount of 10% a year, except as otherwise provided by law. *See* Tex. Fin. Code § 302.001. Ancillary to the business of making small loans to low-income consumers, who typically are viewed as higher credit risks, loan brokers, loan arrangers, and credit enhancers (like TitleMax) have developed a practice of getting involved in short-term loans to

low-income consumers to broker, facilitate, or arrange the loans. The charges, fees, and assessments charged by these loan brokers and credit enhancers are not controlled or capped by the state as interest rates on these same loans are regulated and capped. Consequently, with short-term loans to low-income borrowers, it is fairly common that loan brokers, loan arrangers, or credit enhancers charge and collect service charges, assessments, and fees that exceed 200% APR on a short-term auto title secured loans. These service charges and fees often exceed 500%-600% on unsecured personal loans. By comparison, the lender charges and collects interest on these small consumer loans at the rate capped at 10% per year. These additional fees and charges made by loan brokers and loan arrangers create a heavy financial burden on low-income borrowers and cause a significant risk that these low-income borrowers will become mired or stuck in a cycle of debt and re-financing, which leads to additional service fees and charges and heightened risk that low-income borrowers will default and lose their vehicle pledged as security for the loan, which could further exacerbate their financial distress if they lose the means to go to work and transport their families.

A sample TitleMax loan to low-income consumers is shown by an "Auto Title Loan Cost Disclosure" obtained from TitleMax's website. (*See* City App'x at 1.)  The Cost Disclosure illustrates a typical auto title loan made by Plaintiffs and arranged or brokered by TitleMax in the amount of $1,250 to be repaid in 5 payments. On the sample loan illustrated in the Cost Disclosure, the interest paid to the lender at the rate of 9.95% per annum is $52.46 over the term of the loan. By comparison, the fees payable to TitleMax on this loan are $1,108.80 (more than 20 times the amount of interest paid to the lender). The amount payable by the consumer/borrower yields an APR cost of credit at the yearly rate of 211.08% APR (with over 200% of the APR arising due to fees and charges that are not interest on the loan). On the sample loan of $1,250, the borrower is

required to repay a total of $2,411.26 if paid on time over five months as originally structured. The TitleMax "Cost Disclosure" provides for monthly payments of $215.16 per month for the first four months, with a final balloon payment due in the fifth month of $1,550.62, which is over $300 more than the $1,250 amount initially borrowed. Note that the principal owed has not been reduced at all by the $860 the borrower paid in installment payments made over the prior months.  If the borrower does not pay on time or requests to extend the loan repayment date because the borrower does not have the funds to pay the balloon payment due at the end of the loan term, the fees and charges increase dramatically. Many borrowers also lose their vehicles to repossession when they are unable to repay the loan in full, including the predatory fees and charges that typically dwarf the interest charges.

The latest Auto Title Loan Cost Disclosure form promulgated by the Texas Office of Consumer Credit Commissioner ("OCCC") (*see* City App'x at 2) shows that based upon data from 2019 reports submitted to the OCCC by credit access businesses ("CABs") (like TitleMax) 12.5% of borrowers will renew an auto title loan two to four times before paying off the loan – and 35% of borrowers will renew or re-finance the loan five or more times or will never pay off the loan. Those borrowers who do not pay off the loan face foreclosure and repossession of their vehicle. The provisions in the Amended Ordinance requiring that the total amount owed be reduced by 25% for each payment and the loan to be repaid in no more than four installments is designed and intended to avoid the "cycle of debt" that is shown to be a well-founded concern based upon the data provided by the OCCC. This cycle of debt results in multiple re-financings and often ends in foreclosure and repossession of the borrower's vehicle. The TitleMax Auto Title Loan Cost Disclosure form at City App'x 1 does not comply with the Amended Ordinance repayment

requirements because the loan is structured with small periodic payments and a large balloon payment due at the end of the loan term.

TitleMax's "Texas Schedule of All Fees Effective June 2019" ( "Schedule of Fees") obtained from TitleMax's website shows how oppressive TitleMax's credit services fees are for low-income borrowers. (*See* City App'x at 3-24.) As an example of TitleMax's disturbingly high charges, the Schedule of Fees at page 4 of the City's Appendix shows that, on a 30-day loan in the amount of $533.00 secured by an auto title as collateral, TitleMax charges a CSO fee of $101.21 whereas the lender interest is only $5.19, so the total of the repayments is $639.40, representing an APR of 242.88%. (*Id.* at 4.)

On a 30-day loan of $1,233, TitleMax charges a CSO fee of $221.82 whereas the lender charges interest of only $11.90 so the total repayment is $1,466.71, representing an APR of 230.62%. (*See id.*)  On a five-month secured loan in the amount of $1,033, TitleMax charges a CSO fee of $917.30, which far exceeds the $42.24 in interest charged by the lender. The total repayments by the borrower on the five-month loan is $1,992.54, representing an APR of 219.93%. (*See id.* at 7-8.)

