IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., IVY FUNDING COMPANY LLC, and NCP FINANCE LIMITED PARTNERSHIP, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-cv-1040-S-BN |
| CITY OF DALLAS, | § § | |
| Defendant. | § § § | |

**BRIEF SUPPORTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

CHRISTOPHER J. CASO
City Attorney

Gary R. Powell
Texas Bar No. 16195500
gary.powell@dallas.gov
Senior Assistant City Attorney

Kathleen M. Fones
Texas Bar No. 24050611
kathleen.fones@dallas.gov
Senior Assistant City Attorney

Dallas City Attorney's Office
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
214-670-3519 / fax 214-670-0622

**ATTORNEYS FOR DEFENDANT
CITY OF DALLAS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... iii

I.      SUMMARY JUDGMENT STANDARD ............................................................ 2

II.     BACKGROUND FACTS .................................................................................... 3

        A.      General Background on the Type of Loans at Issue in This Lawsuit .................... 3

        B.      TitleMax's Loan Cost Information ........................................................... 4

                1.      Auto Loan Disclosure ............................................................. 4

                2.      TitleMax's Schedule of All Fees ............................................. 6

                3.      Unsecured Personal Loans at APR Rates of 500%-600% ......................... 6

        C.      The Amending Ordinance .................................................................... 8

        D.      City Council Meeting – TitleMax Speaks before Amendment Vote .................. 10

III.    SUMMARY OF THE ARGUMENT ............................................................. 12

IV.     ARGUMENT .................................................................................................. 15

        A.      THE AMENDING ORDINANCE IS NOT PREEMPTED BY STATE LAW. .. 15

                1.      The Amending Ordinance Does Not Amount to a Prohibition of a Business Licensed by the State. ............................................... 16

                2.      The Theory of Field Preemption Does Not Apply to a Home Rule City Under Texas Law. ............................................................. 18

                3.      Conflict Does Not Exist Between the Amending Ordinance and the Texas Finance Code ..................................................................... 20

        B.      THE AMENDING ORDINANCE DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE U.S CONSTITUTION. ....................................... 22

        C.      THE AMENDING ORDINANCE DOES NOT VIOLATE THE DUE COURSE OF LAW PROVISION OF THE TEXAS CONSTITUTION. ........................... 28

                1.      Plaintiffs have no vested right entitled to constitutional protection .......... 29

                2.      The Amending Ordinance is rationally related to a legitimate governmental interest and is not unduly oppressive in light of the governmental interest in protecting borrowers. ................................... 30

V.      CONCLUSION ........................................................................................................ 32

CERTIFICATE OF SERVICE ........................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................... 2

*Arizona v. U.S.*,
  132 S. Ct. 2492 (2012).............................................................. 18

*BCCA Appeal Grp., Inc. v. City of Houston*,
  496 S.W.3d 1 (Tex. 2016)........................................... 12, 13, 18, 19

*Big Tyme Investments, L.L.C. v. Edwards*,
  985 F. 3d 456 (5th Cir. 2021)........................................... 24, 27

*City of Brookside Village v. Comeau*,
  633 S.W.2d 790 (Tex. 1982)............................... 15, 18, 20, 28

*City of Dallas v. Trammell*,
  101 S.W.2d 1009 (Tex. 1937)....................................... 29

*City of Fort Worth v. McDonald*,
  293 S.W.2d 256 (Tex. Civ. App.—Fort Worth
  956, writ ref'd n.r.e.).................................................. 17

*City of La Marque v. Braskey*,
  216 S.W.3d 861 (Tex. App.—Houston [1st
  Dist.] 2007, pet. denied)............................................... 29

*City of San Antonio v. TPLP Office Park
  Properties, LP*,
  218 S.W. 3d 60 (Tex. 2007)........................................ 28

*City of Waxahachie v. Watkins*,
  275 S.W.2d 477 (Tex. 1955).......................................... 29

*Consumer Serv. All. of Texas, Inc. v. City of Dallas*,
  433 S.W.3d 796 (Tex. App.—Dallas 2014, no pet.)............... 29

*Dallas Merch.'s & Concessionaire's Ass'n v. City of Dallas*,
  852 S.W.2d 489 (Tex. 1993)........................................ 13, 20

*English v. General Elec. Co.*,
  496 U.S. 72 (1990)................................................... 18

*F.C.C. v. Beach Commc'ns*,
  508 U.S. 307 (1993)............................................ 23, 24, 26, 27

*FM Properties Operating Co. v. City of Austin*,
  93 F. 3d 167 (5th Cir. 1996)............................................................ 22, 26

*Heller v. Doe*,
  509 U.S. 312 (1993) .................................................................... 23, 28

*Hunt v. City of San Antonio*,
  462 S.W.2d 536 (Tex. 1971)................................................................. 28

*In re Sanchez*,
  81 S.W.3d 794 (Tex. 2002) .................................................................. 15

*Klumb v. Houston Mun. Emp. Pension Sys.*,
  458 S.W.3d 1 (Tex. 2015)............................................................... 29, 30

*Lindquist v. City of Pasadena*,
  56 F. Supp. 2d 262 (S.D. Tex. 2009),
  aff'd, 669 F. 3d 225 (5th Cir. 2012) ......................................................... 24

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) (en banc) ....................................................... 3

*Lovick v. Ritemoney, Ltd.*,
  378 F. 3d 433 (5th Cir. 2004)............................................................... 8, 9

*Lynch Props., Inc. v. Potomac Ins. Co.*,
  140 F.3d 622 (5th Cir. 1998)................................................................. 2

*Morrow v. Truckload Fireworks, Inc.*,
  230 S.W.3d 232 (Tex. App.—Eastland 2007,
  pet. dism'd) ................................................................................ 29

*Mr. W. Fireworks, Inc. v. Comal County*,
  No. 03-06-00638-CV, 2010 WL 1253931
  (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.)....................................... 30

*Murphy v. Wright*,
  115 S.W.2d 448 (Tex. Civ. App.—Fort Worth
  1938, no writ) .............................................................................. 17

*Patel v. Tex. Dep't of Licensing & Regulation*,
  469 S.W.3d 69 (Tex. 2015).................................................. 28, 30, 31, 32, 33

*Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*,
  767 F.3d 503 (5th Cir. 2014)................................................................. 2

*Planned Parenthood of Greater Tex. Surgical*
  *Health Servs. v. Abbott,*
  748 F. 3d 583 (5th Cir. 2014)..................................................... 27, 28

*Porter v. Houma Terrabonne Hous. Auth. Bd. Of Comm'rs,*
  810 F.3d 940 (5th Cir. 2015)....................................................... 2

*RCI Entertainment (San Antonio), Inc. v. City of San Antonio,*
  373 S.W.3d 589 (Tex. App.—San Antonio 2012, no pet.)................ 15, 17

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947)................................................................. 18

*Shelton v. City of College Station,*
  780 F. 2d 475 (5th Cir. 1985) (en banc)..................................... 23

*Texas Dep't of State Health Servcs. v. Crown*
  *Distributing LLC,*
  647 S.W.3d 648 (Tex. 2022)...................................................... 29, 30

*Texas Midstream Gas Services, LLC v. City of Grand Prairie,*
  608 F. 3d 200 (5th Cir. 2010)................................................... 26

*Thompson v. City of Palestine,*
  510 S.W.2d 579 (Tex. 1974)...................................................... 28, 29

*Tiwari v. Friedlander,*
  26 F.4th 355 (6th Cir. 2022) .................................................... 23

*United States v. Amalfi,*
  47 F.4th 114 (2d Cir. 2022)...................................................... 24

*Village of Euclid v. Ambler Realty Co.,*
  272 U.S. 365 (1926)................................................................. 23

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)................................................................. 23

*Williams v. State,*
  997 S.W.2d 265 (Tex. 1999)...................................................... 22

**Statutes**

30 Tex. Admin. Code §§ 1.1–351.104 .................................................................. 19

Tex. Fin. Code § 302.001 ...................................................................................... 3

Tex. Fin. Code § 393 .............................................................................................. 8

Tex. Fin. Code §§ 393.001–393.628 ..................................................................... 19

Tex. Health & Safety Code §§ 382.001–.510 ...................................................... 19

