IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TITLEMAX OF TEXAS, INC., IVY FUNDING COMPANY LLC, and NCP FINANCE LIMITED PARTNERSHIP, | § § § § | |
| Plaintiffs, | § § | |
| V. | § § | No. 3:21-cv-1040-S-BN |
| CITY OF DALLAS, | § § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiffs TitleMax of Texas, Inc. (TitleMax), Ivy Funding Company LLC (Ivy), and NCP Finance Limited Partnership (NCP) filed in state court a Verified Original Petition for Declaratory Relief and Application for Temporary and Permanent Injunctive Relief against the City of Dallas challenging an amended city ordinance concerning their industry (the Amending Ordinance). *See* Dkt. No. 1-3.

The City answered in state court and removed this action under 28 U.S.C. §§ 1331 and 1441(a). *See* Dkt. Nos. 1, 1-10. And United States District Judge Karen Gren Scholer referred the removed action to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and an order of reference. *See* Dkt. No. 4.

On October 27, 2021, the Court denied Plaintiffs' motion for a preliminary injunction under Federal Rule of Civil Procedure 65. *See TitleMax of Tex., Inc. v. City of Dall.*, No. 3:21-cv-1040-S-BN, 2021 WL 4994448 (N.D. Tex. Aug. 11, 2021), *rec.*

*accepted*, 2021 WL 4991989 (N.D. Tex. Oct. 27, 2021). Plaintiffs appealed. *See* Dkt. No. 44. The United States Court of Appeals for the Fifth Circuit heard oral argument on August 3, 2022, and, as of entry of these findings, conclusions, and recommendation, the appeal remains pending. *See TitleMax of Tex., Inc. v. City of Dall.*, No. 21-11170 (5th Cir.).

But neither the consideration of the preliminary injunction nor the pendency of the related appeal prevented this action from proceeding in the district court. *See, e.g.*, Dkt. No. 10 (initial scheduling order entered June 8, 2021); Dkt. Nos. 57, 75, 79 (amended scheduling orders entered on the parties' requests).

And, by the extended Court-established deadline, the City moved for summary judgment on all Plaintiffs' claims. *See* Dkt. Nos. 90-92. The parties have briefed the City's motion. *See* Dkt. Nos. 96-100, 104-07. And the undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should grant in part and deny in part the motion for summary judgment.

## Legal Standards

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). And "[a] factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (internal quotation marks and footnote omitted).

"Once the moving party meets this burden, the nonmoving party must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc);

*accord Pioneer Expl.*, 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." (internal quotation marks and footnotes omitted)).

The Court is required to consider all evidence and view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party – but only if the summary judgment evidence shows that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Pioneer Expl.*, 767 F.3d at 511; *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Lynch Props.*, 140 F.3d at 625.

"The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. While the court must disregard evidence favorable to the moving party that the jury is not required to believe, it gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (internal quotation marks and footnotes omitted).

And "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little*, 37 F.3d at 1075; *accord Pioneer Expl.*,

767 F.3d at 511 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (internal quotation marks and footnote omitted)); *Hassen v. Ruston La. Hosp. Co., L.L.C.*, 932 F.3d 353, 355 (5th Cir. 2019) (A court must "view the evidence and draw all justifiable inferences in favor of the nonmovant. Even so, barebones, conclusory, or otherwise-unsupported assertions won't cut it; the nonmovant 'must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial.'" (footnotes omitted)).

So, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted). Rather, the non-moving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

And "[o]nly disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Pioneer Expl.*, 767 F.3d at 511 (internal quotation marks and footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott*, 550 U.S. at 380 (internal quotation marks and emphasis omitted). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *DIRECTV, Inc. v. Minor*, 420 F.3d 546, 549 (5th Cir. 2005) (footnote and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted).

The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential

element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks omitted).

If, on the other hand, "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*,780 F.2d 1190, 1194 (5th Cir. 1986). The "beyond peradventure" standard imposes a "heavy" burden. *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-cv-1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007). The moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See, e.g., Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). On such a motion, the Court will, again, "draw all reasonable inferences in favor of the non-moving party." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

## Analysis

The City moves for summary judgment on all of Plaintiffs' claims, framing those claims as:

 (1) the Amending Ordinance violates Plaintiffs' right to due process under the United States Constitution;

 (2) the Amending Ordinance violates Plaintiffs' rights under the due course of law provision of the Texas Constitution;

(3) the Amending Ordinance exceeds the City's authority as a home rule city under Texas law;

(4) the Amending Ordinance is invalid because it is in direct and irreconcilable conflict with various provisions of Texas Finance Code Chapter 393; and

(5) the Amending Ordinance is invalid because it prohibits Plaintiffs' operation of a business licensed by the state.

*See, e.g.*, Dkt. No. 90.

While Plaintiffs urge the Court to deny the City's motion in its entirety, as they contend that genuine issues of material fact preclude judgment as a matter of law, they argue that, "at the least," summary judgment is not proper due to "the existence of genuine issues of material fact as to whether (1) the Amending Ordinance is pre-empted by the Texas Finance Code because it effectively prohibits the successful operation of a business authorized by state statutes; and (2) the Amending Ordinance deprives Plaintiffs of federally-guaranteed Due Process of Law and State-guaranteed Due Course of Law." Dkt. No. 97.

And the City's reply focuses on the law, not the questions of fact raised by Plaintiffs: "the determination whether [the Amending Ordinance] is invalid on grounds asserted by Plaintiffs is a question of law which the Court should determine on summary judgment by rejecting Plaintiffs' challenges to the City's ordinance." Dkt. No. 104 at 5 ("Plaintiffs' Response argues that they have presented evidence that raises a genuine issue of material fact which they assert should defeat the City's motion for summary judgment. However, under the applicable substantive law

governing Plaintiffs' claims, especially their substantive due process claims, Plaintiffs are wrong.").

As their filings reflect, the "opposing parties tell two different stories," *Scott*, 550 U.S. at 380, each side arguing that the governing law favors it. So the Court must keep in mind that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *Pioneer Expl.*, 767 F.3d at 511, while honoring the applicable burdens at this stage of this proceeding, particularly that Plaintiffs, as the nonmovants, "must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial," *Lynch Props.*, 140 F.3d at 625, and that, at this stage – and only insofar as an actual controversy exists – the Court considers all evidence, views all facts, and draws all reasonable inferences in the light most favorable to Plaintiffs and resolves all disputed factual controversies in their favor, *see Anderson*, 477 U.S. at 255.

Again, not all "alleged factual dispute[s] between the parties will" "defeat an otherwise properly supported motion for summary judgment." *Scott*, 550 U.S. at 380. Only a genuine dispute as to a fact where "its resolution could affect the outcome of the action" will defeat an otherwise proper summary judgment motion. *Weeks Marine*, 340 F.3d at 235; *accord Pioneer Expl.*, 767 F.3d at 511.

Without determining that all are material, the Court sets out the following facts from Plaintiffs' response, which the City generally does not contest on reply:

> In Texas, TitleMax arranges and documents two types of loans: (1) loans secured by motor vehicle titles ("title-secured"), and (2) unsecured personal loans.
> TitleMax arranges title-secured loans in its capacity as a Credit

Access Business ("CAB"). TitleMax is licensed as a CAB by the State of Texas under Section 393.603 *et seq.* of the Texas Finance Code.

TitleMax arranges unsecured loans in the separate capacity as a Credit Services Organization ("CSO"), for which TitleMax is required to register with the Secretary of State of the State of Texas.