The CSO fees and charges TitleMax extracts from its low-income borrowers on unsecured personal loans are much higher and even more disturbing than on loans secured by the borrower's auto title. For example, TitleMax's Schedule of All Fees shows that on a personal unsecured loan of $500 over a 140-day term, the CSO fee (paid to TitleMax) is $1,246, whereas the interest paid to the lender is only $19.08. (*See id.* at 13-14.) The total of repayments by the borrower on the $500 loan over a 140-day term is $1,765.08 representing an APR of 650.90%. (*Id.*)

A review of TitleMax's Schedule of Fees covering other loan amounts and different durations of personal unsecured loans show a clear pattern where the cost of the loan is 500%-

600% APR even excluding the interest paid to the lender.  (*See id.* at 15-22.)  The interest portion

of the loan repayment is generally less than 10% of the fees charged to the borrower, whereas the

overwhelming majority of the fees charged to the low-income borrowers are the TitleMax CSO

fees and charges.  The table below shows the ratio of the interest charges payable to the lender

compared to TitleMax's CSO fees and service charges on various unsecured personal loans.

| Loan Amount | Interest | CSO Fees | APR | Appendix Pg. |
|-------------|----------|----------|-----|--------------|
| $500 | $19.08 | $1,246.00 | 650.90% | 14-15 |
| $500 | $19.08 | $996.80 | 522.14% | 15-16 |
| $1,500 | $57.25 | $3,738.00 | 650.90% | 16 |
| $1,500 | $57.25 | $2,990.40 | 522.14% | 16-17 |
| $500 | $20.45 | $1,335.00 | 655.55% | 17-18 |
| $500 | $20.45 | $1,068.00 | 525.35% | 18-19 |
| $1,500 | $61.34 | $4,005.00 | 655.55% | 19 |
| $1,500 | $61.34 | $3,204.00 | 525.35% | 20 |
| $500 | $20.85 | $1,882.55 | 659.21% | 20-21 |
| $500 | $20.85 | $1,089.36 | 528.54% | 21-22 |
| $1,500 | $62.56 | $4,085.10 | 659.21% | 22-23 |
| $1,500 | $62.56 | $3,268.08 | 528.54% | 23 |

(*See id.* at 14-23.)  As is readily apparent from the above table, the disturbingly large amount of

CSO fees and charges (payable to TitleMax) dwarf the interest charges on the loans depicted in

TitleMax's Schedule of Fees.  The CSO fees are typically fifty (50) or sixty (60) times more than

the interest amount payable to the lender. The first page of TitleMax's Schedule of Fees states that

TitleMax "is not a lender". The above table indicates that it is much more profitable not to be the

lender in these loan transactions but instead it is much more profitable to be the CSO on the

TitleMax loan transactions.

　　　In order to protect low-income consumers, the City adopted the Amended Ordinance,

which is codified at Dallas City Code Chapter 50, Article XI ("Article XI"). The original version

of Article XI was adopted in 2011 (the "2011 Ordinance"). The Dallas City Council (the "City

Council") later determined that the 2011 Ordinance did not provide sufficient protection to low-

income borrowers against predatory charges and assessments made by loan brokers and arrangers like TitleMax.  Consequently, in January 2021, the City Council adopted the Amended Ordinance, amending Article XI to, among other things, cap the loan broker services fees and charges payable to a CSO on unsecured personal loans not to exceed 0.1% per day (36.5% per year) and to require that these high cost loans be structured such that each payment reduce by at least 25% the amount owed on the loan, including all principal, interest and the fees and charges assessed by the loan broker or loan arranger (like TitleMax).

As discussed above, Texas law provides limits on the interest rate that lenders can charge to borrowers on short-term loans, but loan brokers, arrangers, and credit services organizations ("CSOs") (like TitleMax) take the position that the services fees and assessments they charge are not interest and, therefore, that the charges to borrowers by CSOs are not limited by any specific interest rate cap under Texas state law.

In order to limit or regulate these CSO fees on unsecured personal loans like those shown in the above table, the City enacted a specific provision of the Amended Ordinance in January 2021. Section 50-151.6(b) of the Dallas City Code states: "The sum of all valuable consideration, fees, or other charges owed by the consumer to the [CSO] may not exceed 0.1 percent per day of the outstanding balance of the extension of consumer credit."  Dallas, Tex., Code § 50-151.6 (b). Under the Amended Ordinance, therefore, a CSO that obtains, brokers, or arranges for a consumer a loan covered by Article XI or provides advice or assistance to a consumer to obtain the loan cannot make charges of more than 36.5% APR on the loan amount. This provision capping loan brokers' fees and charges does not include or cap the interest payable to the lender, so with interest typically at the rate of 10% per annum the total amount payable by the borrower on an unsecured personal loan would be 46.5% per annum.  Before adoption of this provision of the Amended

Ordinance, organizations like TitleMax were able to charge and collect services or broker fees and charges of 500%-600% APR (or even more) on unsecured consumer loans to low-income borrowers. The provision of the Amended Ordinance limiting the charges to no more than 0.1 percent per day does not regulate or limit the amount of interest the lender may lawfully charge a consumer, because interest charges are capped by state law. The Amended Ordinance is designed and intended to limit and control the excessive ancillary credit services charges and loan broker fees charged by credit brokers, credit arrangers, and credit enhancers from being extracted from borrowers at abusive rates.