**Constitutional Provisions**

Texas Constitution art. XI, §5 ................................................................... 12, 15, 20

**Charter Provisions and Ordinances**

Dallas, Tex., Code § 50-151.4 .............................................................................. 10

Dallas, Tex., Code § 50-151.6 ................................................................................ 9

**<u>BRIEF SUPPORTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

The City of Dallas (the "City") filed its motion for summary judgment (the "Motion") and files this supporting brief pursuant to Rule 56 of the Federal Rules of Civil Procedure requesting that the Court enter judgment dismissing all of Plaintiffs' claims against the City because there is no genuine dispute as to the material facts and the City is entitled to judgment as a matter of law. Plaintiffs may assert some facts they allege or contend support their claims and defeat summary judgment, but due to the applicable law on each of Plaintiffs' claims the facts Plaintiffs present are not material – and thus do not defeat Defendant's motion for summary judgment. Plaintiffs erroneously assert that Ordinance No. 31747 (the "Amending Ordinance") enacted in January 2021 is invalid and unenforceable because: 1) the Amending Ordinance is preempted by state statutes which are in direct and irreconcilable conflict with the Amending Ordinance; 2) the Amending Ordinance violates Plaintiffs' right to substantive due process under the U.S. Constitution; 3) the Amending Ordinance violates Plaintiffs' rights under the due course of law provision of the Texas Constitution; and 4) the Amending Ordinance prohibits the operation of a business licensed by the State. Based upon the showing made herein and the supporting Appendix, this Court can and should determine as a matter of law that the Amending Ordinance is a valid exercise of the City's police powers in a reasonable effort to protect low-income members of the public from being victimized by predatory loan terms peddled by Plaintiffs. Specifically, the Amending Ordinance is not preempted by any provision of Chapter 393 of the Texas Finance Code and does not violate Plaintiffs' right to substantive due process or due course of law under the U.S. and Texas Constitutions. Furthermore, the Amending Ordinance does not prohibit or prevent the operation of a business licensed by the state.

## I.      SUMMARY JUDGMENT STANDARD

Under rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When the moving party seeks summary judgment as to the opponent's claims or defenses, the moving party bears the initial burden of identifying those claims or defenses where based upon the record the movant believes there is not a genuine issue of material fact that the claims fail as a matter of law. The moving party is not required to negate the elements of the nonmoving party's case. *Lynch Props., Inc. v. Potomac Ins. Co*., 140 F.3d 622, 625 (5th Cir. 1998). "Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the non-movant will bear the burden of proof at trial." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co*., 767 F.3d 503, 511 (5th Cir. 2014). Once the moving party meets its burden, the nonmoving party must set forth – and submit evidence -- of specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in the pleadings. *Lynch Props*., 140 F.3d at 62; *Pioneer Expl*., 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.") In considering summary judgment, the evidence is viewed in the light most favorable to the nonmoving party, and all reasonable inferences are drawn in the light most favorable to the nonmoving party where there is evidence showing that an actual controversy or genuine dispute exists as to material facts in the evidence. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The court should give credence to the evidence supporting the moving party if that evidence is uncontradicted or unimpeached or the evidence is from disinterested witnesses. *Porter v. Houma Terrabonne Hous. Auth. Bd. Of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015).

Evidence that amounts to only a scintilla of evidence is not sufficient to meet the nonmovant's burden and defeat a motion for summary judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).   The City submits that there is no genuine issue as to the material facts that Plaintiffs' legal claims are deficient as a matter of law such that the City is entitled to judgment on all of Plaintiffs' legal claims or theories to invalidate the Amending Ordinance.

The Amending Ordinance is a valid and proper exercise of the City's authority as a home-rule city to protect the general and economic welfare of the City's low-income residents and is not in direct and irreconcilable conflict with state law. Furthermore, the City has a legitimate governmental interest in seeking to protect low-income residents from financial exploitation by predatory lenders charging loan fees, broker fees, and commission charges that often exceed 200%-300% APR (and sometimes even exceed 500%-600% APR as evidenced by Plaintiffs' own records) – in addition to the interest charged to the borrower on small short term consumer loans. The Amending Ordinance, therefore, is rationally related to the City's legitimate governmental interest in protecting low-income consumers from financial exploitation and does not violate due process provisions of either the Texas or U.S. Constitutions.  and is not in conflict with Texas statutes.

## II.      BACKGROUND FACTS

### A.     General Background on the Type of Loans at Issue in This Lawsuit

Texas state law limits and regulates the rate of interest a lender can charge and collect on small consumer loans at the maximum amount of 10% a year, except as otherwise provided by law. *See* Tex. Fin. Code § 302.001. Ancillary to the business of making small loans to low-income consumers, who typically are viewed as higher credit risks, loan brokers, loan arrangers, and credit enhancers (like TitleMax) have developed a practice of arranging short-term loans to low-income consumers. The charges, fees, and assessments charged by these loan brokers and credit enhancers

are not controlled or capped by the state as interest rates on these same loans are regulated and capped, so the borrower can be charged rates that exceed 600% APR. Consequently, with short-term loans to low-income borrowers, it is fairly common that loan brokers, loan arrangers, or credit enhancers charge and collect service charges, assessments, and fees that typically exceed 200% APR on a short-term auto title secured loans. These service charges and fees made by loan brokers or arrangers (like TitleMax) often exceed 500%-600% on unsecured personal loans. By comparison, the lender charges and collects interest on these small consumer loans at the rate capped at 10% per year under Texas law. These additional fees and charges made by loan brokers and loan arrangers create a heavy financial burden on low-income borrowers and cause a significant risk that these low-income borrowers will become mired or stuck in a cycle of debt and re-financing, which leads to additional service fees and charges and heightened risk that low-income borrowers will default and lose their vehicle pledged as security for the loan, which could further exacerbate their financial distress if they lose the means to go to work and transport their families.

**B.     TitleMax's Loan Cost Information**

**1.     Auto Loan Disclosure**

A sample TitleMax loan to low-income consumers is shown by an "Auto Title Loan Cost Disclosure" obtained from TitleMax's website. (*See* City App'x at 1.) The Cost Disclosure illustrates a typical auto title loan made by Plaintiffs and arranged or brokered by TitleMax in the amount of $1,250 to be repaid in five payments. On the sample loan illustrated in the Cost Disclosure, the interest paid to the lender at the rate of 9.95% per annum is $52.46 over the term of the loan. By comparison, the fees payable to TitleMax on this loan are $1,108.80 (more than twenty times the amount of interest paid to the lender). The amount payable by the consumer/borrower yields an APR cost of credit at the yearly rate of 211.08% APR (with over

200% of the APR arising due to fees and charges that are not interest on the loan). On the sample loan of $1,250, the borrower is required to repay a total of $2,411.26 if paid on time over five months as originally structured. The TitleMax "Cost Disclosure" provides for monthly payments of $215.16 per month for the first four months, with a final balloon payment due in the fifth month of $1,550.62, which is over $300 more than the $1,250 amount initially borrowed. Note that the principal owed has not been reduced at all by the $860 the borrower paid in installment payments made over the prior four months. If the borrower does not pay on time or requests to extend the loan repayment date because the borrower does not have the funds to pay the balloon payment due at the end of the loan term, the fees and charges increase dramatically. Many borrowers also lose their vehicles to repossession when they are unable to repay the loan in full, including the predatory fees and service charges that typically dwarf the interest charges.

The Auto Title Loan Cost Disclosure form promulgated by the Texas Office of Consumer Credit Commissioner ("OCCC") (*see* City App'x at 2) shows that based upon data from 2019 reports submitted to the OCCC by credit access businesses ("CABs") (like TitleMax), 12.5% of borrowers will renew an auto title loan two to four times before paying off the loan – and 35% of borrowers will renew or re-finance the loan five or more times or will never pay off the loan. Those borrowers who do not pay off the loan face foreclosure and repossession of their vehicle. The provisions in the Amending Ordinance requiring that the total amount owed be reduced by 25% for each payment and the loan be repaid in no more than four installments avoids the large balloon payment due as the last payment and the "cycle of debt" that is a concern. This balloon payment and the cycle of debt can result in multiple re-financings and often ends in foreclosure and repossession of the borrower's vehicle. The TitleMax Auto Title Loan Cost Disclosure form at page 1 of the City's Appendix does not comply with the Amending Ordinance's repayment

requirements because the loan is structured with four small periodic payments of $215 each month and a large balloon payment of $1,550 due at the end of the loan term—which is more than seven times larger than each of the four prior monthly payments.