Before the City Council adopted the Amending Ordinance, TitleMax arranged both types of loans – title-secured and unsecured – in the City of Dallas, operating in compliance with the then-existing version of Article XI of Chapter 50 of the Dallas City Code (the "2011 Ordinance").

Before the adoption of the Amending Ordinance, Article XI did not mention or restrict the facilitation of CSO loans such as Plaintiffs' facilitation and funding of unsecured personal loans.

TitleMax's company policy includes operating in compliance with all applicable federal, state and local laws and regulations.

The Amending Ordinance brought CSO-arranged unsecured loans within Article XI and placed a cap of 0.1% of the principal balance per day on the amount that could be charged to the borrower. TitleMax immediately determined that it would lose money arranging (and guaranteeing) unsecured personal loans with its fees thus capped, and therefore ceased arranging unsecured personal loans in Dallas on January 28, 2021, the day after the Amending Ordinance was enacted.

Before the passage of the Amending Ordinance, TitleMax, in its capacity as a CAB, arranged a single-payment, title-secured loan for which the principal and interest was payable to the Lender (NCP or Ivy) five months after funding, with the borrower paying a monthly CAB fee to TitleMax while the loan was in place. The loan, which TitleMax denominated a "4x5 Loan," could be refinanced at the end of the five-month term with payment of TitleMax's fee and payment to the Lender of accrued interest and a 25% reduction in the principal balance.

The Amending Ordinance prohibited the 4x5 Loan by imposing a new requirement that the total outstanding balance of any loan – inclusive of fees, interest and principal – be reduced by at least 25% (a) at each payment of an installment loan – of which there could be no more than four installments – or (b) at each (of not more than three) refinance of a single-repayment loan.

To comply with the Amending Ordinance, TitleMax ceased arranging the now-noncompliant 4x5 loan in Dallas as of January 28, 2021 and began arranging a title-secured loan that complies with the Amending Ordinance's new restrictions. The Dallas-compliant title-secured loan is a thirty-day, single-payment loan, which the borrower can either pay in full at or before the end of the thirty days or refinance up to three times by reducing what the Amending Ordinance calls the "total amount of consumer credit transaction" – including principal,

- 10 -

interest, and TitleMax's fees – by 25%. If the customer is unable to at least reduce the "total amount of consumer credit transaction" by one-fourth within thirty days, the customer is in default.

The vote on and passage of the Amending Ordinance was preceded by a lobbying campaign by proponents of Dallas's adoption of an ordinance modeled on an ordinance that had already been enacted by the Austin City Council. The lobbying campaign began more than eight months before the Dallas Council vote. There were numerous meetings and contacts with Councilmembers by proponents of such an amendment, including the following:

On May 15, 2020, Stephanie Mace, the Vice President for Strong Communities of United Way of Metropolitan Dallas, contacted Councilmember Cara Mendelsohn to request a meeting concerning "most recent efforts" to "pass and expand reasonable loan practices...." Councilmember Mendelsohn responded that she would "love to hear what you have been working on."

Shortly thereafter, on May 23, 2020, Councilmember Mendelsohn sent an email message to (among others) Carl Simpson, the City's Manager of Code Compliance, asking how many payday and auto title lending locations there were in the City of Dallas. Mr. Simpson replied on May 26, informing Councilmember Mendelsohn that there were 54 payday and auto title lenders in the City.

Councilmember Mendelsohn did meet with Ms. Mace and Greg Mangum of United Way on June 1, 2020. Ms. Mace followed up on June 4 with an email message to Councilmember Mendelsohn, forwarding information concerning, among other things, Dallas's existing payday lending ordinance, a link to the recently passed Austin ordinance from which the Amending Ordinance was eventually copied, and a link to a list of payday lenders in Dallas. The materials forwarded by Ms. Mace to Councilmember Mendelsohn also included a Texas Appleseed fact sheet reflecting that in 2019 in the Dallas Metropolitan Statistical Area, the dollar volume of new payday loans exceeded $288 million.

Councilmember Mendelsohn did not attempt to communicate either with representatives of the payday and auto title lending industry listed on the document linked by Ms. Mace, or with any consumers who utilized the industry's loans.

On May 11, 2020, Ms. Mace sent an email message to (among others) Clifford Sparks, the City's State Legislative Director, inquiring whether the City had any plan to consider "the updated city payday and auto title lending ordinance" being considered by the city of Austin. In response to a follow-up message from Ms. Mace, Mr. Sparks informed her that if such an ordinance were to be considered by a Council Committee, "… it would be either the Government Performance or the Workforce, Education and Equity [Committee]." Neither Committee

ultimately considered the Amending Ordinance, which was instead presented to, considered by, and recommended by the COVID-19 Ad Hoc Committee.

Advocates for additional Dallas regulation of short-term lending continued their communications with Dallas City Councilmembers in the summer and fall of 2020. On August 13, 2020, Ms. Mace and James McGee, a representative of an organization called Southern Dallas Progress, met with Councilmember Tennell Atkins "about the need to update Dallas's payday lending ordinance." Ms. Mace's email message later that day forwarded materials to Councilmember Atkins including a "1-pager on the AG opinion" – Texas Attorney General Opinion KP-0277 – which, according to Ms. Mace, "leaves the door open to new unregulated products …." On September 2, 2020, Ms. Mace sent a follow-up message to Councilmember Atkins, asking "how things are going with the payday lending ordinance" and asking whether the city attorneys needed any additional information and whether the ordinance could "get a hearing."

Ms. Mace led a concerted campaign to lobby Councilmembers in favor of an ordinance amendment in October and November of 2020, leading up to the December 3, 2020 meeting of the COVID-19 Committee. A "strategy call" among a group of citizens organized by Ms. Mace was held on October 20, 2020. In follow-up email messages, members of the group were assigned to contact Councilmembers Thomas, Atkins, Mendelsohn, West, McGough, Kleinman, Blewitt, Gates, and Blackmon concerning the ordinance.

Among the informal group organized by Ms. Mace were Reverend Gerald Britt and Pastor Danielle Ayers. It was decided that Reverend Britt and Pastor Ayers would make a presentation to one of the City Council's subcommittees chaired by Councilmember Thomas, in part because of his long-time friendship with both advocates. Councilmember Thomas chose the COVID-19 Ad Hoc Committee entirely at his own discretion, not because that Committee was tasked with financial-services reform. The invitation for Reverend Britt and Pastor Ayers to appear before that Committee, along with logistical details, was confirmed by email message dated December 1, 2020.

On December 3, 2020, the subject of an amendment to the 2011 Ordinance was considered at a videoconference meeting of the COVID-19 Ad Hoc Committee. Reverend Britt and Pastor Ayers appeared on behalf of the Anti-Poverty Coalition of Greater Dallas and presented a PowerPoint presentation, provided to members of the Committee as an attachment to the Agenda that was sent in advance of the meeting. No other speakers were invited to participate in or speak at the December 3, 2020 meeting, whether from the affected industry or from among customers of short-term loans.

The text of the proposed Amending Ordinance was not provided to COVID-19 Ad Hoc Committee members in advance of their December 3, 2020 meeting; it was sent to them as an attachment to an email message at 2:59 p.m. on December 3 as the presentation by Reverend Britt and Pastor Ayers was in progress. Committee consideration of an amendment with the presentation by Reverend Britt and Pastor Ayers had begun earlier at 2:47 p.m. Reverend Britt admitted that the proposed Amending Ordinance was "pretty much a cut and paste job" from the earlier ordinance in Austin.