Another provision of the Amended Ordinance attacked by Plaintiffs is section 50-151.4(d)(1) which provides that any extension of credit that a CSO or CAB obtains for or assists a consumer in obtaining shall require repayment of the total amount of the extension of credit, including any principal, interest, and fees, valuable consideration, credit access, business fees, and any other charges or costs in installments may not be payable in more than four installments. *Id.* § 50-151.4(d)(1). Subsection (d)(2) provides that proceeds from each installment payment must be used to repay at least 25% of the total amount of the transaction, including the principal, fees, interest, business fees, services fees, and any other charges or costs that the consumer owes on the loan transaction. *Id.* § 50-151.4 (d)(2). This provision is designed and intended to protect the consumer from becoming stuck in a cycle of debt with high charges and fees where the consumer struggles to catch up and pay the amount owed with a large balloon payment at the end of a few months after the loan is made. The repayment in four payments with each payment reducing the amount owed by 25% has a rational basis as it is designed and intended to require lenders to structure these very expensive loans in such a way that these predatory loans and the attendant expensive fees and charges are paid off relatively promptly.  This makes it less likely that a low-

income borrower will become mired in a cycle of expensive debt and re-financings that could further escalate the charges and cause dire economic hardship for low-income borrowers.

### III.    ARGUMENT

The FCR correctly concludes that Plaintiffs have not proved the elements to show they are entitled to a preliminary injunction.  First and foremost, Plaintiffs have not proved a substantial likelihood that they will prevail on the merits of any of their claims, especially including their due course of law claim under the Texas Constitution.  Plaintiffs and particularly TitleMax claim that the Amended Ordinance has devastated their businesses arranging and brokering predatory loans. TitleMax does not present any financial evidence and records showing TitleMax's revenues from its business in the area covered by the Amended Ordinance before January 2021 compared with its revenues after the Amended Ordinance was enacted. Even if it did, however, TitleMax has admitted that its loan business was down significantly in the last quarters of 2020 compared to earlier periods because of the government stimulus payments and enhanced unemployment benefits paid to consumers, and TitleMax has not established that any alleged downturn in its revenues is due to the Amended Ordinance.

The Amended Ordinance does not violate the "due course of law" clause of the Texas Constitution or the due process clause of the U.S. Constitution because the Amended Ordinance is rationally related to advancing a legitimate governmental interest, specifically to assist low-income borrowers by limiting the abusive and predatory terms of loan broker fees, assessments, and charges. Where an ordinance, like the Amended Ordinance, is rationally related to a legitimate governmental interest, it satisfies substantive due process. Consequently, Plaintiffs' request for a preliminary injunction should be denied as stated in the FCR because Plaintiffs have not shown there is a substantial likelihood that they will prevail on the merits of their claim attacking the

constitutionality of the Amended Ordinance under the due course of law provision of the Texas Constitution.

Plaintiffs have not satisfied their burden of proof and burden of persuasion to show that they are entitled to a mandatory preliminary injunction rolling back the status quo to January 26, 2021, before the City enacted the Amended Ordinance on January 27, 2021. Plaintiffs are not entitled to a preliminary injunction of the Amended Ordinance because Plaintiffs have failed to satisfy each of the four criteria to obtain a preliminary injunction. Plaintiffs have failed to show: 1) a substantial likelihood of success on the merits of their attack on the Amended Ordinance; 2) that granting the preliminary injunction will not disserve the public interest; 3) that the injury to Plaintiffs if the injunction is denied is greater than the harm to others if the injunction is granted and the Amended Ordinance is enjoined; and 4) a substantial threat of irreparable injury pending trial. Accordingly, because Plaintiffs have not established any of the elements to obtain preliminary injunctive relief, Plaintiffs' request for a preliminary injunction enjoining enforcement of the Amended Ordinance should be denied as recommended by Magistrate Judge Horan in his detailed and well-reasoned FCR.