### 2.    TitleMax's Schedule of All Fees

TitleMax's "Texas Schedule of All Fees Effective June 2019" ("Schedule of Fees") obtained from TitleMax's website shows how oppressive TitleMax's credit services fees are for low-income borrowers. (*See* City App'x at 3-24.) As an example of TitleMax's disturbingly high charges, the Schedule of Fees at page 4 of the City's Appendix shows that, on a 30-day loan in the amount of $533.00 secured by an auto title as collateral, TitleMax charges a credit services organization ("CSO") fee of $101.21 whereas the lender interest is only $5.19, so the total of the repayments is $639.40, representing an APR of 242.88%. (*Id.* at 4.)

On a 30-day loan of $1,233, TitleMax charges a CSO fee of $221.82 whereas the lender charges interest of only $11.90 so the total repayment is $1,466.71, representing an APR of 230.62%. (*See id.*) On a five-month secured loan in the amount of $1,033, TitleMax charges a CSO fee of $917.30, which far exceeds the $42.24 in interest charged by the lender. The total repayments by the borrower on the five-month loan is $1,992.54, representing an APR of 219.93%. (*See id.* at 7-8.)

### 3.    Unsecured Personal Loans at APR Rates of 500%-600%

The CSO fees and charges TitleMax extracts from its low-income borrowers on unsecured personal loans are much higher and even more disturbing than on loans secured by the borrower's auto title. For example, TitleMax's Schedule of All Fees shows that on a personal unsecured loan of $500 over a 140-day term, the CSO fee (paid to TitleMax) is $1,246, whereas the interest paid to the lender is only $19.08. (*See id.* at 13-14.) The total of repayments by the borrower on the $500 loan over a 140-day term is $1,765.08 representing an APR of 650.90%. (*Id.*)

A review of TitleMax's Schedule of Fees covering other loan amounts and different durations of personal unsecured loans show a clear pattern where the cost of the loan is 500%-600% APR even excluding the interest paid to the lender. (*See id*. at 15-22.) The interest portion of the loan repayment is generally less than 10% of the fees charged to the borrower, whereas the overwhelming majority of the fees charged to the low-income borrowers are the TitleMax CSO fees and charges. The table below shows the ratio of the interest charges payable to the lender compared to TitleMax's CSO fees and service charges on various unsecured personal loans.

| Loan Amount | Interest | CSO Fees | APR | Appendix Pg. |
|:---:|:---:|:---:|:---:|:---:|
| $500 | $19.08 | $1,246.00 | 650.90% | 14-15 |
| $500 | $19.08 | $996.80 | 522.14% | 15-16 |
| $1,500 | $57.25 | $3,738.00 | 650.90% | 16 |
| $1,500 | $57.25 | $2,990.40 | 522.14% | 16-17 |
| $500 | $20.45 | $1,335.00 | 655.55% | 17-18 |
| $500 | $20.45 | $1,068.00 | 525.35% | 18-19 |
| $1,500 | $61.34 | $4,005.00 | 655.55% | 19 |
| $1,500 | $61.34 | $3,204.00 | 525.35% | 20 |
| $500 | $20.85 | $1,882.55 | 659.21% | 20-21 |
| $500 | $20.85 | $1,089.36 | 528.54% | 21-22 |
| $1,500 | $62.56 | $4,085.10 | 659.21% | 22-23 |
| $1,500 | $62.56 | $3,268.08 | 528.54% | 23 |

(*See id*. at 14-23.) As is readily apparent from the above table, the disturbingly large amount of CSO fees and charges (payable to TitleMax) dwarf the interest charges on the loans depicted in TitleMax's Schedule of Fees. The CSO fees are typically fifty or sixty times more than the interest amount payable to the lender. The first page of TitleMax's Schedule of Fees states that TitleMax "is not a lender." The above table indicates that it is much more profitable not to be a lender in these loan transactions (where state law caps the interest rate) but instead it is much more profitable to be the CSO on the TitleMax loan transactions, because state law does not cap or limit the brokers' charges for arranging loans.

C.      **The Amending Ordinance**

In order to protect low-income consumers, the City adopted the original Ordinance, which is codified at Dallas City Code Chapter 50, Article XI ("Article XI"). The original version of Article XI was adopted in 2011 (the "2011 Ordinance"). The Dallas City Council (the "City Council") later determined that the 2011 Ordinance did not provide sufficient protection to low-income borrowers against predatory charges and assessments made by loan brokers and arrangers like TitleMax. Consequently, in January 2021, the City Council enacted the Amending Ordinance, amending Article XI to, among other things, cap the loan broker services fees and charges payable to a CSO on unsecured personal loans not to exceed 0.1% per day (36.5% per year) and to require that these high cost loans be structured such that each payment reduce by at least 25% the amount owed on the loan, including all principal, interest and the fees and charges assessed by the loan broker or loan arranger (like TitleMax). The Amending Ordinance also is designed to require that the loan repayment schedule be structured so there is no large balloon payment at the end as part of the final payment. For example, the auto-title secured loan depicted in City App'x at 1 calls for a 5th final payment in the amount of $1,550 on an original loan of only $1,250.

As discussed above, Texas law provides limits on the interest rate that lenders can charge to borrowers on short-term loans, but loan brokers, arrangers, and CSOs (like TitleMax) take the position that the services fees and assessments they charge are not interest and, therefore, that the charges to borrowers by CSOs are not limited by any specific interest rate cap under Texas state law. As explained and examined by the Fifth Circuit in *Lovick v. Ritemoney, Ltd.*, 378 F. 3d 433 (5th Cir. 2004), the activities of loan brokers like TitleMax charging rates for their brokerage services that often exceed 200%-600% APR would likely constitute usury under Texas common law if not for the legislature's enactment of the Credit Services Organization Act ("CSOA"), Tex. Fin. Code § 393. As the Fifth Circuit noted in *Lovick*, the CSOA does not limit the amount that

8

may be charged by a CSO for its services as a loan broker. As illustrated in *Lovick*, the CSOA does not place any limits or caps on how much loan brokers can charge and collect as fees without the potentially heavy penalties under the Texas usury laws. In *Lovick* the Court observed: "[W]e are more than well aware that a $1,500 fee for a $2,000 loan appears quite excessive." *Id.* at 443. As noted in *Lovick*, the CSOA permits the loan broker or CSO to charge credit services fees that are not restricted as to amount by state law. *Id.* at 442. Even though the CSOA does not limit the amount TitleMax and other CSOs can charge borrowers for loan broker services, the CSOA does not prohibit a municipality from enacting some limits on the brokers' charges.

In order to limit or regulate these CSO fees on unsecured personal loans like those shown in the above table, the City enacted a specific provision of the Amending Ordinance in January 2021. Section 50-151.6(b) of the Dallas City Code states: "The sum of all valuable consideration, fees, or other charges owed by the consumer to the [CSO] may not exceed 0.1 percent per day of the outstanding balance of the extension of consumer credit." Dallas, Tex., Code § 50-151.6(b). Under the Amending Ordinance, therefore, a CSO that obtains, brokers, or arranges for a consumer a loan covered by Article XI or provides advice or assistance to a consumer to obtain the loan cannot make charges of more than 36.5% APR on the loan amount. This provision capping loan brokers' fees and charges does not include or cap the interest payable to the lender (which is set by state law), so with interest typically at the rate of 10% per annum the total amount payable by the borrower on an unsecured personal loan would be 46.5% per annum. Before adoption of this provision of the Amending Ordinance, organizations like TitleMax were able to charge and collect services or broker fees and charges of 500%-600% APR (or even more) on unsecured consumer loans to low-income borrowers. The provision of the Amending Ordinance limiting the charges to no more than 0.1 percent per day does not regulate or limit the amount of interest the lender may

lawfully charge a consumer, because interest charges are capped or set by state law. The Amending Ordinance is designed and intended to limit and control the excessive and predatory ancillary credit services charges and loan broker fees charged by credit brokers, credit arrangers, and credit enhancers from being extracted from borrowers at abusive rates.