The PowerPoint presentation asserted that Opinion KP-0277 "creates loopholes," that prior to the issuance of the Opinion Texas state law "limited payday and auto title loan outfits to offering just payday and auto title loans …," and that the Opinion "Allows payday and auto title loan businesses to offer new products that they are calling 'personal loans' and 'signature loans.'" Reverend Britt and Pastor Ayers also asserted in their oral presentations that the Opinion "created loopholes" and that unsecured loans were "new products" resulting from the permission granted by Opinion KP-0277. Members of the COVID-19 Ad Hoc Committee accepted such characterizations stating, for example, that "[i]f there's a loophole that's been created and our vulnerable population is getting taken advantage of let's work together to kind of close that …" , and that "… if this loophole is where it sounds like it is, we need to address it …."

Unsecured loans arranged by payday or auto title lenders did not result from or begin with the issuance of Opinion KP-0277. TitleMax, for example, began arranging unsecured personal loans in Texas in 2018.

Reverend Britt and Pastor Ayers also asserted that the COVID-19 pandemic "exacerbate[d]" problems relating to short-term lending, which were "a problem prior to the pandemic" and have "blown up even more." Comments by members of the COVID-19 Committee echoed these assertions, stating for example that there existed "an urgency" and that COVID "rental assistance is coming to an end this month … people will turn to payday loans to keep their housing, to keep their cars, to keep fed."

In actuality, the COVID-19 pandemic neither increased consumers' resort to payday or title loans, nor increased borrowers' inability to pay such loans at maturity. For example, arrangers of deferred presentment (or "payday") and title-secured [loans] are required by the Texas Finance Code to provide information concerning such loans to the Texas Office of the Consumer Credit Commissioner ("OCCC"), which aggregates and publishes statistics from those reports on a quarterly and annual basis. (The OCCC does not obtain or publish statistics concerning unsecured loans, which – as Opinion KP-0277

explained – are not regulated under the Texas Finance Code.) In the second calendar quarter of 2020 – the first full quarter after general recognition of the COVID-19 pandemic in this country – the OCCC's report reflects that volumes of new single-payment and installment deferred presentment loans in the Dallas Metropolitan Statistical Area ("MSA") were down by 59.4% and 76.5%, respectively, from volumes in the pre-pandemic second calendar quarter of 2019. For single-payment and installment title-secured loans, the volumes were down by 28.3% and 46.9%[ ], respectively, from the same calendar quarter of 2019. (OCCC figures for the full calendar year 2020 to 2019 would not have been available by January 27, 2021.)

Similarly, OCCC reports indicate that in the Dallas MSA in the second quarter of 2020 – again, the first full quarter of general knowledge of the COVID-19 pandemic, and in which federal pandemic-related payments commenced – refinances decreased substantially, meaning that borrowers of deferred-presentment and title-secured loans were more able to make repay their loans at the first due date than in the corresponding period the prior year.

Consistent with OCCC figures, TitleMax's loan volume significantly decreased from and after the onset of the COVID-19 pandemic, and refinancings substantially decreased as well, meaning that a larger percentage of customers were able to repay their loans without refinancing than prior to the pandemic. The apparent reason for the decrease in customers' availing themselves of TitleMax-arranged loans, as well as for the increase in at-first-due-date repayment by customers who did avail themselves of TitleMax-arranged loans, was the availability of pandemic-related government assistance payments.

Unaware and unapprised of such facts, Councilmembers adopted the Pandemic-related rationale following the proponents' presentation to the COVID-19 Ad Hoc Committee, stating that "This is an urgency. We need to do something right away…" , and that "… as rental assistance dries up … people will turn to payday loans …. I don't think it can wait…."

Even as advocates for an amendment were contacting multiple Councilmembers and were invited to and did present before the COVID-19 Ad Hoc Committee, neither the Council nor City staff contacted or communicated with any representative of the short-term lending industry to inform the industry that a restrictive amendment was under consideration. At the January 27, 2021 meeting of the City Council, a representative from the City Attorney's office was asked, "… did you talk with the industry at all when you were working through this ordinance?" His reply was, "I'm not aware of any contacts with the industry." Councilmembers, when deposed, confirmed the omission.

Likewise, the City presented no evidence that, at any time in 2020

or continuing up to the January 27, 2021 meeting of the City Council, any Councilmember or City employee met with or otherwise communicated with any consumer concerning his or her use of short-term loans. The email messages and other documents produced by the City evidence no such communications, and the Councilmembers who have been deposed either admitted that they had not consulted with consumers or could not remember doing so.

An industry representative learned of the agenda item for an ordinance amendment in the upcoming January 27, 2021 Council meeting one day before the meeting. Two speakers from the industry secured three-minute speaking slots for the meeting – Rob Norcross from the Consumer Service Alliance of Texas, and Victoria Newman, who was then the General Counsel (and now is Chief Legal Officer of Plaintiff TitleMax.[)] No Councilmember asked any questions of either Mr. Norcross or Ms. Newman following their three-minute talks; immediately after Ms. Newman finished speaking, Councilmember (and COVID-19 Ad Hoc Committee Chair) Thomas moved for passage of the Amending Ordinance. In his deposition, Councilmember Thomas testified that even though the information provided by Mr. Norcross and Ms. Newman was new to him, he had no desire to conduct any further inquiry or research or obtain any additional data.

The immediate effect on Plaintiffs' business of the Amending Ordinance's cap of fees at 0.1% per day was the forced cessation of Plaintiffs' unsecured lending in Dallas. In light of the fixed costs involved in arranging short-term loans and the high rates of defaults and charge offs, TitleMax would have lost money continuing to facilitate unsecured loans under the capped-fee restriction. Thus, TitleMax ceased arranging unsecured loans in Dallas as of January 28, 2021, the day after the Amending Ordinance was passed.

Plaintiffs have proffered expert testimony that TitleMax cannot feasibly or profitably offer unsecured loans given the Amending Ordinance's cap of 0.1% per day on fees. The sole and undisputed summary judgment evidence is that capping fees on unsecured loans at 0.1% per day, as was done by the amendment to Section 50-151.6 of Article XI of Chapter 50, does not result in short-term loans being made available to consumers at lower rates than absent that cap. Instead, because CSOs are unable to avoid losing money arranging loans with their fees capped at 0.1% per day, the installation of such a cap result in CSOs ceasing to arrange and fund personal unsecured loans, meaning that consumers lose access to these loans as a source of credit.

The Amending Ordinance's changes to Section 50.154 (d), (e) and (f) of Article XI brought about by the Amending Ordinance effectively require a consumer who receives a title-secured or deferred presentment loan to repay 25% of the total consideration for the transaction –

- 15 -

including principal, interest, and fees – not more than thirty (30) days after funding of the loan, and to repay the entirety of principal, interest and fees in not more than four payments spaced approximately thirty days apart. Plaintiffs' undisputed summary judgment evidence established that such requirements drastically reduce loan volume because of potential borrowers' concern for ability to repay the loan in four months or to repay 25% of the total consideration within 30 days, and that many if not most prospective borrowers therefore forego a TitleMax-arranged title-secured loan.

Plaintiffs have proffered expert opinion testimony that when short-term lending is eliminated as an option for emergency credit, as by legislative action, the effect on former customers of such loans is adverse, as they turn to more disadvantageous sources of emergency credit such as writing checks on insufficient funds, delaying paying bills, or selling or pawning personal items; and that overall, removing short-term loans as a source of credit reduces consumer welfare.