### A.    LEGAL STANDARD FOR INJUNCTIVE RELIEF

To obtain a preliminary injunction, a plaintiff must establish four elements: (1) a substantial likelihood that Plaintiffs will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm the injunction may do to defendants (or those persons who would be or might be harmed if the injunction is granted; and (4) that granting the preliminary injunction will not disserve the public interest. *See, e.g.*, *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). "A preliminary injunction is an extraordinary remedy which should only be granted if the movant has clearly carried his burden of persuasion on all four

factors." *Id.*  It is also the plaintiff's burden to introduce sufficient evidence to justify the grant of a preliminary injunction.  *PCI Transportation, Inc. v. Fort Worth & Western Railroad Company,* 418 F.3d 535, 546 (5th Cir. 2005).  A decision to grant a preliminary injunction should be treated as the exception and not the rule and the movant must clearly carry the burden of persuasion to be entitled to a preliminary injunction.  *Mississippi Power & Light*, 760 F.2d at 621.  In addition, mandatory preliminary injunctive relief, such as Plaintiffs seek here, "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and the law clearly favor the moving party." *Martinez v. Matthews*, 544 F. 2d 1233, 1243 (5th Cir. 1976).  The FCR correctly and properly evaluated Plaintiffs' request for a preliminary injunction under the standard applicable to a mandatory preliminary injunction. However, even if the preliminary injunction sought by Plaintiffs were evaluated as a prohibitory injunction, Plaintiffs nevertheless fail to carry their burden of proof and burden of persuasion to clearly show they are entitled to a preliminary injunction on each of the four required elements.

In Plaintiffs' Objections, they attempt to lower their burden of proof by arguing: "the court may issue a preliminary injunction on a prima facie showing that the movant is entitled to relief." (Dkt. 32 at 6). To support this argument that their burden is merely to make a prima facie showing on their claim, Plaintiffs cite to dicta in *Brock Services, L.L.C. v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019). In *Brock*, the district court found that the movant had demonstrated a likelihood of success on the merits of movant's claim that the opponent had breached the non-compete provision and the other required elements were shown so that it was proper to grant a preliminary injunction. The 5th Circuit affirmed the trial court's conclusion that the movant had shown a substantial likelihood of success on the merits. In affirming the preliminary injunction granted by the district court, the 5th Circuit stated: "The party seeking the injunction must carry the burden of persuasion."

*Id*. at 296. It is clear from reading *Brock* that its statement about a *prima facie* showing is dicta. The holding in *Brock* is that the trial judge reasonably found that movant proved entitlement to a preliminary injunction and carried the burden of persuasion on all four elements required. Simply making a *prima facie* showing is not a sufficient showing of entitlement to a preliminary injunction. Plaintiffs must show a substantial likelihood of success on the merits and carry the burden of persuasion that they are entitled to a mandatory preliminary injunction considering all four required elements. As the FCR concludes, Plaintiffs failed to carry their burden of proof and persuasion as they failed to show a substantial likelihood of success on the merits of any of their claims. The FCR does not include findings and conclusions on all four elements of proof required to obtain a preliminary injunction because the law is clear that if the movant does not sustain or satisfy its burden of proof and persuasion on the substantial likelihood of success element there is no need for the court to address and consider the other three elements of proof required.

Plaintiffs argue that *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974), helps their cause, however, in that case, the 5th Circuit decided that the preliminary injunction issued for the movant was improper because the trial judge had erroneously placed the burden of proof on the defendants on the irreparable harm element whereas the burden of persuasion was at all times on the movant as to each element required to prove entitlement to a preliminary injunction. *Id.* at 572. The 5th Circuit remanded the *Callaway* case for new findings of fact and conclusions of law regarding the preliminary injunction request. *Id*. at 579.  In this case the 5th Circuit stated that the trial court "must exercise that discretion in light of what we have termed the four prerequisites for the extraordinary relief of preliminary injunction."  *Id*. at 572. Those four prerequisites include proving "a substantial likelihood that plaintiff will prevail on the merits."  It is not sufficient to obtain a preliminary injunction for the Plaintiffs to merely allege a

*prima facie* case to obtain a preliminary injunction. The movant/Plaintiffs must clearly prove a substantial likelihood of success on the merits of their claim and must carry the burden of persuasion. The FCR correctly found that Plaintiffs failed to meet this burden – and thus properly recommended that Plaintiffs' motion be denied.

Plaintiffs argue that the FCR concludes that they have made a showing of irreparable injury because the City, as a governmental entity, has governmental immunity under Texas law against any award of money damages, so there is no viable opportunity for Plaintiffs to recover money damages to compensate Plaintiffs for any financial losses they might incur. Plaintiffs then contend that since irreparable injury is shown due to the City's governmental immunity and the lack of any damages remedy, the Court should place much less weight on the "substantial likelihood of success on the merits" element of a preliminary injunction and grant a preliminary injunction in order to prevent irreparable injury even without Plaintiffs showing a substantial likelihood of success on the merits. Plaintiffs' contention is wrong and should not be followed. A logical extension of Plaintiffs' argument on this issue would mean that anytime a litigant sues a governmental entity (city, state, county, or similar) and the defendant entity has immunity against a damages award then the claimant/litigant could be entitled to a preliminary injunction without regard to whether the claimant can prove a substantial likelihood of success on the merits of the claim.