Another provision of the Amending Ordinance attacked by Plaintiffs is section 50-151.4(d)(1), which provides that any extension of credit that a CSO or CAB obtains for or assists a consumer in obtaining shall require repayment of the total amount of the extension of credit, including any principal, interest, and fees, valuable consideration, credit access, business fees, and any other charges or costs in installments may not be payable in more than four installments. Dallas, Tex., Code § 50-151.4(d)(1). Subsection (d)(2) provides that proceeds from each installment payment must be used to repay at least 25% of the total amount of the transaction, including the principal, fees, interest, business fees, services fees, and any other charges or costs that the consumer owes on the loan transaction. Dallas, Tex., Code § 50-151.4(d)(2). This provision is designed and intended to protect the consumer from becoming stuck in a cycle of debt with high charges and fees where the consumer struggles to catch up and pay the amount owed with a large balloon payment at the end of a few months after the loan is made. The repayment in four payments with each payment reducing the amount owed by 25% has a rational basis as it requires lenders to structure these very expensive loans in such a way that these loans and the attendant fees and charges are paid off relatively promptly. This makes it less likely that a low-income borrower will become mired in a cycle of expensive debt and re-financings that could further escalate the charges and cause dire economic hardship for low-income borrowers.

D.     **City Council Meeting – TitleMax Speaks before Amendment Vote**

At the City Council meeting on January 27, 2021 at which the Amending Ordinance was enacted by a unanimous vote, Plaintiffs were represented by two speakers who took advantage of

the opportunity to explain Plaintiffs' reasons for opposing the proposed Amending Ordinance. The transcript of this City Council meeting is included in the Appendix. (*See* City App'x at 106-113.). Rob Norcross, representing the Consumer Service Alliance of Texas ("CSAT") asked the City Council to delay voting on the proposed amendment and "appoint some sort of task force to consider changes." (City App'x at 107 p.3.). Among the reasons Norcross stated in opposition to the proposed ordinance were: 1) the proposed amendments would effectively eliminate an essential business; and 2) the Ordinance "has easily curable drafting deficiencies" (yet no specific easily curable drafting deficiencies were identified). In commenting upon "drafting deficiencies" Norcross stated: "No specific grounds, other than vague subjective claims of overly expensive and predatory transactions have been decided as justification for the amendments." (City App'x at 107 p. 3-4.). The final reason Norcross stated for the requested delay was that "taking action during a pandemic is unnecessary … loan demand has plummeted as a result of federal stimulus and federally enhanced unemployment benefits." (*Id.* at 107 p. 4.).

TitleMax also sent its General Counsel, Victoria Newman, to the City Council meeting. In explaining TitleMax's opposition to the Amending Ordinance, Newman stated: "[T]he proposed ordinance before you shrinks the payback guide for borrowers and mandatorily increases the amount a customer must pay back each payment." (*Id.* at 108 p. 6.). Newman asked the Council to delay voting on the ordinance and appoint a task force to consider the ordinance. Newman stated that TitleMax was "eager to assist and address any purported issues with the current ordinance in place." (*Id.* at 108 p. 7.). Newman did not mention any concerns expressed that TitleMax's services were "overly expensive and predatory transactions" as had been acknowledged as issues in the comments made by Norcross.

Newman spoke again later at the Council meeting in response to a question, at which point Newman explained TitleMax's opposition to the 0.10% per day limit on fees and charges on unsecured personal loans – and explained TitleMax's opposition to the repayment restrictions providing that a loan secured by an auto title lien must be repaid in no more than four installments, with each installment repaying 25% of the total outstanding balance on the loan – leaving no balloon payment due at the end of the loan term. (*Id.* at 112 p. 22-23.). Neither Newman nor Norcross made any mention whatsoever about reducing TitleMax's very high rates and charges for loan brokerage services. After Newman's second round of remarks and several minutes of additional discussion among members of the City Council, the Council voted 14-0 to enact the Amending Ordinance.

### III.    SUMMARY OF THE ARGUMENT

Texas Finance Code Chapter 393 does not preempt the Amending Ordinance with unmistakable clarity. The Amending Ordinance is not in direct and irreconcilable conflict with chapter 393 of the Texas Finance Code. On the contrary, there is a reasonable construction that would reconcile the Amending Ordinance with chapter 393 and allow both to be given effect and enforced without any direct conflict between the ordinance and Texas law. As a home-rule city, Dallas has the full power of self-government under the Texas Constitution. *See* Texas Constitution art. XI, §5. Home-rule cities have broad discretionary powers to enact ordinances pursuant to their police powers to protect and further the general welfare of their residents. An ordinance enacted by a home-rule municipality to protect the general welfare of residents is presumed to be valid, and the party challenging an ordinance bears a heavy burden to show that the ordinance is invalid. Home-rule cities do not look to the state legislature for grants of power, but only for limitations on their authority. *See BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016).

A home-rule city like Dallas derives from the Texas Constitution its police powers and authority to enact ordinances. When the Texas legislature intends to bar home-rule cities from legislating or adopting ordinances in an area, it must do so with unmistakable clarity. *Dallas Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex. 1993). A municipal ordinance and a state statute will not be held repugnant or in conflict if there is any other reasonable construction where both provisions can be reconciled and given effect. *BCCA Appeal Grp.*, 496 S.W.3d at 7.

In the federal system, a state or local law may be found to be preempted by federal law when a federal statutory or regulatory scheme is so pervasive and extensive that the federal government has exercised exclusive or preemptive power over an entire field of law or subject of regulation (also referred to as "field preemption"). Texas law does not provide for field preemption of city ordinances by state laws. In fact, Texas law is clear that, for an ordinance enacted by a home-rule city to be preempted, the preemption must either be expressly stated by the legislature or arise because the home-rule ordinance is irreconcilably in conflict with the state statute such that there is no reasonable construction that can give both effect. Due to the very broad powers conferred on home rule cities by the Texas Constitution, an ordinance enacted by a home-rule city can be preempted by a state statute only where there is a direct conflict between the two provisions or the legislature's intention to preempt ordinances regarding the subject matter is expressly stated by the legislature. Field preemption of a municipal ordinance by a state statute does not apply under Texas law and is not a viable claim by Plaintiffs in this case.

Nothing in the Texas Finance Code explicitly states that the legislature intended to exercise exclusive control over regulation of CABs and CSOs or that municipalities are prevented from enacting any ordinances regulating CABs and CSOs. Furthermore, Plaintiffs have not shown that

there is no reasonable construction that would allow the Amending Ordinance to be enforced without an irreconcilable conflict with chapter 393 of the Finance Code. State law is considered a floor upon which a home-rule city can build, so long as the City's ordinances do not directly and unmistakably conflict with state law.

Section 393.622(c) of the Texas Finance Code bars state regulators from establishing limits on the fees charged by CABs. This section makes it clear that the legislature knew how to write expressly preemptive instructions if preemption is intended. If the state had intended home-rule cities to be barred as state regulators are barred, the legislature would have included cities in the prohibition found in section 393.622(c). The Amending Ordinance functions alongside these state laws, not in opposition to them. The Amending Ordinance and provisions of the Texas Finance Code function side by side and can be harmonized and viewed as complementary, and therefore, the City's Amending Ordinance is not preempted.

The Amending Ordinance does not violate the "due course of law" clause of the Texas Constitution or the due process clause of the U.S. Constitution because the Amending Ordinance is rationally related to advancing a legitimate governmental interest, specifically to assist low-income borrowers and limit the abusive and predatory terms of loan broker fees, assessments, and charges and mandate repayment terms that limit the duration of repayment obligations, avoid large balloon payments at the end of the loan term, and hasten repayment of this expensive form of credit. Where an ordinance, like the Amending Ordinance, is rationally related to a legitimate governmental interest, it satisfies substantive due process under both the U.S. and the Texas constitutions; consequently, a challenge to the constitutionality of the Amending Ordinance fails. Finally, the Amending Ordinance does not prohibit the operation of a business licensed by the state. The Amending Ordinance allows Plaintiffs to operate their loan business, as long as they

conduct their business in accordance with applicable law. The City has not forced Plaintiffs to cease their loan business. If Plaintiffs claim to have ceased some of their previous lending business, that is a choice Plaintiffs made.