TitleMax's average loan volume for the calendar year 2022 in Dallas was more than eighty percent (80%) less than its loan volume for the calendar year 2019; in Austin, loan volume for 2022 was more than eighty-two percent (82%) less than for the calendar year 2019.

The undisputed summary judgment evidence – fact testimony from a TitleMax officer, supported by expert opinion evidence – is that TitleMax is therefore losing money in Dallas attempting to continue the business of arranging title-secured loans.

Plaintiffs' undisputed evidence established that despite reducing staff and closing TitleMax's weakest stores, TitleMax is losing money operating stores within the City of Dallas, and will continue to lose money as it operates in compliance with the Amending Ordinance; that TitleMax likewise began losing and continues to lose money attempting to continue in business in Austin under the city code provision from which the Amending Ordinance was copied; and that TitleMax will entirely cease operations in Dallas absent judicial relief from this Court.

Documents produced by the City reflect that fifty-two (52) "payday" lending locations were licensed and active in Dallas for the year 2020-21, during the course of which the Amending Ordinance was enacted; and that for the following year 2021-22 (the first full year in which the Amending Ordinance was in effect) and for the current year 2022-23, only forty-one (41) such locations were licensed and in operation.

Plaintiffs' undisputed testimony is that Plaintiffs are incurring continuing monetary losses attempting to operate in Dallas (arranging and funding title-secured loans in compliance with the Amending Ordinance) solely in anticipation or hope of obtaining permanent injunctive relief from this Court.

Dkt. No. 98 at 10-21; *see also* Dkt. No. 96 (stipulated facts); *compare* Dkt. No. 104 at 19-20, *with* Dkt. No. 107 at 5-6 (asserting that a recent consent order contradicts the claim that TitleMax complies with all applicable federal laws and rebutting that assertion).

Considering these facts and other factual assertions as set out below, the undersigned will address the City's grounds for seeking summary judgment in turn.

## I. The Court should grant the City summary judgment on Plaintiffs' claim that the Amending Ordinance is invalid because it either exceeds the City's authority as a home rule city under Texas law or is preempted by or in conflict with provisions of Texas Finance Code Chapter 393.

In response to the City's motion, Plaintiffs urge that the Amending Ordinance is preempted by state law. *See* Dkt. No. 98 at 23. While Plaintiffs' argument is that the Amending Ordinance is preempted by the Texas Finance Code, Plaintiffs say that is so because the Amending Ordinance "effectively prohibits the successful operation of a business authorized by State statutes." Dkt. No. 98 at 23; *see id.* at 23-29. The undersigned will address this argument directly in the next section of the analysis.

But, insofar as the City moves for summary judgment based on a more traditional preemption analysis, *see* Dkt. No. 91 at 22, 25-29, the City has shown that it is entitled to summary judgment.

"Home-rule cities, like the City of [Dallas], derive their powers from the Texas Constitution." *City of Hous. v. Bates*, 406 S.W.3d 539, 546 (Tex. 2013) (citing TEX. CONST. art. XI, § 5; TEX. LOC. GOV'T CODE § 51.072(a) ("The municipality has full power of local self-government.")); *accord In re Sanchez*, 81 S.W.3d 794, 796 (2002) (per curiam). They "possess the full power of self government and look to the

Legislature not for grants of power, but only for limitations on their power." *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dall.*, 852 S.W.2d 489, 490-91 (Tex. 1993) (citing *MJR's Fare of Dall. v. City of Dall.*, 792 S.W.2d 569, 573 (Tex. App. – Dallas 1990, writ denied)). Cities such as Dallas therefore "have broad discretionary powers, provided that no ordinance 'shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State.'" *Id.* at 490 (quoting TEX. CONST. art. XI, § 5).

To "limit a home-rule city's broad powers," the Legislature must express "its intent to do so with 'unmistakable clarity.'" *Bates*, 406 S.W.3d at 546 (citation omitted); *accord Dall. Merch.'s*, 852 S.W.2d at 491 ("[I]f the Legislature chooses to preempt a subject matter usually encompassed by the broad powers of a home-rule city, it must do so with unmistakable clarity." (citing *City of Sweetwater v. Geron*, 380 S.W.2d 550, 552 (Tex. 1964))).

But where "'[a]n ordinance of a home-rule city'" "'attempts to regulate a subject matter preempted by a state statute,'" it "'is unenforceable to the extent it conflicts with the state statute.'" *Bates*, 406 S.W.3d at 546 (quoting *Dall. Merch.'s*, 852 S.W.2d at 491; citing TEX. CONST. art. XI, § 5). Even so, "'the mere fact that the legislature has enacted a law addressing a subject does not mean the complete subject matter is completely preempted.'" *Dall. Merch.'s*, 852 S.W.2d at 491 (quoting *City of Richardson v. Responsible Dog Owners*, 794 S.W.2d 17, 19 (Tex. 1990)). And "a general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached." *City of Beaumont v. Fall*, 291 S.W.

202, 206 (Tex. 1927) (quoted in *Dall. Merch.'s*, 852 S.W.2d at 491); *accord Bates*, 406

S.W.3d at 546 ("If a reasonable construction giving effect to both the state statute and

the ordinance can be reached, then a city ordinance will not be held to have been

preempted by the state statute." (citation omitted)).

"Furthermore, '[t]he entry of the state into a field of legislation ... does not

automatically preempt that field from city regulation; local regulation, ancillary to

and in harmony with the general scope and purpose of the state enactment, is

acceptable.'" *BCCA Appeal Grp., Inc. v. City of Hous.*, 496 S.W.3d 1, 7 (Tex. 2016)

(quoting *City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 796 (Tex. 1982)).

So courts "presume a home-rule city charter provision to be valid" and "cannot

interfere unless it is unreasonable and arbitrary, amounting to a clear abuse of

municipal discretion." *Sanchez*, 81 S.W.3d at 796 (citing *City of Brookside Vill.*, 633

S.W.2d at 792; *City of Hous. v. Todd*, 41 S.W.3d 289, 295 (Tex. App – Houston [1st

Dist.] 2001, pet. denied)).

Against this framework, there is no genuine dispute of material fact as to

whether the City has exceeded its authority as a home rule city under Texas law or

that the Amending Ordinance is preempted by or in conflict with provisions of Texas

Finance Code Chapter 393 given that courts must "focus on whether the Legislature's

intent to provide a limitation appears with 'unmistakable clarity.'" *BCCA Appeal

Grp.*, 496 S.W.3d at 7-8 (citing *Dall. Merch.'s*, 852 S.W.2d at 494; *Tyra v. City of Hous.*,

822 S.W.2d 626, 628 (Tex. 1991)); *see also Republic Waste Servs. of Tex., Ltd. v. Tex.

Disposal Sys., Inc.*, 848 F.3d 342, 345 (5th Cir. 2016) ("Further, 'if the limitations

- 19 -

arise by implication, the provisions of the law must be "clear and compelling to that end."' *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 807 (Tex. 1984) (providing that a statutory enumeration of powers is not to 'be construed as an implied limitation on home rule powers').").

"Because the critical inquiry in determining whether an ordinance is preempted is whether the Legislature expressed its preemptive intent through clear and unmistakable language, [courts should] begin with statutory construction analysis." *BCCA Appeal Grp.*, 496 S.W.3d at 8 (citing TEX. CONST. art. XI, § 5(a); *Dall. Merch.'s*, 852 S.W.2d at 491).