The U.S. Supreme Court has stated that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008); *see also*, *Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."). Even though Magistrate Judge Horan concluded that Plaintiffs

had made a substantial showing of irreparable harm since Plaintiffs would not be able to recover monetary damages against the City due to governmental immunity, this finding does not dilute or reduce the requirement that Plaintiffs must show that there is a substantial likelihood that they will prevail on the merits—which they failed to show.

A showing of irreparable harm, no matter how strong, does not relieve the movant of the requirement that movant must show a likelihood of success on the merits in order to obtain a preliminary injunction. In *Barr v. Lee*, 140 S. Ct. 2590 (2020), the district court granted a preliminary injunction enjoining four executions only a few hours before the first was set and a few days before others, so the district court could consider the inmates' Eighth Amendment challenge to the method of their executions. Clearly, irreparable injury was shown as the inmates all faced execution within only a few days if a preliminary injunction was not granted. The Supreme Court vacated the trial court's preliminary injunction because "the plaintiffs have not established that they are likely to succeed on the merits of their Eighth Amendment claim." Despite the clear irreparability of the harm faced by the plaintiffs in *Barr* as a result of the likelihood of their imminent executions, the Court vacated the injunction because the Court decided the plaintiffs had not shown a substantial likelihood of success on the merits, therefore, a preliminary injunction was error – regardless of the presence of irreparable harm. Despite the finding in the FCR that Plaintiffs have made some showing of irreparable harm, still Plaintiffs' burden to prove a substantial likelihood of success on the merits is not negated or reduced.

### B.    THE AMENDED ORDINANCE DOES NOT AMOUNT TO A PROHIBITION OF A BUSINESS LICENSED BY THE STATE

The Amended Ordinance does not preclude or prohibit the operation of a business licensed by the State. The Amended Ordinance merely places reasonable limits on the charges TitleMax and other loan brokers and arrangers can charge to their low-income borrowers for fees, charges

and assessments to not exceed 0.1 percent per day of the outstanding balance (36.5% per year). This per diem limit for charges and assessments made by a CSO does not include the interest charged and collected by the lenders (which generally is capped by the State at 10% per annum, so the total charges to the consumer borrower would be capped at 46.5% per year). The lenders in these small short-term loan transactions are operating their respective businesses with a cap set by state law of 10% per annum for interest charged and collected. The cap the Amended Ordinance places on the loan brokers and loan arrangers is more than three and a half times higher than the cap for the lenders. TitleMax is not prohibited from operating its business under the Amended Ordinance. TitleMax is simply unhappy with the Amended Ordinance because it reduces TitleMax's predatory rates of return on the small short-term loans TitleMax brokers and arranges. TitleMax will charge excessively high rates for its loan brokerage and loan arranging services – unless restrained by the Amended Ordinance. Many businesses involved in making loans can conduct their businesses successfully with rates less than 36.5% per annum. TitleMax is not precluded or prohibited from operating its business in the City if it chooses to do so. TitleMax must merely operate within the bounds and in accordance with the Amended Ordinance.

In the FCR, Magistrate Judge Horan very correctly and properly rejected this argument. (*See* FCR at 28-30.) Plaintiffs cite two appeals court decisions as support for their argument, but neither case cited by Plaintiffs was comparable to the facts in this case. As Magistrate Judge Horan correctly observed: "Both cases are distinguishable from the facts here. In both, the home rule city's ordinance prohibited a business regulated by the State from operating – at all—in the municipality (either by declaring it to be a nuisance or by enacting prohibitory zoning)." (*See* FCR at 28-29.)

In *City of Fort Worth v. McDonald*, 293 S.W.2d 256 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.), the City of Fort Worth enacted an ordinance that declared pinball machines a nuisance and made the ownership, operation, or exhibition of pinball machines a misdemeanor subject to a fine for each day of violation. A state statute levied an occupational tax on coin-operated machines such as pinball machines. The Court decided that the City could not prohibit and declare unlawful and a nuisance a business licensed under a state revenue statute. *McDonald*, 293 S.W.2d at 258-259. The City is not prohibiting Plaintiffs from operating their business; they are merely expected to operate in compliance with the Amended Ordinance. As the FCR correctly found, the City is not prohibiting Plaintiffs from operating their business in the City.

Section 50-151.3(d) of the Amended Ordinance provides that when a CSO or a CAB assists a consumer in obtaining an extension of consumer credit, where the loan provides for payment in installments, the loan may not be payable in more than four installments and each installment payment must be used to repay at least 25% of the total amount of the transaction including all principal, interest, fees and other charges or costs.  The Amended Ordinance does not mandate the timing, duration, or frequency of the four installment payments – whether monthly or otherwise. See Dallas, Tex., Code § 50-151.3(d)(1), (2). This provision – that a borrower must pay all that they owe on a small consumer loan in no more than four installment payments with each installment paying down the total amount owed by 25% – helps to avoid the "cycle of debt" problem often caused by large balloon payments due even after a consumer borrower has been paying on a loan for several months without any reduction in the principal amount owed. This provision helps the low-income consumer to more promptly repay this very expensive form of debt in order to avoid or minimize the ill effects of the high fees and loan charges that are part of the structure of these loans and potential re-financings.