## IV.   ARGUMENT

### A.   THE AMENDING ORDINANCE IS NOT PREEMPTED BY STATE LAW.

The City is entitled to summary judgment with respect to Plaintiffs' assertion that the Amending Ordinance is preempted by state law. When considering the validity of a city ordinance, a court is to presume the ordinance is valid. *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982). The burden of showing that a city ordinance is invalid rests solely on the party attacking it. *RCI Entertainment (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 595 (Tex. App.—San Antonio 2012, no pet.). Home-rule cities, like Dallas, have the full authority of self-government conferred by the Texas Constitution. *See* Texas Constitution art. XI, §5. This Court must, therefore, determine not if the legislature has made a specific grant of authority to allow a home-rule city like Dallas to enact ordinances in the subject area, but only whether the Texas legislature has limited the power of home-rule cities to enact ordinances in this area. *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002). In fact, when the legislature decides to preempt a subject matter to prevent a home-rule city from enacting ordinances relating to a particular area, the legislature must communicate its preemptive intent with unmistakable clarity. *Id.* Here, the Amending Ordinance is not preempted because it is not in direct conflict with chapter 393 of the Texas Finance Code. There is a reasonable construction leaving both the Amending Ordinance and state law in effect, so the Amending Ordinance is not preempted.

1.    **The Amending Ordinance Does Not Amount to a Prohibition of a Business Licensed by the State.**

The Amending Ordinance does not prohibit the operation of a business licensed by the State. The Amending Ordinance merely places reasonable limits (36.5% per annum of the loan amount) on the charges TitleMax and its similarly situated loan brokers and arrangers can charge to their low-income borrowers. This limit does not include the interest charged and collected by the lenders (capped by Texas law at 10% per annum) so the amount charged to the borrower on personal unsecured loans by Plaintiffs could be as much as 46.5% APR. The lenders in these small short-term loan transactions are operating their respective businesses with the 10% cap in place. The cap that the Amending Ordinance places on loan brokers and loan arrangers is more than three and a half times higher than the cap the lenders operate under. TitleMax is not prohibited from operating its business under the Amending Ordinance. The Ordinance only attempts to prevent predatory charges and rates of return on the type of small short-term loans TitleMax brokers and arranges. The table at page 7 shows the disturbingly high rates TitleMax charges for its loan brokerage and loan arranging services – unless restrained by the Amending Ordinance. Many businesses involved in the business of making loans can conduct their businesses successfully with rates less than 36.5% per annum. The Amending Ordinance does not preclude TitleMax from operating its business in the City if it chooses to do so, but only requires that the loans arranged by Plaintiffs and secured by an auto-title lien must be structured to avoid a large balloon payment at the end of the loan term.

Plaintiffs have continued to operate their business since the Amending Ordinance was enacted two years ago in January 2021. Plaintiffs can still arrange loans and charge very significant brokerage fees and charges so long as the assessments do not exceed 0.1 percent per day of the outstanding balance owed (36.5% APR) plus the interest charged by the lender. The cap on loan

brokers' and loan arrangers' fees and assessments is more than three and a half times higher than the state law cap for interest the lenders can charge.

Plaintiffs have previously relied on *City of Fort Worth v. McDonald*, 293 S.W.2d 256, 258 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.), but the ordinance at issue in *McDonald* was invalidated because it was designed to "prevent or prohibit" pinball machines, whereas a state statute validated pinball machines as a reven.ue source for state taxes. *See RCI Entm't (San Antonio) v. City of San Antonio*, 373 S.W.3d 589, 598 (Tex. App.—San Antonio 2012) (quoting *McDonald*, 293 S.W.2d at 258, that the invalidated ordinance prohibited what the statute specifically authorized). The second case Plaintiffs have previously relied upon, *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. Civ. App.—Fort Worth 1938, no writ), is distinguishable because, there, the evidence was undisputed that due to the challenged exclusionary zoning, there was no place within Denton where the business could operate a dance hall and not violate the provisions of the zoning ordinance. The Ordinance at issue here does not prohibit the operation of their businesses—no matter how vigorously Plaintiffs contend otherwise. The *McDonald* and *Murphy* cases essentially apply the principle that state law will preempt a municipal ordinance when the ordinance is in irreconcilable conflict with the state law and it is impossible to give effect to both provisions. The municipal ordinance is preempted only to the extent of such an irreconcilable conflict and the state law is paramount. Here, there is no irreconcilable conflict between the Amending Ordinance and Texas law regulating the sort of loans Plaintiffs make to low-income borrowers.

Plaintiffs are not prohibited from operating their businesses in the City if they choose to do so, but merely must operate within the bounds and in accordance with the terms of the Amending Ordinance.

**2.    The Theory of Field Preemption Does Not Apply to a Home Rule City Under Texas Law.**

The doctrine of field preemption is derived from federal case law and is found when the United States Congress intends a federal statutory or regulatory scheme to occupy an entire field exclusively, thereby entirely precluding state regulation of that field's subject matter. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). This intent can be manifested through explicit statutory language or implied by the pervasiveness and complexity of the federal law or regulations in question. *Id.*; *English v. General Elec. Co.*, 496 U.S. 72, 79-80 (1990). As an example, the United State Supreme Court found in 2012 that the federal government possesses exclusive authority to regulate the field of alien registration, thus foreclosing state regulation in the same area. *Arizona v. U.S.*, 132 S. Ct. 2492, 2499–50 (2012).

The relationship between Texas home-rule cities and the state government is not the same as the relationship between a sovereign state and the federal government regarding preemption. Texas courts are authorized to scrutinize city ordinances to determine if a particular city ordinance *conflicts* with state law, otherwise the ordinance stands unless expressly preempted by the legislature. Consequently, the doctrine of field preemption is not applicable to the relationship between a home-rule city's ordinances and Texas statutes. *See BCCA Appeal Grp.*, 496 S.W.3d at 25 (Boyd, J., dissenting in part) ("[C]ity ordinances are not subject to state-law 'field preemption'…even if the Legislature intended to 'occupy that field' of law."); *Comeau*, 633 S.W.2d at 796. There is no instance where a Texas court has applied the doctrine of field preemption to invalidate an ordinance enacted by a home-rule city because the field where the ordinance applied was deemed to be so thoroughly regulated by the state that the field had been preempted such that the local ordinance was nullified even where there was no direct conflict between the statute and the ordinance.

There is no section within chapter 393 of the Texas Finance Code expressly stating that the field of CAB or CSO regulation is preempted and exclusively under state control, so any contention of preemption would have to arise by implication. In *BCCA Appeal Group v. City of Houston*, the Texas Supreme Court analyzed a Houston ordinance that addressed the same subject matter as chapter 382 of the Texas Health and Safety Code. *BCCA Appeal Grp.*, 496 S.W.3d at 10-17. Chapter 382 is the codification of the Texas Clean Air Act of 1967, which operates in conjunction with rules promulgated by the Texas Commission on Environmental Quality to regulate a staggering number of activities relating to environmental protection. *See generally* Tex. Health & Safety Code §§ 382.001–.510; 30 Tex. Admin. Code §§ 1.1–351.104. Even when presented with such a complex and far-reaching statutory framework, the Texas Supreme Court analyzed the Houston ordinance in detail to determine whether it specifically conflicted with the state regulations and not whether the entire field was preempted by state law. *See BCCA Appeal Grp.*, 496 S.W.3d at 12-25. In other words, there was an obvious opportunity to apply the doctrine of field preemption to the case before it, yet the Texas Supreme Court chose instead to engage in a lengthy conflict preemption analysis to arrive at its ruling. *Id.* Here, chapter 393 of the Texas Finance Code addresses a single type of business activity within the State and most of the sections of chapter 393 concern licensing, registration, and disclosure procedures. *See generally* Tex. Fin. Code §§ 393.001–393.628. It thus stands to reason that, if field preemption was not applied to the vastly more comprehensive statutory scheme in chapter 382 of the Texas Health and Safety Code, Texas courts would similarly not apply the doctrine of field preemption to the far more narrow state regulation of CABs in chapter 393 of the Texas Finance Code. Accordingly, there is no merit to any argument that the Amending Ordinance is – or could be – preempted because the state has comprehensively occupied the field of regulating short-term loans under chapter 393.