So the proponent of preemption must demonstrate that the Legislature has expressed its intent to limit a home-rule city's broad powers with unmistakable clarity. *See, e.g.*, *BCCA Appeal Grp.*, 496 S.W.3d at 9 ("We must determine whether the Act and the Water Code reflect unmistakably clear legislative intent to limit the City's authority to enact an ordinance to enforce the state air-quality standards and, if so, whether the Ordinance's enforcement provisions are inconsistent with the statutory provisions." (citations omitted)); *Republic Waste Servs. of Tex.*, 848 F.3d at 347 ("[W]e hold that the language in Section 364.034(h) fails to indicate with unmistakable clarity that the legislature intended to restrict a home-rule city's authority to enter into an exclusive contract for solid waste disposal services to a construction project. Accordingly, we hold that the district court erred in granting Texas Disposal's Rule 12(b)(6) motion to dismiss." (citation omitted)).

And preemption of a city ordinance may be avoided "[i]f a reasonable

construction giv[es] effect to both the state statute and the ordinance." *Bates*, 406

S.W.3d at 546; *see also Nat'l Solid Wastes Mgmt. Ass'n v. City of Dall.*, 903 F. Supp.

2d 446, 469 (N.D. Tex. 2012) ("When the state legislature intends to preempt a subject

traditionally within a home-rule city's broad powers, it must do so with 'unmistakable

clarity.' Accordingly, courts do not find conflict between a general law and a city

ordinance 'if any other reasonable construction leaving both in effect can be reached.'"

(citations omitted)).

## II. The Court should grant the City summary judgment on Plaintiffs' claim that the Amending Ordinance is invalid because it prohibits Plaintiffs' operation of a business licensed by the state.

Plaintiffs' broader preemption argument is that the Amending Ordinance is

invalid insofar as it prohibits their successful operation of a business licensed by the

state:

> The Constitution of this State requires that "[N]o … ordinance passed under [a city] charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." TEX. CONST. ARTICLE XI, § 5(a). "[M]unicipalities have no power to prohibit pursuit of occupations regulated by State law." *City of Fort Worth v. McDonald*, 293 S.W.2d 256, 258 (Tex. Civ. App. – Fort Worth 1956, writ ref'd n.r.e.). If the city's ordinance "amounts to a virtual prohibition against premises licensed by state laws, such ordinances will be held void and unenforceable." *Murphy v. Wright*, 115 S.W.2d 448, 452 (Tex. Civ. App. – Fort Worth 1938, no writ).
>
> TitleMax has been issued a license by the OCCC to operate as a CAB, the capacity in which it arranges title-secured loans, pursuant to TEX. FIN. CODE § 393.603 *et seq*. That agency-issued license authorizes TitleMax to do business as a CAB under extensive disclosure requirements and other restrictions and is subject to revocation on specified grounds. *Id.* § 393.614. TitleMax is in good standing with the OCCC.
>
> Doing business as a CSO, the capacity in which TitleMax formerly arranged unsecured loans in Dallas (and continues to do so elsewhere in the State), does not require a license but does require registration with

the Texas Secretary of State and the payment of a filing fee. *Id.* § 393.101 *et seq.* TitleMax's registration as a CSO is likewise current and in good standing. Indeed, the Attorney General of Texas, in Opinion KP-0277 – the opinion that ostensibly provoked the Amending Ordinance – has made it clear that CSOs are permitted to operate, and specifically to arrange unsecured loans, in this State.

> The undisputed summary judgment evidence supports a finding that the restrictions imposed by the Amending Ordinance on doing business as a CSO in Dallas – notably, the limitation on the total consideration that can be paid by the consumer – render it impossible to arrange unsecured loans without losing money. In direct response to the Amending Ordinance, TitleMax immediately ceased arranging unsecured personal loans in Dallas, as it had previously done in Austin in reaction to Austin's ordinance. Limiting returns on high-overhead, high-default-rate small loans to an amount that guarantees monetary losses constitutes a *de facto* prohibition on making such loans; TitleMax's uncontroverted evidence is that in its line of business, a 0.1% per day limitation is effectively such a prohibition, resulting in the ultimate elimination of unsecured short-term loans as a viable product in Dallas.

Dkt. No. 98 at 23-24; *see also id.* at 29 ("A home-rule city lacks the authority to impose conditions on a legislatively authorized business that guarantee operational losses, as an ordinance that mandates that a business lose money amounts to a 'virtual prohibition' every bit as much as an ordinance outlawing the business on its face. *Murphy*, 115 S.W.2d at 452. A statutory authorization to do business cannot be overridden through a form-over-substance scheme such as the one concocted by the City.").

But the cases that Plaintiffs rely on, *McDonald* and *Murphy*, do not support their position as a matter of law regardless of the economic damage to their business that they attribute to the Amending Ordinance.

That is, both cases are distinguishable from the facts here. In both, the home-rule city's ordinance prohibited a business regulated by the State from operating – at

all – in the municipality (either by declaring it to be a nuisance or by enacting prohibitory zoning). As explained by the facts of each case, neither municipal ordinance could have been considered ancillary to, and in harmony with, the state statute, and the broader takeaway is that no reasonable construction could give effect to both the state statute and municipal ordinance at issue:

> In *McDonald*, the City of Fort Worth enacted an ordinance that defined marble boards as a nuisance per se; made their ownership, operation, or exhibition a misdemeanor; prescribed a fine up to $200 for each day of violation; and provided for summary seizure by any police officer. A state statute at the time levied an occupation tax on owners of "skill or pleasure coin-operated machines," which included marble machines, marble table machines, and marble shooting machines. The court of appeals held that merely because a city has the power by charter and statute to define and prevent a nuisance does not mean a city "may 'by an arbitrary standard, declare that to be a nuisance which is not so in fact.'" The court concluded a city has no right to supersede a revenue statute by declaration that a licensed business is a nuisance. However, the court noted no general statute allowed the Fort Worth City Council to "prevent or prohibit" marble boards.

*RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 598 (Tex. App. – San Antonio 2012) (quoting 293 S.W.2d at 258); *see also Murphy*, 115 S.W.2d at 452 ("The testimony offered upon the hearing in this case is undisputed that there is no place within the city of Denton plaintiff could operate a dance hall and not violate the provisions of the ordinance attacked. As before indicated, we do not think such an ordinance is regulatory, but is as effectively prohibitory in the city of Denton as it would have been had it not contained the provisions against operation 'within less than 500 feet from any occupied building, church or school, private residence or place of business.' The provisions of law which authorize a city to regulate the location and operation of places of amusement mean regulation and not prohibition. Even such a

regulation must be a reasonable one; but if such an attempted regulation amounts to a virtual prohibition against premises licensed by state laws, such ordinances will be held void and unenforceable.").

### III. The Court should grant the City summary judgment on Plaintiffs' claim that the Amending Ordinance violates Plaintiffs' right to due process under the United States Constitution.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no "State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. This clause provides both procedural and substantive protections. *See, e.g.*, *DM Arbor Court, Ltd. v. City of Hous.*, Civ. A. H-18-1884, 2021 WL 4926015, at *27 (S.D. Tex. Oct. 21, 2021) ("[W]hereas substantive due process protects plaintiffs from the arbitrary deprivation of protected interests, procedural due process guarantees 'an opportunity to be heard' before the deprivation." (citations omitted)).

And, insofar as Plaintiffs claim that the process by which the Amending Ordinance was enacted violated their right to procedural due process under the Fourteenth Amendment, *see, e.g.*, Dkt. No. 98 at 38-49; Dkt. No. 96, they have not shown that the enactment of an ordinance applicable to the community at large by an elected body should not be characterized as purely legislative and have therefore not shown a procedural due process violation as a matter of law.