### C. THE AMENDED ORDINANCE DOES NOT VIOLATE PLAINTIFFS' RIGHTS UNDER THE TEXAS DUE COURSE OF LAW PROVISION OR THE DUE PROCESS CLAUSE UNDER THE FOURTEENTH AMENDMENT

A governmental action such as a municipal ordinance is generally presumed to be valid and constitutional, consistent with procedural and substantive due process when the ordinance is rationally related to furthering a legitimate governmental interest. *Patel v. Texas Department of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2014) ("To be clear, the foregoing standard includes the presumption that legislative enactments are constitutional"); *see also FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174-75 (5th Cir. 1996) ("The question is only whether a rational relationship exists between the policy [or ordinance] and a *conceivable* legitimate governmental objective. . . . If the question is at least debatable, there is no substantive due process violation."). Texas law presumes that ordinances enacted by a home-rule city are valid exercises of a city's police powers. A challenger must "prove the ordinance is arbitrary or unreasonable in that it bears no substantial relationship to the health, safety, morals or general welfare of the community." *Texas Midstream Gas Services LLC v. City of Grand Prairie*, 608 F.3d 200, 207 (5th Cir. 2010). With respect to the Amended Ordinance, the City has a legitimate interest in seeking to protect low-income borrowers from abusive and predatory lending practices and charges. The Amended Ordinance is rationally related to furthering this objective because the Amended Ordinance is designed to limit the charges, fees, and assessments that low-income borrowers can be charged by loan brokers, loan arrangers, credit enhancers, and similar entities ancillary to making small consumer loans to those borrowers. When a city ordinance is challenged as a violation of substantive due process under the Texas and federal constitutions, the ordinance is sustainable against a substantive due process challenge if there is "any conceivable rational basis" for the enactment. *Shelton v. City of College Station*, 780 F.2d 475, 483 (5th Cir. 1985) (en banc).

Plaintiffs' Objections rely heavily on *Patel v. Texas Department of Licensing & Regulation*. In *Patel*, the Texas Supreme Court reviewed three slightly different variations that Texas courts have applied or followed when determining whether governmental action violates the Texas "due course of law" protection in Art. I § 19 of the Texas Constitution. *Patel*, 469 S.W.3d at 86. The Court then adopted a standard of review for as-applied substantive due course of law challenges to economic regulation that calls for consideration of whether the governmental statute, ordinance, or regulation's "effect as a whole is so unreasonably burdensome that it becomes oppressive in relation to the underlying governmental interest." *Id.* at 87. The Court in *Patel* cited with approval to its prior opinion in *Mayhew v. Town of Sunnyvale*, which stated that an ordinance "will violate substantive due process only if it is **clearly** arbitrary and unreasonable"). *Id.* (citing *Mayhew v. Town of Sunnyvale*, 964 S.W. 2d 922, 938 (Tex. 1998)). The Court stated:

> In sum, statutes are presumed to be constitutional. To overcome that presumption the proponent of an as-applied challenge to an economic regulation … under Section 19's substantive due course of law requirement must demonstrate that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest, or 2) when considered as a whole, the statute's actual real-world effect as applied to the challenging party could not arguably be rationally related to,  or is so burdensome as to be oppressive in light of the governmental interest.

*Id.* In *Patel*, the State conceded that that as many as 320 hours of the State-required training for claimants to obtain their license as eyebrow threaders were not related to activities threaders annually perform. *Id*. at 89. The Court in *Patel* held that the admittedly unrelated 320 hours of required training, combined with the fact that the threader trainees must pay for the useless training (and at the same time lose the opportunity to make money actively practicing their trade, led the Court to conclude that the claimants in *Patel* met their high burden of proving that as applied to them, the requirement of 750 hours of training to become licensed was not just unreasonable or harsh, but was so oppressive that it violated the due course of law provision of the Texas

Constitution. Magistrate Judge Horan carefully and thoroughly considered Plaintiffs' "due course of law" challenge based on *Patel* – outlining his findings and conclusions at pages 34 through 39 of the FCR – and concluded: "Plaintiffs have not shown a likelihood of success as to their Due Course of Law challenge based on *Patel*." (FCR at 39.)