3.      **Conflict Does Not Exist Between the Amending Ordinance and the Texas Finance Code.**

Plaintiffs make generalized claims that sections of the Texas Finance Code conflict with the Amending Ordinance such that it should be preempted. In order to prevail on these claims of preemption, Plaintiffs must show that there is no reading or interpretation of the Amending Ordinance where it could co-exist in concert with chapter 393 of the Texas Finance Code. As set out above, under Texas law, if there is any reasonable interpretation where the Amending Ordinance can be read as leaving both the ordinance and the state statute in effect, then the Amending Ordinance must be allowed to stand. *Dallas Merch.'s*, 852 S.W.2d at 491. Home-rule cities have broad discretionary powers to enact ordinances provided that no ordinance shall contain any provision in conflict with the Constitution and the general laws enacted by the legislature. *Id.* at 490 (quoting Texas Constitution art. XI, §5). A state statute and a home-rule city ordinance "will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached." *Comeau*, 633 S.W. 2d at 796.

When home-rule cities enact ordinances in areas in which the state has also passed laws, "local regulation, ancillary to and in harmony with the general scope and purpose of the state enactment is acceptable." *Comeau*, 633 S.W.2d at 796. In other words, state law is considered a floor upon which the city can build, as long as the city's ordinances do not unmistakably conflict with state law. *Id.*; *Dallas Merch.'s*, 852 S.W.2d at 490–91.

As explained above, Section 50-151.3(d) of the Amending Ordinance provides that, in an extension of consumer credit where a credit access business assists a consumer in obtaining the credit and where the loan provides for payment in installments, the loan may not be payable in more than four installments and each installment payment must be used to repay at least 25% of the total amount of the transaction including all fees and other charges or costs. This provision that

a borrower must pay all that they owe on a small consumer loan in no more than four installment payments helps to avoid large balloon payments due on the final installment and helps ensure that the low-income consumer swiftly repays this very expensive form of debt and helps avoid the need for refinancing of a large balloon payment at the end of the loan term in order to avoid or minimize the ill effects of the high fees and loan charges that are part of the structure of these loans.

Plaintiffs attempt to read into the Texas Finance Code the idea that CABs are free to do whatever they wish in regard to the fees that they charge as long as the customer agrees and these service fees are disclosed. However, not only does the Texas Finance Code not give any such free rein to Plaintiffs and other CABs, but it specifically makes the assessment of fees subject to other laws, like ordinances enacted by the City. Texas Finance Code §393.602(b) states in part: "A credit access business is permitted to charge amounts allowed by other laws, as applicable." This quoted provision appears to contemplate that the service fees that a credit services organization or credit access business may charge *may* be regulated by local ordinances – such as the Amending Ordinance.

Finally, section 393.622(c) of the Texas Finance Code undermines Plaintiffs' argument that Plaintiffs and their industry are so comprehensively regulated by the OCCC and the Finance Commission that city ordinances regulating in this area should be deemed preempted and nullified. That section states:

> Nothing in Section 393.201(c) or Sections 393.601-393.628 grants authority to the finance commission or the Office of Consumer Credit Commissioner to establish a limit on the fees charged by a credit access business.

The above-quoted section makes it clear that the legislature knew how to write expressly preemptive instructions or provisions to exempt a business-type from regulation by any governmental entity. If the legislature had intended for cities to be barred from enacting ordinances to regulate the predatory charges and fees charged by entities like TitleMax, it obviously knew

how to do so. In fact, all it would have taken to enact preemption is to add to the above quoted phrase, "or any municipal government," thereby prohibiting any city from establishing a limit on fees charged for arranging or brokering these small consumer loans. The doctrine of *expressio unius est exclusion alterius* thus supports the conclusion that the City acted within its powers as a home-rule city when it enacted ordinances limiting the fees and charges loan brokers and arrangers could extract from low-income borrowers. *See Williams v. State*, 997 S.W.2d 265, 273-74 (Tex. 1999).

**B.    THE AMENDING ORDINANCE DOES NOT VIOLATE THE DUE PROCESS CLAUSE OF THE U.S CONSTITUTION.**

A governmental action, such as a municipal ordinance, is generally presumed to be valid and constitutional, consistent with procedural and substantive due process when the ordinance is rationally related to furthering a legitimate governmental interest. *FM Properties Operating Co. v. City of Austin*, 93 F. 3d 167, 174-75 (5th Cir. 1996) ("The question is only whether a rational relationship exists between the policy [or ordinance] and a *conceivable* legitimate governmental objective. If the question is at least debatable, there is no substantive due process violation.") (emphasis in original, internal citations omitted). With respect to the Amending Ordinance, the City has a legitimate interest in seeking to protect low-income borrowers from abusive and predatory lending practices and charges. The Amending Ordinance is rationally related to furthering this objective because it is designed to limit the charges, fees, and assessments that low-income borrowers can be charged by loan brokers, loan arrangers, credit enhancers, and similar entities ancillary to making small consumer loans to those borrowers. When a city ordinance is challenged as a violation of substantive due process under the federal constitution, the ordinance is sustainable against a substantive due process challenge if there is "any conceivable rational

basis" for the enactment. *Shelton v. City of College Station*, 780 F. 2d 475, 483 (5th Cir. 1985) (en banc).

The U.S. Supreme Court has instructed that a law will survive a substantive due process challenge if the enactment is rationally related to legitimate governmental objective. *See Washington v. Glucksberg*, 521 U.S. 702, 728 (1997). Only if such governmental action is clearly arbitrary and unreasonable, having no substantial relation to the public general welfare may the ordinance be declared unconstitutional as a violation of due process. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).

Economic regulations facing a due process challenge under the U.S. Constitution generally have a presumption of validity, which requires that a challenger must show that there is no conceivable rational basis for the enactment relating to a legitimate governmental interest. "So long as some "plausible" reason exists for the law – any plausible reason, even one that did not inspire the enacting legislators—the law must stand." *See Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) (citing *Heller v. Doe*, 509 U.S. 312, 320, 324, 330 (1993)). Rational speculation about the reasonable justifications for an enactment or law unsupported by evidence or empirical data is sufficient to defeat a substantive due process challenge. *See F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 315 (1993). Courts cannot subject legislative choices "to courtroom factfinding." *Id.* at 315. In performing a rational basis review of a law or ordinance courts are directed to engage in "rational speculation unsupported by evidence or empirical data" as to the reasons which might support the enactment. *Id.* at 315. As long as there is a conceivable rational basis for the official action, it is immaterial that it was not the primary factor in reaching the action – or that the rational basis was not actually relied upon by the decisionmakers or that some other irrational factors may

have been considered in arriving at the decision or enactment. *See Big Tyme Investments, L.L.C. v. Edwards*, 985 F. 3d 456, 469 (5th Cir. 2021).

Rational basis review is an extremely lenient standard of review, therefore, attacks on ordinances under rational basis review are rarely successful. See *Lindquist v. City of Pasadena*, 656 F. Supp. 2d 262, 696 (S.D. Tex. 2009), *aff'd,* 669 F. 3d 225 (5th Cir. 2012). For purposes of rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason … actually motivated the legislature." *See United States v. Amalfi*, 47 F.4th 114, 124 (2d Cir. 2022) (citing *Beach*, 508 U.S. at 315). It is not enough for those attacking the rationality of a law to argue that the stated reasons for the law do not support the enactment made.  Rather, the challengers "have the burden to negate *every conceivable basis* which might support it." *Beach*, 508 U.S. at 314; *see also Amalfi*, 47 F.4th at 124 (emphasis in original). As the court in *Amalfi* held, in order to defeat a law under substantive due process rational basis review, the challenger "must discredit any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record or actually motivated the legislature." *Amalfi*, 47 F.4th at 125. The opinions of Professor Christopher Peterson in his declaration (City App'x at 32-36) and report (City App'x at 37-92) identifying what "the Dallas City Council could reasonably conclude" are each a conceivable rational basis supporting the enactment of the Amending Ordinance, regardless of whether there is testimony in the record whether one or more of those reasons actually motivated one or more members of the City Council to vote to enact the ordinance. *See Amalfi*, 47 F.4th at 124-25.