"[D]ue process is flexible and calls [only] for such procedural protections as the particular situation demands." *Serrano v. Customs & Border Patrol*, 975 F.3d 488, 496 (5th Cir. 2020) (per curiam) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). And, as another judge in this district has explained the scope of procedural

protections when the challenged actions are characterized as legislative,

> "[w]here a rule ... applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption," so legislative bodies may implement general policies without providing notice-and-hearing procedures to all affected parties. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). As a result, "it is well established law that once an action is characterized as legislative, procedural due process requirements do not apply." *Jackson Court Condos., Inc. v. City of New Orleans*, 874 F.2d 1070, 1074 (5th Cir. 1989). This is because when a legislative action "affects a general class of persons, those persons have all received procedural due process – the legislative process." *Cnty. Line Joint Venture v. City of Grand Prairie, Tex.*, 839 F.2d 1142, 1144 (5th Cir. 1988).

*Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, No. 3:17-cv-1596-N, 2018 WL 4026373, at *4 (N.D. Tex. Mar. 14, 2018); *see also Cnty. Line Joint Venture*, 839 F.2d at 1145-46 ("The enactment of the ordinance was a result of a purely legislative act by the city council of Grand Prairie, an elected body which wields broad power to make a decision in the area of city planning and zoning. The ordinance in question applies generally to all [specific use permits (SUPs)] in existence and those thereafter created. County Line presented no evidence that the city council aimed the ordinance specifically at County Line rather than calling for termination of all SUPs which had suffered non-use for a period of at least six months. Because the city council possesses extensive legislative powers and had enacted an ordinance general in scope, we must apply the legislative model to the ordinance here in question and reject County Line's argument that it has a cognizable claim for relief for violation of procedural due process.").

To determine whether a plaintiff has shown "a substantive due process violation" based on a city's amendment of an ordinance, a "court reviews [the city's]

- 25 -

actions 'against the deferential "rational basis" test that governs substantive due process.'" *Energy Mgmt. Corp. v. City of Shreveport*, 467 F.3d 471, 481 (5th Cir. 2006) (quoting *Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000)).

> In the initial step of this analysis, [Plaintiffs] must demonstrate that [they have] a constitutionally protected property right to which the Fourteenth Amendment's due process protection applies. *Simi*, 236 F.3d at 249-50.... [Assuming they do], the next step in the substantive due process inquiry is whether the action is rationally related to a legitimate government interest. *Simi*, 236 F.3d at 250-51 (citing *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)). [And the Fifth Circuit] has said that "[t]he question is only whether a rational relationship exists between the [policy] and a conceivable legitimate objective. If the question is at least debatable, there is no substantive due process violation." *Simi*, 236 F.3d at 250-51 (citing *FM Props. Operating Co.*, 93 F.3d at 175 (alteration in original)).

*Id.*

As to federal due process, the City does not argue that Plaintiffs lack a constitutionally protected property right. *See* Dkt. No. 91 at 29-35. So, accepting that Plaintiffs have such a right in this context insofar as courts have, for example, found an interest in pursuing a lawful profession, *see Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983), *reh'g granted in part*, 742 F.2d 490 (5th Cir. 1984); *see also Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 654 (Tex. 2022) (observing that "the constitutionally protected work-related interest" may not "protect every form and method in which one may choose to work or earn a living," but there is "a right to 'engage in any of the common occupations of life' and 'to follow or pursue a 'lawful calling, business, or profession'" (citations and emphases omitted)); *see also* Dkt. No. 98 at 49-51, the undersigned will address the second step of the inquiry.

In *FM Properties*, the Fifth Circuit, considering a substantive due process challenge to the Austin City Council's policy as to (or interpretation of) Texas legislation, observed that "'the "true" purpose of the [policy], (i.e., the actual purpose that may have motivated its proponents, assuming this can be known) is irrelevant for rational basis analysis." 93 F.3d at 174-75 (quoting *Smithfield Concerned Citizens for Fair Zoning v. Twn. of Smithfield*, 907 F.2d 239, 246 (1st Cir. 1990)). Similarly, the United States Court of Appeals for the Second Circuit, quoting United States Supreme Court precedent, more recently explained why "[t]he rational basis test is [such] an extremely deferential standard":

> [O]n rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." Indeed, "a legislative choice" … "may be based on rational speculation unsupported by evidence or empirical data." … [So i]t is not enough for "those attacking the rationality of [legislation]" to argue that [the] stated reasons do not support the decision it made; rather, challengers "have the burden to negative *every conceivable basis* which might support it."

*United States v. Amalfi*, 47 F.4th 114, 124 (2d Cir. 2022) (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); emphasis in *Amalfi*).

To carry its burden to show that enacting the Amending Ordinance is rationally related to a legitimate government interest, the City offers the opinions of Professor Christopher Peterson

> identifying what "the Dallas City Council could reasonably conclude" are each a conceivable rational basis supporting the enactment of the Amending Ordinance, regardless of whether there is testimony in the record whether one or more of those reasons actually motivated one or more members of the City Council to vote to enact the ordinance.
>
> Professor Peterson's report … observes that the Dallas City Council could reasonably conclude that the changes made by the Amending Ordinance help to establish a fairer more economical

regulatory environment for CSO brokered loans to Dallas residents. He also states that the Dallas City Council could reasonably conclude that the repayment structuring restrictions (i.e., four equal payments with no large balloon payment at the end of the loan term) are needed to promote the financial wellbeing of Dallas residents using these type loans. The Dallas City Council could also reasonably conclude that card products such as those offered by Capital One (and other lenders) offer a superior more reasonably priced alternative for providing short term loans than the credit terms available through CSOs and CABs like TitleMax and better promote the financial welfare of Dallas residents. The Dallas City Council could also reasonably conclude that credit unions and other sources of funds could be available to Dallas residents as superior alternatives to the high-cost expensive loans through CSOs and CABs like TitleMax. The City Council could reasonably conclude that other alternatives to borrowing at triple digit APR rates are a better alternative for Dallas residents, such as reducing expenses, borrowing from family or friends, obtaining extra work and income, delaying payment of some bills, or obtaining needed goods or services on credit rather than being forced to pay cash which must be borrowed through a high-cost loan such as from a CSO or CAB, like TitleMax. A reasonable policy maker, such as a member of the Dallas City Council, could reasonably conclude that it is in the best interest of Dallas residents to enact the Amending Ordinance to reduce the oppressiveness of the loans covered by the Amending Ordinance.

Dkt. No. 91 at 31-32 (citations omitted); *see also* Dkt. No. 92 at 35-95.

Plaintiffs respond that "the insurmountable shortfall in the City's Motion on this issue involves the followup question, which the City correctly states: 'whether a rational relationship exists between the ordinance and any conceivable legitimate governmental objective'" and urge that they "have answered that question by submitting proof that more than establishes genuine issues of material fact, proffering admissible summary judgment evidence that the restrictions imposed by the Amending Ordinance do not bear a rational relationship to the City's *post hoc* explications of its governmental interest." Dkt. No. 98 at 34-35 (citation omitted).

But Plaintiffs response, *see, e.g.*, *id.* at 35-38, does not establish genuine issues

of material fact that prevent granting summary judgment for the City on the federal substantive due process claim.