The City has a legitimate governmental interest in protecting low-income borrowers from unduly high charges by loan brokers, loan arrangers, and credit enhancers. Plaintiffs have suggested several theories why they believe the City enacted the Amended Ordinance – suggesting that all the City's reasons for enacting the Amended Ordinance are invalid, irrational, arbitrary, and improper, but the City's basis or reason for enacting the Amended Ordinance is stated right in the ordinance at Section 50-144: "The purpose of this article is to protect the welfare of the residents and consumers in the City of Dallas by monitoring [CSOs] and [CABs] in an effort to reduce abusive and predatory lending practices.".   Dallas, Tex., Code § 50-144. In Plaintiffs' Objections, they repeatedly contend that "for litigation purposes the City abandoned the two repeatedly expressed justifications for the Amending Ordinance in favor of a generic 'protect the consumer' rationale."  (Dkt. 34 at 3.) Plaintiffs contend that "the City's post hoc rationalization" of the basis and purpose for the Amended Ordinance is contrived, manufactured, and disingenuous. (*Id.* at 3.) However, it should be very clear to any objective observer that the reason the City enacted the Original Ordinance in 2011 was in an effort to protect low-income consumers from predatory and abusive lending practices. Similarly, the reason the City enacted the Amended Ordinance in January 2021 is also "an effort to reduce abusive and predatory lending practices." *See* Dallas, Tex., Code § 50-144. The need to protect low-income borrowers against abusive and predatory lending practices has been shown by the evidence presented by the City in this Response and in the City's Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

Plaintiffs repeatedly claim that they are trying to help low-income borrowers as the borrowers only source for emergency loans. However, TitleMax flatters itself by claiming that the type of loans that TitleMax brokers and arranges with the high costs and high fees and abusive terms which TitleMax offers are the only option for low-income borrowers. It also appears likely that some other lenders and loan arrangers (which have not filed suit against the City challenging the Amended Ordinance) are conducting their businesses in compliance with the Amended Ordinance and providing loans to low-income consumers on terms consistent with the Amended Ordinance. The website of the OCCC (the state agency given responsibility to license and loosely regulate or monitor CSOs and CABs when those entities are making payday loans and auto title secured loans) identifies other potential options to the high cost loans offered through CSOs and CABs (like TitleMax). (See City App'x at 29-30). The OCCC does not gather and publish statistical data regarding unsecured personal loans, which are not regulated by the OCCC. The OCCC's "2020 Report on Availability, Quality, and Pricing of Certain Financial Services and Consumer Loan Products" (the "Report") which is available in full on-line at: occc.tex.gov/sites/default/files/uploands/pub/2020_study_consumer_loan_products.acc.pdf -- addresses "Alternatives to High Cost Lending". Pertinent pages from the Report are provided at City App'x at 25-31. The Report addresses "Alternatives to High-Cost Lending" at pages 27-29 which are available at City App'x 29-30.

Of course, irrational, unreasonable, and arbitrary ordinances that are unduly oppressive and harsh when considered in light of the governmental interest sought to be advanced are subject to being held unconstitutional under the Texas due course of law provision as held by the Texas Supreme Court in *Patel*. The Amended Ordinance is not unconstitutional under the standard announced in *Patel* – as the FCR concluded. The Amended Ordinance is rationally and

substantially related to a legitimate objective of the City, specifically to protect low-income residents from oppressive, harsh, and predatory charges, fees, and assessments which were frequently made a part of the loan transaction prior to the enactment of the Amended Ordinance.

There is no least restrictive means component to rational basis review, so even where there is an imperfect fit between the means and the ends or where the enactment is not made with mathematical precision, it can still satisfy rational basis review. *F.C.C. v. Beach Communications, Inc.*, 508  U.S. 307, 315 (1993), (citing *Heller v. Doe*, 509 U.S. 312, 321 (1993)). The Amended Ordinance is rationally related to furthering a legitimate City objective. Consequently, the Amended Ordinance is not invalid or unconstitutional under either the due course of law provision of the Texas Constitution or the 14th Amendment due process clause of the U.S. Constitution.

### D.  PLAINTIFFS HAVE NOT MADE THE SHOWING REQUIRED FOR A PRELIMINARY INJUNCTION

As the FCR concluded, Plaintiffs have not made the showing required for a preliminary injunction. A party seeking a preliminary injunction must satisfy each of the four criteria: 1) a substantial likelihood of success on the merits; 2) a substantial threat of irreparable injury if the injunction is not granted; 3) the substantial injury to the movant outweighs the threatened harm to the party against whom the injunction is sought; and 4) granting the injunction will not disserve the public interest.  *See Big Tyme Investments, LLC v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021); *Austin Apartment Ass'n v. City of Austin*, 89 F. Supp. 3d 886 (W.D. Tex. 2015). A preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.  *Big Tyme*, 985 F.3d at 464; *Planned Parenthood Ass'n of Hidalgo County, Texas, Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).  As discussed above, Plaintiffs have not shown a substantial likelihood of success on the merits. If the party requesting a preliminary injunction cannot show a substantial

likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction. *Big Tyme*, 985 F.3d at 464. Therefore, the FCR correctly concluded that Plaintiffs' request for injunctive relief should be denied solely on that basis, but Plaintiffs also have failed to satisfy the other elements to obtain a preliminary injunction.