Professor Peterson's report provided in the Appendix (City App'x at 37-92) observes that the Dallas City Council could reasonably conclude that the changes made by the Amending Ordinance help to establish a fairer more economical regulatory environment for CSO brokered

loans to Dallas residents. (City App'x at 52 ¶20.). He also states that the Dallas City Council could reasonably conclude that the repayment structuring restrictions (i.e., four equal payments with no large balloon payment at the end of the loan term) are needed to promote the financial wellbeing of Dallas residents using these type loans. (City App'x at 63 ¶32). The Dallas City Council could also reasonably conclude that card products such as those offered by Capital One (and other lenders) offer a superior more reasonably priced alternative for providing short term loans than the credit terms available through CSOs and CABs like TitleMax and better promote the financial welfare of Dallas residents. (City App'x at 66-67 ¶37.). The Dallas City Council could also reasonably conclude that credit unions and other sources of funds could be available to Dallas residents as superior alternatives to the high-cost expensive loans through CSOs and CABs like TitleMax. (City App'x at 67-68 ¶38). The City Council could reasonably conclude that other alternatives to borrowing at triple digit APR rates are a better alternative for Dallas residents, such as reducing expenses, borrowing from family or friends, obtaining extra work and income, delaying payment of some bills, or obtaining needed goods or services on credit rather than being forced to pay cash which must be borrowed through a high-cost loan such as from a CSO or CAB, like TitleMax. (City App'x at 68-69 ¶39).   A reasonable policy maker, such as a member of the Dallas City Council, could reasonably conclude that it is in the best interest of Dallas residents to enact the Amending Ordinance to reduce the oppressiveness of the loans covered by the Amending Ordinance.

The City has a legitimate governmental interest in preventing low-income residents from being unduly exploited, abused, and oppressed by loan brokers, loan arrangers, and credit enhancers charging very high fees for facilitating small loans and other predatory terms such as balloon payments due at the end of the loan term. The Amending Ordinance recites that it was

enacted "to protect the welfare of the residents and consumers in the City of Dallas … in an effort to reduce abusive and predatory lending practices." (*See* City App'x at 93 (Amending Ordinance, Section 50-144, titled "Purpose of Article"). Plaintiffs cannot sustain their burden on summary judgment to show that there is no conceivable rational basis for the Amending Ordinance. Plaintiffs have suggested several theories why they believe the City enacted the Amended Ordinance – suggesting that all reasons are invalid, irrational, arbitrary, and improper, but the actual purpose that may have motivated proponents of the Amending Ordinance to act as they did in enacting the ordinance is irrelevant for rational basis analysis. The question under a rational basis analysis of an ordinance is only whether a rational relationship exists between the ordinance and any conceivable legitimate governmental objective. See *FM Properties Operating Co. v, City of Austin,* 93 F. 3d 167, 174-75 (5th Cir. 1996).

In determining whether a governmental enactment survives rational basis review, the law bears a strong presumption of validity, and those attacking the rationality of the law or enactment have the burden to negative every conceivable basis which might support the law. *See Texas Midstream Gas Services, LLC v. City of Grand Prairie,* 608 F. 3d 200, 207, 469 (5th Cir. 2010). The legislative body is not required to articulate its reasons for enacting a provision, and it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged action actually motivated the enactment.  The scrutiny of an enactment to determine whether is it supported by a rational basis may be based on rational speculation unsupported by evidence or empirical data and is not generally subject to courtroom fact finding. *See Beach*, 508 U.S. at 307. As long as there is a conceivable rational basis for the official action, it is immaterial that it was not the primary factor in reaching the action – or that the rational basis was not actually relied upon

by the decisionmakers or that some other irrational factors may have been considered in arriving at the decision or enactment. *See Big Tyme*, 985 F. 3d at 469.

Under a rational basis review a court should accord a governmental legislative decision a strong presumption of validity and should uphold the action or ordinance if there is any reasonably conceivable basis or state of facts which could provide a rational basis for the governmental action or ordinance. The range of rational grounds is not restricted to those articulated at the time the government made its decision or enactment but encompasses all conceivable bases actual or hypothesized. The Amending Ordinance is rationally related to a legitimate objective of the City, specifically to protect low-income residents from oppressive, harsh, and predatory charges, fees, and assessments frequently made a part of the loan transaction prior to the enactment of the Amending Ordinance.

The rational basis test seeks only to determine whether any conceivable rational basis exists for an enactment or ordinance. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F. 3d 583, 594 (5th Cir. 2014). Because this rational basis inquiry or examination does not lend itself to an evidentiary inquiry in court, the government is not required to "prove" that the objective of the law or ordinance would be fulfilled or achieved. *Id.* Most legislation and ordinances deal ultimately in probabilities, and the estimation of the people's representatives that the law or ordinance will be beneficial to the community. *Id.* "A law 'based on rational speculation unsupported by evidence or empirical data' satisfies rational basis review." *Id.* (quoting *Beach*, 508 U.S. at 315). The fact that reasonable minds may disagree on legislation or a governmental enactment suffices to prove that the law has a rational basis. *Id.* There is no least restrictive means component to rational basis review, so even where there is an imperfect fit between the means and the ends or where the enactment is not made with mathematical precision, it can still satisfy rational

basis review. *Id.* (citing *Heller*, 509 U.S. at 321)). The Amending Ordinance is rationally related to furthering a legitimate City objective. Consequently, the Amending Ordinance is not invalid or unconstitutional under the due process clause of the U.S. Constitution, and the Court should grant the City summary judgment as to Plaintiffs' due process claim.

## C.   THE AMENDING ORDINANCE DOES NOT VIOLATE THE DUE COURSE OF LAW PROVISION OF THE TEXAS CONSTITUTION.

The standard for review under the due course of law provision in the Texas Constitution is similar to the standard under the due process provision of the U.S. Constitution. The question is whether the ordinance "rationally could have been related to a proper exercise of its police powers." *See City of San Antonio v. TPLP Office Park Properties, LP*, 218 S.W. 3d 60, 65 (Tex. 2007). This is referred to as the "rational relationship standard" under which the city's enactments must be upheld if it is at least fairly debatable that the enactments or ordinances are rationally related to a legitimate governmental interest. *Id.* A plaintiff has a "high burden" to overcome the presumption that legislative enactments are constitutional by demonstrating "that either (1) the statute's purpose could not arguably be rationally related to a legitimate governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." *Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015). "Judicial review of a municipality's regulatory action is necessarily circumscribed as appropriate to the line of demarcation between legislative and judicial functions." *Comeau*, 633 S.W.2d at 792. Because ordinances are presumed valid, "courts have no authority to interfere unless the ordinance is unreasonable and arbitrary - a clear abuse of municipal discretion." (citing *Hunt v. City of San Antonio*, 462 S.W.2d 536, 539 (Tex. 1971); *Thompson v. City of Palestine*, 510 S.W.2d 579 (Tex. 1974)). "The party attacking the ordinance bears an 'extraordinary burden' to

show 'that no conclusive or even controversial or issuable fact or condition existed' which would authorize the municipality's passage of the ordinance." *Comeau*, 633 S.W.2d at 792-93 (citing *Thompson*, 510 S.W.2d at 579; *City of Waxahachie v. Watkins*, 275 S.W.2d 477 (Tex. 1955)).