That is because Plaintiffs' rational-relationship arguments merely take issue with the wisdom behind enacting and/or the effectiveness of the Amending Ordinance. *See, e.g.*, *id.* at 35 ("The new fee cap on unsecured loans at least facially addresses fees, but a stated purpose of 'limit[ing] the charges, fees and assessments … [on] small consumer loans' implies and assumes the continued existence and availability of those loans. Instead, rather than limiting fees on such loans, the Amending Ordinance has entirely eliminated the loans." (emphases omitted)); *id.* ("The Amending Ordinance's new requirements do not truly address 'charges, fees, and assessments;' instead, in theory such charges are only 'limited' because the duration of the loan is shortened, and its repayment schedule made more onerous, by the Council's fiat. In practice, most of Plaintiffs' former or potential customers who might seek a title-secured loan from TitleMax end up forgoing the funds that would otherwise meet a financial crisis because of lack of confidence in their ability to repay 25% in a month and the entire loan in four."); *id.* at 36 ("If any relationship could be conjured between the new repayment requirement and the city's 'limit the fees and charges' rationale, that relationship would not meet the requirement of reasonableness. TitleMax does not charge prepayment penalties. Consumers of Plaintiffs loans have always had the option of repaying early and are routinely informed of the advantages of early payoff. Mandating a repayment schedule that City Councilmembers find appropriate (presuming they had actually known of that

requirement in the ordinance) rather than allowing the consumer to tailor repayment to his or her financial circumstances amounts to condescending paternalism and governmental overreach rather than a rational response to a perceived governmental interest." (citation omitted)).

As the Texas Supreme Court has explained, the "deferential inquiry" as to whether "a rational relationship exists between the [Amending Ordinance] and its purpose … does not focus on the ultimate effectiveness of the ordinance, but on whether the enacting body could have rationally believed at the time of enactment that the ordinance would promote its objective." *Mayhew v. Twn. of Sunnyvale*, 964 S.W.2d 922, 938 (Tex. 1998) (citations omitted); *accord Amalfi*, 47 F.4th at 124. "If it is at least fairly debatable that the decision was rationally related to legitimate government interests, the decision must be upheld." *Mayhew*, 964 S.W.2d at 938 (citations omitted). So "[t]he ordinance will violate substantive due process only if it is *clearly* arbitrary and unreasonable." *Id.* (citation omitted).

## IV. The Court should deny the City summary judgment on Plaintiffs' claim that the Amending Ordinance violates Plaintiffs' rights under the due course of law provision of the Texas Constitution.

Under the Texas Constitution, "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. art. I, § 19.

While "[t]he due process clause of the Fourteenth Amendment to the United States Constitution uses similar language," "'federal interpretations of procedural due process' are not binding but are 'persuasive authority in applying [Texas's] due course of law guarantee.'" *Tex. S. Univ. v. Villareal*, 620 S.W.3d 899, 905 (Tex. 2021)

(quoting *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995));

*see also Lindquist v. City of Pasadena*, 669 F.3d 225, 238 (5th Cir. 2012) ("The

protections afforded by the Texas Constitution's Due Course of Law Clause and the

United States Constitution's Due Process Clause are generally the same." (citing *Tex.

Worker's Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 658 (Tex. 2004)

("Texas's due course of law clause and the federal due process clause are textually

different, but we generally construe the due course clause in the same way as its

federal counterpart.")).

And, after *Patel v. Texas Department of Licensing and Regulations*, 469 S.W.3d

69 (Tex. 2015), a due course of law challenge under Texas's constitution may not be

tantamount to a federal due process challenge, *see, e.g., Hackbelt 27 Partners v. City

of Coppell*, 661 F. App'x 843, 846 n.1 (5th Cir. 2016) (per curiam).

In *Patel*, the Texas Supreme Court held that

> Section 19's substantive due course provisions undoubtedly were
> intended to bear at least some burden for protecting individual rights
> that the United States Supreme Court determined were not protected
> by the federal Constitution. That burden has been recognized in various
> decisions of Texas courts for over one hundred and twenty-five years.
> We continue to do so today: the standard of review for as-applied
> substantive due course challenges to economic regulation statutes
> includes an accompanying consideration as reflected by cases referenced
> above: whether the statute's effect as a whole is so unreasonably
> burdensome that it becomes oppressive in relation to the underlying
> governmental interest.

469 S.W.3d at 87 (citations omitted).

> In sum, statutes are presumed to be constitutional. To overcome
> that presumption, the proponent of an as-applied challenge to an
> economic regulation statute under Section 19's substantive due course
> of law requirement must demonstrate that either (1) the statute's
> purpose could not arguably be rationally related to a legitimate

governmental interest; or (2) when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest.

*Id.*

As to the Due Course of Law Clause's "accompanying consideration" – whether, "when considered as a whole, the [Amending Ordinance's] real-world effect as applied to [Plaintiffs] could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest" – since *Patel*, "[t]he Supreme Court of Texas has made clear that its holdings in that case must remain 'properly limited to the particular legal framework' in which they were made." *Transformative Learning Sys. v. Tex. Educ. Agency*, 572 S.W.3d 281, 293 (Tex. App. – Austin 2018, no pet.) (quoting *Hegar v. Tex. Small Tobacco Coal.*, 496 S.W.3d 778, 788 n.35 (Tex. 2016)).

And, in applying the "so burdensome as to be oppressive" test announced in *Patel*, the Texas Supreme Court

> focused on the [Eyebrow] Threaders' constitutional right to occupational freedom and the State's concession that "as many as 320 of the curriculum hours [were] not related to activities that threaders actually perform." *See* [469 S.W.3d] at 89-90. The evidence showed that the Threaders were entirely shut out from practicing their trade until they completed the "oppressive" required training and that the threader trainees had to pay out-of-pocket expenses for that training "and at the same time lose the opportunity to make money actively practicing their trade." *Id.* at 88-90.

*Tex. Alcoholic Beverage Comm'n v. Live Oak Brewing Co., LLC*, 537 S.W.3d 647, 656 (Tex. App. – Austin 2017, pet. denied); *see also Transformative Learning Sys.*, 572 S.W.3d at 293 (describing the statute at issue in *Patel* as "erect[ing] an economic

barrier of entry into a given profession": "*Patel* involved a challenge to occupational licensing regulations requiring cosmeticians providing threading services to undergo a minimum of 750 hours of training at their own expense. To comply with the statute, the 'threader trainees have to pay for the training and at the same time lose the opportunity to make money actively practicing their trade.' The court analyzed these requirements under our constitution's substantive-due-course provisions, which, the court concluded, 'were undoubtedly intended to bear at least some burden for protecting individual rights.' Ultimately, the court determined that the licensing regime imposed such an unreasonably oppressive burden on the threaders that it violated their right to due course of law." (citations omitted)).

But *Patel* "did not reach that crucial first question of whether the due-course clause even applies," because, "[i]n *Patel*, all sides assumed for summary judgment and appeal that the due-course clause substantively protected the threaders' claimed rights." *Crown Distrib.*, 647 S.W.3d at 670 (Young, J., concurring).

Here, unlike in *Patel*, the City does argue that "Plaintiffs have no vested right entitled to constitutional protection" under Texas's Due Course of Law Clause. Dkt. 91 at 36-37.

So, "[b]efore [the Court] can address the [Plaintiffs'] no-rational-basis and oppressiveness arguments" under the Due Course of Law Clause, it "must determine whether the [Plaintiffs] have alleged the deprivation of an interest the due-course clause protects." *Crown Distrib.*, 647 S.W.3d at 653 (citing *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018) ("Before any substantive or procedural

due-process rights attach, however, the citizen must have a liberty or property interest that is entitled to constitutional protection."); footnote omitted).