Plaintiffs' contention that the Amended Ordinance was an improper attempt by the City to close the so-called "loophole" in Texas Finance Code Chapter 393 is a red-herring and is a meritless diversion. The City, as a home home-rule city under Texas law, clearly has authority to enact ordinances supplementary to Texas state statutes, unless expressly preempted by the Texas Legislature. Where there is a void in the regulatory coverage of a particular state statute, it is appropriate for a home-rule city to enact a provision to address this void or perceived "loophole" – whether or not such a loophole actually exists. The Amended Ordinance was enacted to further a legitimate governmental purpose of protecting low-income residents. The Amended Ordinance was enacted in January 2021 in part to cover CSOs that were engaged in arranging and brokering unsecured personal loans.

Prior to the Attorney General's Opinion issued in November 2019, it was not apparent to many governmental entities that CSOs, like TitleMax, were engaged in arranging, assisting, or brokering unsecured personal loans for consumers. The Amended Ordinance is a legitimate response or effort by a home-rule city to address a problem which adversely impacts a significant number of low-income residents of the City. Prior to the enactment of the Amended Ordinance the activities of TitleMax and its competitors in arranging unsecured personal loans for consumer borrowers were not under governmental review of state or municipal authorities.

Plaintiffs place a significant amount of emphasis in their argument on statistics from the OCCC for 2019-2020 that Plaintiffs contend show that the number of low-income loan transactions, borrowings, and defaults decreased significantly in 2020 during the last three quarters of 2020 (as compared to the same period and quarters in 2019) due to the government stimulus funds resulting from the COVID-19 pandemic. Plaintiffs use these apparent statistics from 2020 compared to 2019 to argue the point that there was no need in January 2021 for the City to adopt the Amended Ordinance, because the problem the City sought to address was either getting much better or was improving without need for an ordinance. Plaintiffs' argument and logic is faulty. The need for the Amended Ordinance and the problems it sought to address still existed in 2020 despite the governmental financial aid resulting from the pandemic, even if on a smaller scale than in 2019, and will continue to exist in the future.

As to the third element, Plaintiffs wrongly assert that the City will suffer no harm from the injunction, but this assertion ignores the fact that any time a governmental entity is enjoined by a court from effectuating the laws enacted by representatives of its people, the governmental entity suffers a form of irreparable injury. *See Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury".); *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984)). Furthermore, an injunction would disserve the public interest, which also harms the City as it enacted the Amended Ordinance to protect the public. The City Council unanimously voted to enact the Amended Ordinance. The enactment of the Amended Ordinance by the City's elected leaders is the best guidepost to show what is in the public interest. Enjoining the Amended Ordinance will disserve the public interest and leave those low-income residents who benefit from

the protections provided by the Amended Ordinance to the mercy of the loan brokers, loan arrangers, and credit enhancers who caused the problems sought to be addressed by the Amended Ordinance.  If the Amended Ordinance were to be enjoined, the substantial injury to the low-income borrowers who benefit from the protections provided by the Amended Ordinance and to the City, which has an interest in seeing its laws effectuated, would substantially outweigh any short-term injury to Plaintiffs due to the continued enforcement of the Amended Ordinance. The burdens and harm caused to the City and the public by granting the preliminary injunction weigh in favor of denying Plaintiffs' request for a preliminary injunction. The Court should follow the FCR and deny Plaintiffs' request for a preliminary injunction.

## IV.    CONCLUSION

The FCR issued by Magistrate Judge Horan correctly concludes that Plaintiffs failed to prove a likelihood of success on the merits as to any of Plaintiffs claims for relief. Accordingly, the FCR recommends this Court should deny Plaintiffs' motion for a preliminary injunction. This Court should follow the FCR and deny Plaintiffs' request for a preliminary injunction.

Therefore, for the reasons stated herein and pursuant to the FCR, the City requests that this Court deny Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

CHRISTOPHER J. CASO
City Attorney

*/s/ Gary R. Powell*
Gary R. Powell
Texas Bar No. 16195500
gary.powell@dallascityhall.com
Senior Assistant City Attorney

Kathleen M. Fones
Texas Bar No. 24050611
kathleen.fones@dallascityhall.com
Senior Assistant City Attorney

Dallas City Attorney's Office
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
214-670-3519 / fax 214-670-0622

**ATTORNEYS FOR**
**DEFENDANT CITY OF DALLAS**

## CERTIFICATE OF SERVICE

I certify that on September 28, 2021, a true and correct copy of the foregoing was served

via electronic filing upon the following attorneys of record:

T. Ray Guy
Todd J. Harlow
Ben A. West
Frost Brown Todd LLC
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201

*/s/Gary R. Powell*
Gary R. Powell