### 1. Plaintiffs have no vested right entitled to constitutional protection.

Before any substantive due course of law rights attach, however, a party must have a vested property or liberty interest that is entitled to constitutional protection. *See Klumb v. Houston Mun. Emp. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015). A constitutionally protected right must be a "vested right" which is something "more than a mere expectancy based upon an anticipated continuance of an existing law." *Id.* (citing *City of Dallas v. Trammell*, 101 S.W.2d 1009, 1014 (Tex. 1937)). Before addressing Plaintiffs' contention that the Amending Ordinance has no rational connection to any possible governmental interest or that the real-world effect of the Amending Ordinance is so burdensome as to be unduly oppressive in light of any governmental interest, the Court must first determine whether Plaintiffs have asserted "the deprivation of an interest the due-course clause protects." *See Texas Dep't of State Health Servcs. v. Crown Distributing LLC*, 647 S.W.3d 648, 653 (Tex. 2022). The Fifth Court of Appeals has held, however, that "a law that does not forbid a lawful business from operating will not be regarded as harming vested property rights." *See Consumer Serv. All. of Texas, Inc. v. City of Dallas*, 433 S.W.3d 796, 806 (Tex. App.—Dallas 2014, no pet.) (citing cases from sister courts of appeals determining that restriction on a particular aspect of a business or use of property does not harm any vested right); *see also, e.g.*, *City of La Marque v. Braskey*, 216 S.W.3d 861, 864 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (no vested right to use property as a cat shelter despite alleged harms including closure of facility and death of cats housed at the facility); *Morrow v. Truckload Fireworks, Inc.*, 230 S.W.3d 232, 239-40 (Tex. App.—Eastland 2007, pet. dism'd) (despite pleading that ban on use of fireworks would cause "tremendous financial loss," no vested

property right at stake and still would not be deprivation of vested right even if ordinance also banned sale); *Mr. W. Fireworks, Inc. v. Comal County*, No. 03-06-00638-CV, 2010 WL 1253931, at *8 (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.) (no vested property right to sell or dispense fireworks). The Amending Ordinance does not prevent Plaintiffs from operating, and in fact, Plaintiffs have continued operating for two years now under the Amending Ordinance. Therefore, Plaintiffs have not been deprived of any interest protected under the Texas due course of law provision. Under the "two-step" inquiry or analysis the first step is to determine whether the claimant asserts a vested interest that is entitled to constitutional protection. *Crown,* 647 S.W.3d at 653. In *Klumb* the Texas Supreme Court determined that the claimants had no vested right in the pension plan contributions and future benefits at issue because Houston had the authority and power under law to amend the pension system in the manner complained about. *See* 458 S.W.3d at 15.     The court in *Klumb* observed that no vested property right entitled to constitutional protection under the due course of law provision existed when the pension fund at issue can be amended by the city exercising its lawful authority. *Id*. at 15-16.  The court noted that as to the vested rights issue it makes no difference whether the authority with the power to revise the pension system (or the rights at issue) is the legislature or municipality. *Id.* at 16. The crux of the vested rights analysis is that any right emanating from a mere expectancy based on the continuation of existing law is not a constitutionally guaranteed right. *Id.* at 15-16.

> **2.**     **The Amending Ordinance is rationally related to a legitimate governmental interest and is not unduly oppressive in light of the governmental interest in protecting borrowers.**

The Texas Supreme Court has stated that courts "must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and maintain a high bar for declaring any of them in violation of the Constitution." *Patel*, 469 S.W.3d at 91. The City is entitled to summary judgment on Plaintiffs' contention that the Amending Ordinance is unconstitutional

as a violation of the due course of law provision of the Texas Constitution. As discussed above, the Amending Ordinance is rationally and reasonably related to a legitimate governmental interest of the City. It is designed and intended to provide protection and assistance to low-income borrowers in order to limit and reduce the undue oppression and exploitation of these borrowers at the hands of the loan brokers, loan arrangers, and credit enhancers. The Amending Ordinance is also designed to avoid large balloon payments at the end of the loan term that can lead to a cycle of debt and serial refinancing of the balance due. The Amending Ordinance is not unduly oppressive in light of the important governmental interest intended to be advanced by the law. Even if Plaintiffs experience reduced revenues or profits or incur losses, that does not mean that the Amending Ordinance violates the due course of law provision of the Texas Constitution. As the Texas Supreme Court has noted, simply because a requirement is "harsh" that does not necessarily mean that it is not "constitutionally acceptable." *Id.* at 90 ("The dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement and the number that would not."). Because Plaintiffs cannot meet their high burden to overcome the presumption of validity and establish that the Ordinance violates the Texas due course of law clause, the Court should grant the City summary judgment as to Plaintiffs' due course of law claim.

Plaintiffs contend that statistics from the Office of the Consumer Credit Commissioner for 2019-2020 show that the number of low-income loan transactions, borrowings, and defaults decreased significantly during the last 3 quarters of 2020 (as compared to the same period and quarters in 2019) due to the government stimulus funds resulting from the COVID-19 pandemic. Plaintiffs use these apparent statistics from 2020 compared to 2019 to argue that there was no need in January 2021 for the City to enact the Amending Ordinance, because the problem the City

sought to address was either getting much better or was improving without need for the Amending Ordinance. Plaintiffs' argument and logic is faulty. The need for the Amending Ordinance and the problems it sought to address still existed in 2020, even if on a smaller scale than in 2019. Furthermore, Plaintiffs themselves suggested that the pandemic in 2020 and the federal government stimulus funds provided to low-income consumers greatly reduced the need for the types of loans Plaintiffs make, arrange, and broker to low-income borrowers. However, when the pandemic is no longer a significant issue and the federal government stimulus funds have greatly diminished or ceased then the same problems will remain for low-income consumers who feel the need to seek these high-cost loans. The problems that have existed for years prior to the Amending Ordinance and which were sought to be addressed by the Amending Ordinance existed long before the pandemic in 2020 and would continue to exist long after the pandemic is over—so it was reasonable and appropriate for the City in January 2021 to enact the Amending Ordinance to attempt to address persistent problems with these high cost predatory loans to low-income consumers who have no bargaining leverage and little political voice except for those persons, non-profits, governmental entities, and organizations who seek to take up the cause to lessen the exposure of these low-income residents to these abusive charges and fees made by entities like Plaintiffs and particularly to the loan brokers and arrangers such as TitleMax.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant the City's motion for summary judgment as there is no genuine dispute as to material facts that the City is entitled to judgment as a matter of law. As to the second step in the two-step analysis mentioned in *Crown Distributing* regarding the due course of law clause, the court in *Patel,* 469 S.W.3d at 91 stated: "[C]ourts must extend great deference to legislative enactments, apply a strong presumption in favor of their validity, and

maintain a high bar for declaring any of them in violation of the Constitution." *Id.* at 91. The Amending Ordinance does not violate the due course of law clause of the Texas Constitution or the due process clause of the U.S. Constitution.

The City of Dallas, along with other Texas cities (most notably Austin), has determined that credit access businesses, loan brokers, loan arrangers, and similar entities that impose abusive and predatory charges and terms for their services in connection with loans to low-income consumers pose a threat to the most vulnerable of borrowers. In response to the ongoing predatory lending practices of such businesses, the city enacted the Amending Ordinance in January 2021. This ordinance was built on the floor of existing state law, erecting new regulations where the state's own regulatory network had left off, protecting the City's low-income borrowers from predatory loan practices. The Amending Ordinance is consistent with the structure envisioned by the crafters of the Texas Constitution who provided for home-rule cities to have broad powers to combat a broad array of challenges to citizens. The existing state statutes in the Texas Finance Code do not conflict with the Amending Ordinance in any way, much less with the requisite unmistakable clarity required in order to render the Amending Ordinance preempted. A reasonable reading of state law and the Amending Ordinance reveals two regulations working in tandem. These laws are not repugnant to one another.

Respectfully submitted,

CHRISTOPHER J. CASO
City Attorney

*/s/ Gary R. Powell*
Gary R. Powell
Texas Bar No. 16195500
gary.powell@dallas.gov
Senior Assistant City Attorney

Kathleen M. Fones
Texas Bar No. 24050611
kathleen.fones@dallas.gov
Senior Assistant City Attorney

Dallas City Attorney's Office
1500 Marilla Street, Room 7DN
Dallas, Texas 75201
214-670-3519 / fax 214-670-0622

**ATTORNEYS FOR DEFENDANT CITY OF
DALLAS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 6, 2023, a true and correct copy of the foregoing was served via electronic filing upon the following attorneys of record:

T. Ray Guy
Todd J. Harlow
Ben A. West
Frost Brown Todd LLC
2101 Cedar Springs Road, Suite 900
Dallas, Texas 75201

<u>/s/ *Gary R. Powell*     </u>
Gary R. Powell

35