The City asserts that "[a] constitutionally protected right must be a 'vested right' which is something 'more than a mere expectancy based upon an anticipated continuance of an existing law'"; that "'a law that does not forbid a lawful business from operating will not be regarded as harming vested property rights'"; and that, because "[t]he Amending Ordinance does not prevent Plaintiffs from operating, and in fact, Plaintiffs have continued operating for two years now under the Amending Ordinance," "Plaintiffs have not been deprived of any interest protected under the Texas due course of law provision." Dkt. No. 91 at 36-37 (quoting first *Klumb v. Hous. Mun. Emp. Pension Sys.*, 458 S.W.3d 1, 15 (Tex. 2015), then *Consumer Alliance of Tex., Inc. v. City of Dall.*, 433 S.W.3d 796, 806 (Tex. App. – Dallas 2014)).

Plaintiffs respond that this assertion is "puzzling" since it is established that they have "'a vested property right in making a living, subject only to valid and subsisting regulatory statutes.'" Dkt. No. 98 at 49 (quoting *Smith v. Decker*, 312 S.W.2d 632, 633 (Tex. 1958)); *see also id.* at 49-50 (defining their vested right as "a right to earn a living"; "a constitutionally protected liberty interest in pursuing a chosen occupation"; and constitutionally "protect[ed] work-related economic interests" (cleaned up)).

For the purpose of the City's motion for summary judgment, where the Court must consider all evidence, view all facts, and draw all reasonable inferences in the light most favorable to Plaintiffs and resolve all disputed factual controversies in

their favor, Plaintiffs have shown a genuine issue of material fact as to the property interest protected by the Due Course of Law Clause. That is, while, as the City contends, TitleMax has continued to operate under the Amending Ordinance, Plaintiffs also provide undisputed evidence that, despite their best efforts, they are losing money operating stores in Dallas and will continue to lose money while operating in compliance with the Amending Ordinance.

And, as caselaw that Plaintiffs offer supports, *see* Dkt. No. 98 at 49-50 (citing *Stidham v. Tex. Comm'n on Private Sec.*, 418 F.3d 486 (5th Cir. 2005)), precedent in the Fifth Circuit at least raises the possibility that profits are considered a protected property interest, *see Stidham*, 418 F.3d at 492 n.9 (discussing *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697 (5th Cir. 1991)); *Kacal*, 928 F.2d at 704 ("Kacal's property interest in her business is essentially her interest in the lost profits, which are sought merely as the measure of damages in this action. Kacal's property interest in the profits of her business and her liberty interest in operating her business do rise to the level of protectible interests." (citing *Vandygriff*, 711 F.2d at 1222)); *see also State of Tex. v. Thompson*, 70 F.3d 390, 393 (5th Cir. 1995) (per curiam) ("*Kacal* is not so narrow as to embrace only those situations where there are physical acts or complete cessation of business. Rather, in *Kacal* we held that the plaintiff could succeed in a § 1983 claim by showing that the officers, acting under color of law, 'sought to remove or significantly alter' the plaintiff's liberty and property interests in operation of a business." (citation omitted)); *Doss v. Morris*, 642 F. App'x 443, 446-47 (5th Cir. 2016) (per curiam) (affirming grant of qualified immunity, noting the circuit precedent's

"lack of clarity" failed to "clearly establish[]" that – that is, it was "beyond debate" whether – the plaintiffs possessed a "property interest in their lost profits," but also distinguishing *Kacal* from the facts at issue there because, in *Kacal*, the "court held that the plaintiff there had sufficiently shown that the government had deprived her of this liberty interest because she adduced evidence 'that the comprehensive, concerted actions of the police caused [plaintiff] to lose so much of her business that she had to close her doors and default on her lease'" (citations omitted)); *A-Pro Towing & Recovery. L.L.C. v. Cantu*, No. 20-40599, 2021 WL 3196461, at *3 (5th Cir. July 28, 2021) (per curiam) (discussing *Kacal* and *Doss* and holding that, "because A-Pro has not produced evidence of a significant alteration or impairment of its business, A-Pro's due process claim fails as a matter of law").

As the discussion of these cases also demonstrates, the degree of economic loss or harm (and maybe even the degree of unavoidable or unmitigated harm or loss) caused to Plaintiffs by the Amending Ordinance may be material to determining whether there is a protected property interest.

Regardless, for present purposes, Plaintiffs have shown a genuine issue of material fact that prevents finding that the City has established that Plaintiffs have not shown that they were deprived of an interest that the Due Course of Law protects and that therefore the City is entitled to judgment as a matter of law on this step of the analysis (and thus also on this claim).

Moving to the second step, the undersigned must at least acknowledge the elephant in the room: What, if anything, does the Due Course of Law Clause protect

outside of the protection afforded by its federal counterpart? As the concurrence in *Crown Distributing* discusses at length, *see* 647 S.W.3d at 664-81 (Young, J., concurring), that remains an open question: "the question of the due-course clause's definitive scope necessarily remained as open after *Patel* as it was before it," *id.* at 665.

And, while any legal uncertainty as to the reach of the Due Course of Law Clause may not prevent granting summary judgment, the material facts before the Court considered against the standards set out in *Patel* frame "how [it] should conduct the rational-basis test when the due-course clause applies." *Crown Distrib.*, 647 S.W.3d at 665 (Young, J., concurring). *Cf. City of S. Padre Island v. Surfvive*, No. 13-20-00536-CV, 2022 WL 2069216, at *6 (Tex. App. – Corpus Christi June 9, 2022, pet. filed) ("Whether an ordinance violates due course of law is a legal question, but 'the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties.'" (quoting *Patel*, 469 S.W.3d at 87; citing *City of San Antonio v. TPLP Off. Park Props.*, 218 S.W.3d 60, 65 (Tex. 2007) ("The trial court resolves disputed fact issues, but the ultimate question of whether an action or ordinance regulating property violates due process is a question of law." (citing, in turn, *Mayhew*, 964 S.W.2d at 932)))).

The standards in *Patel* were articulated while examining a statute that erected an economic barrier of entry into a chosen profession, but it has not been shown as a matter of law that *Patel*'s "whether the requirements of a statute as a whole are so burdensome as to be oppressive considering the governmental interest" standard

cannot apply outside the economic-barrier-of-entry context, to laws like the Amending Ordinance.

And the articulation of the *Patel* standard itself seems to contemplate the Court's weighing the competing interests of the litigants – to find "a constitutionally acceptable" balance – which would make this standard unlike those that apply to a federal substantive due process claim such that the Court does not necessarily face a pure legal question that may be resolved on summary judgment. *E.g.*, *Patel*, 469 S.W.3d at 90 ("The dividing line is not bright between the number of required but irrelevant hours that would yield a harsh, but constitutionally acceptable, requirement and the number that would not.").

And, insofar as Plaintiffs have a property interest protected by the Due Course of Law Clause even though they have continued to operate but nonetheless have submitted evidence of economic harm caused by the Amending Ordinance, there is a genuine issue of material fact that prevents granting summary judgment for the City as to the second step of the analysis (and thus also on this claim) at least to the extent of what degree of economic harm is "constitutionally acceptable" and when the degree of economic harm becomes "so burdensome as to be oppressive."

## Recommendation

The Court should grant in part and deny in part Defendant City of Dallas's Motion for Summary Judgment on all Plaintiffs' Claims [Dkt. No. 90].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these

findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: July 28, 2023

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE